WENDY J. OLSON, Bar No. 7634
wendy.olson@stoel.com
ALAINA HARRINGTON, Bar No. 11879
alaina.harrington@stoel.com
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone: 208.389.9000

LINDSAY C. HARRISON (*pro hac vice forthcoming*)
lharrison@jenner.com
JESSICA RING AMUNSON (*pro hac vice forthcoming*)
jamunson@jenner.com
SOPHIA W. MONTGOMERY (*pro hac vice forthcoming*)
smontgomery@jenner.com
RUBY C. GIAQUINTO (*pro hac vice forthcoming*)
rgiaquinto@jenner.com
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, D.C. 20001
Telephone: 202.639.6000

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD., <br><br> Plaintiff, <br><br> v. <br><br> RAÚL LABRADOR, Attorney General of the State of Idaho, <br><br> Defendant. | Case No. <br><br><br> **COMPLAINT** |

Plaintiff, by and through undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## PRELIMINARY STATEMENT

1.      Under federal law, hospitals that receive federal Medicare funds—like Plaintiff St. Luke's Health System, Ltd. (St. Luke's)—are required to provide necessary stabilizing treatment to patients who arrive at their emergency departments while experiencing a medical emergency. Under the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, if a person with an "emergency medical condition" seeks treatment at an emergency department at a hospital that accepts Medicare funds, the hospital must provide medical treatment necessary to stabilize that condition before transferring or discharging the patient. Crucially, "emergency medical conditions" under the statute include not just conditions that present risks to life but also those that place a patient's "health" in "serious jeopardy" or risk "serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part."

2.      In some circumstances, medical care that a state may characterize as an "abortion" is necessary emergency stabilizing care that hospitals are required to provide under EMTALA. Such circumstances may include, but are not limited to, severe preeclampsia and preterm premature rupture of membranes (PPROM). These conditions can sometimes threaten the life of the mother, but they can also cause severe consequences short of death, including loss of reproductive organs or fertility, sepsis, kidney failure, liver damage, stroke, brain damage, increased risk of future cardiovascular disease and heart failure, and severe pain.

3.      The State of Idaho has passed a near-absolute ban on the termination of a pregnancy.  Idaho Code § 18-622 makes it a felony to terminate pregnancy in all but extremely narrow circumstances.  The Idaho law makes it a criminal offense for medical providers to comply with EMTALA's requirement to provide stabilizing treatment, even where a doctor determines

that termination is the medical treatment necessary to prevent a patient from suffering severe health consequences, if the consequences are short of death.

4.       The law contains certain narrow exceptions, including, as relevant here, an exception permitting termination of pregnancy where "[t]he physician determine[s], in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the [mother's] death." Idaho Code § 18-622(2)(a)(i) (2023).[1] The law does not permit termination of pregnancy when necessary to stabilize other serious and debilitating health conditions. And, even in dire situations that might qualify for the Idaho law's limited "necessary to prevent the [mother's] death" exception, providers have no way of knowing if a prosecutor will agree that the exception applies, and so they may feel it necessary to withhold care based on a well-founded fear of criminal prosecution.

5.       Before Idaho Code § 18-622 went into effect, this Court preliminarily enjoined it to the extent that it conflicts with EMTALA. For two periods of time, that injunction was temporarily stayed. During those periods of time, St. Luke's saw firsthand how the conflict operated to prevent its physicians and other medical providers from providing the stabilizing care required by EMTALA to prevent severe risk to patients' health, and how the conflict thus impeded St. Luke's in its ability to properly treat patients. During those times, six different St. Luke's patients were airlifted to neighboring states so that they could have available to them the full range

---

[1] The law originally provided an affirmative defense requiring medical providers to prove that any abortion they provided or assisted with "was necessary to prevent the death of the pregnant woman" or that, before performing the abortion, the pregnant patient (or, in some circumstances, their parent or guardian) reported an "act of rape or incest" against the patient to a specified agency and provided a copy of the report. Idaho Code § 18-622(3). Idaho's legislature amended the law in 2023 to convert this affirmative defense to exceptions, including the "necessary to prevent the [mother's] death" exception described above.

of stabilizing care required by EMTALA. If the injunction were vacated, that conflict would arise again.

6.      To the extent Idaho's law prohibits medical providers from providing medically necessary treatment that EMTALA requires as emergency medical care, Idaho law directly conflicts with EMTALA. *See* 42 U.S.C. § 1395dd(f) (EMTALA preempts state laws "to the extent that the [state law] requirement directly conflicts with a requirement of this section"). To the extent Idaho's law renders compliance with EMTALA impossible or stands as an obstacle to the accomplishment of federal statutes and objectives, EMTALA preempts the Idaho law under the Supremacy Clause of the United States Constitution.

7.      In this action, Plaintiff seeks a declaratory judgment that Idaho's law is invalid under the Supremacy Clause and is preempted by federal law to the extent that it conflicts with EMTALA. Because the existing injunction could be vacated if the United States were to dismiss its related lawsuit, Plaintiff also seeks an order preliminarily and permanently enjoining Idaho's law to the extent it conflicts with EMTALA.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action under 28 U.S.C. § 1331.

9.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Defendant resides within this judicial district and because a substantial part of the acts or omissions giving rise to this action arose from events occurring within this judicial district.

10.     Pursuant to District of Idaho Local Civil Rule 3.1, venue is proper in the Southern Division because Defendant legally resides in Ada County, Idaho, and because that is where the claim for relief arose.

## PARTIES

11.     Plaintiff St. Luke's Health System, Ltd., is the largest Idaho-based, not-for-profit, community-owned and community-led health system. Its mission is to improve the health of people in the communities it serves. To fulfill that mission, St. Luke's operates hospitals, clinics, and other health facilities across Southwest and South-Central Idaho, including eight emergency departments. Nine trauma centers in Southwest and South-Central Idaho are designated Time Sensitive Emergency centers; St. Luke's operates six of them. St. Luke's employs more than 18,000 people and is the largest private employer in Idaho. St. Luke's medical providers treat patients millions of times each year, including over 740,000 hospital visits, 242,000 emergency department visits, and 2.2 million clinic visits in 2024 alone. Many of those patients are pregnant women: In 2023, St. Luke's helped welcome more than 8,920 newborns, representing 40% of live births in Idaho.[2] In 2024, St. Luke's helped welcome 9,455 newborns.

12.     St. Luke's is certified as a Medicare provider by the United States Department of Health and Human Services. Nearly a quarter of St. Luke's patients have Medicare coverage; if St. Luke's did not participate in Medicare, 144,200 people St. Luke's cared for in 2024 would have had to seek primary care, specialty clinic care, emergency care, and inpatient care alike elsewhere.

13.     Because St. Luke's participates in Medicare, it is required to comply with EMTALA. And because Idaho Code § 18-622 creates a direct conflict with EMTALA, it places hospitals, including the ones operated by St. Luke's, in the precarious position of risking the criminal liability and medical licenses of their providers simply for complying with federal law. Alternatively,

---

[2] Centers for Disease Control and Prevention, National Center for Health Statistics, National Vital Statistics System, Natality on CDC WONDER Online Database. Data are from the Natality Records 2016-2023, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program. Accessed at https://bit.ly/3ZE4rEh (last visited Dec. 20, 2024).

complying with § 18-622 risks violating EMTALA and the ability of St. Luke's to participate in Medicare. St. Luke's could also be subject to civil monetary penalties. And complying with § 18-622 also exposes St. Luke's to litigation by private plaintiffs, who may sue them under EMTALA's private right of action. 18 U.S.C. § 1395dd(d)(2). As a result, St. Luke's and its providers are faced with an irreconcilable conflict that compromises their ability to properly treat patients.

14.    Defendant Raúl Labrador is the Attorney General of the State of Idaho. He is sued in his official capacity. As Attorney General, he has the authority to enforce Idaho law, including the challenged criminal statute, and is a proper defendant. *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F. 4th 825, 843 (9th Cir. 2024); *Planned Parenthood of Idaho, Inc. v. Wasden,* 376 F.3d 908, 919-20 (9th Cir. 2004).[3]

15.    State attorneys general are proper defendants where they "intend[] either to enforce a statute or to 'encourage local law enforcement agencies to do so.'" *Culinary Workers Union, Loc. 226 v. Del Papa*, 200 F.3d 614, 618-619 (9th Cir. 1999) (quoting *Long v. Van de Kamp,* 961 F.2d 151, 152 (9th Cir. 1992)). The Attorney General has made clear, including through his July 1, 2024, letter, that he intends to "continue to enforce [§ 18-622] in the vast majority of circumstances."[4]

---

[3] In a separate case, the Idaho Boards of Medicine and Nursing stipulated that they will take no disciplinary action against a licensee pursuant to § 18-622 absent a criminal conviction. Joint Stipulation, *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, No. 23-cv-00142, ECF No. 182-1 (D. Idaho Dec. 18, 2024). The Attorney General's decision to bring a criminal case is therefore also a precondition to imposition of these deterrent licensure penalties.

[4] Raúl Labrador, *Labrador Letter: Idaho Is Committed to Protecting Life*, OFFICE OF THE ATTORNEY GENERAL (July 1, 2024). https://www.ag.idaho.gov/newsroom/labrador-letter-idaho-is-committed-to-protecting-life/.

## SUPREMACY OF FEDERAL LAW

### I.    The Supremacy Clause and Preemption

16.    The Supremacy Clause of the U.S. Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . , shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

17.    "[S]tates have no power . . . to retard, impede, burden, or in any manner control the operations of the Constitutional laws enacted by [C]ongress to carry into effect the powers vested in the national government." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819). "There is no doubt Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision," and a state law is invalid if it conflicts with such a provision. *Arizona v. United States*, 567 U.S. 387, 399 (2012). Likewise, a state law is invalid if compliance with the state and federal law is impossible or if the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

### II.    The Emergency Medical Treatment and Labor Act (EMTALA)

18.    Medicare, enacted in 1965 as Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, is a federally funded program, administered by the Secretary of the Department of Health and Human Services (HHS), that pays healthcare providers or insurers for healthcare services under certain circumstances.

19.    Medical providers' participation in Medicare is voluntary. When providers agree to participate in Medicare, they submit provider agreements to the Secretary of HHS. *See* 42 U.S.C. § 1395cc. Hospitals submitting such agreements agree that they will "adopt and enforce a

policy to ensure compliance with the requirements of [EMTALA] and to meet the requirements of [EMTALA]." *Id.* § 1395cc(a)(1)(I)(i).

20.     Under EMTALA, hospitals participating in Medicare are generally required to provide stabilizing healthcare to all patients who arrive at an emergency department suffering from an emergency medical condition. *See id.* § 1395dd.

21.     Specifically, EMTALA requires participating hospitals to "screen" patients who request treatment at the hospital's emergency department and provide "necessary stabilizing treatment," including an appropriate transfer to another facility that is able to provide stabilizing care not available at the originating hospital, for any "emergency medical condition" the hospital identifies. *Id.*

22.     The screening requirement necessitates that hospitals act "to determine whether or not an emergency medical condition" exists. *Id.* § 1395dd(a); *see also* 42 C.F.R. § 489.24(a) (noting that EMTALA requires "an appropriate medical screening examination within the capability of the hospital's emergency department").

23.     Congress defined an "emergency medical condition" in EMTALA as:

    (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-

        (i)     placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

        (ii)    serious impairment to bodily functions, or

        (iii)   serious dysfunction of any bodily organ or part …

    (B) with respect to a pregnant woman who is having contractions-

> (i)    that there is inadequate time to effect a safe transfer to another hospital before delivery, or
>
> (ii)    that transfer may pose a threat to the health or safety of the woman or the unborn child.

42 U.S.C. § 1395dd(e)(1).

24.    If the hospital determines an individual has an emergency medical condition, "the hospital must . . . either" (1) provide "further medical examination and such treatment as may be required to stabilize the medical condition," or (2) "transfer of the individual to another medical facility in accordance with" certain requirements. *Id.* § 1395dd(b)(1); *see also* 42 C.F.R. § 489.24(a)(1)(i)-(ii). The hospital may also "admit[] th[e] individual as an inpatient in good faith in order to stabilize the emergency medical condition." 42 C.F.R. § 489.24(d)(2)(i).

25.    EMTALA defines "to stabilize" to mean "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). The term "transfer" is defined to include "discharge" of a patient. *Id.* § 1395dd(e)(4).

26.    A hospital may not transfer (including by discharging) an individual with an emergency medical condition who has not been stabilized, unless, *inter alia*, the individual requests a transfer or a physician certifies that the benefits of a transfer to another medical facility outweigh the increased risks to the patient. *Id.* § 1395dd(c).

27.    In short, when an emergency medical condition exists, EMTALA requires participating hospitals to provide "stabilizing" treatment, as determined by the particular hospital's facilities and the treating physician's professional medical judgment.

28.     As relevant here, there are some pregnancy-related emergency medical conditions—including, but not limited to, severe preeclampsia and PPROM—for which a physician could determine that the necessary stabilizing treatment is care that could be deemed an "abortion" under Idaho law.  In that scenario, EMTALA requires the hospital to provide that stabilizing treatment.[5]

29.     EMTALA contains an express preemption provision, which preempts state laws "to the extent that the [state law] requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f).

## IDAHO'S ABORTION LAW

30.     In 2020, Idaho enacted a law that severely restricts abortions and threatens criminal prosecution against anyone who performs an abortion.  The law, codified at Idaho Code § 18-622, was initially set to take effect on August 25, 2022, 30 days after issuance of the judgment in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022).  *See* Idaho Code § 18-622(1)(a).

31.     This Court, however, preliminary enjoined § 18-622 on August 24, 2022—the day before the law was set to take effect. *United States v. Idaho*, 623 F. Supp. 3d 1096 (D. Idaho 2022) (No. 1:22-cv-329-BLW). After this Court denied reconsideration of its decision, the State of Idaho and intervenors, including Republican state legislators and the Idaho legislature, obtained a stay

---

[5] *See* Dep't of Health and Human Servs., *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, CENTERS FOR MEDICARE & MEDICAID SERVICES (July 11, 2022), https://www.cms.gov/files/document/qso-22-22-hospitals.pdf; *see also Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, CENTERS FOR MEDICARE & MEDICAIDSERVICES (Sept. 17, 2021), https://www.cms.gov/files/document/qso-21-22-hospital.pdf; *Biden-Harris Administration Reaffirms Commitment to EMTALA Enforcement*, DEPARTMENT OF HEALTH & HUMAN SERVICES (July 2, 2024), https://www.hhs.gov/about/news/2024/07/02/biden-harris-administration-reaffirms-commitment-emtala-enforcement.html.

of the preliminary injunction from the United States Court of Appeals for the Ninth Circuit on September 28, 2023. *United States v. Idaho*, 83 F.4th 1130 (9th Cir. 2023). Days later, on October 10, 2023, the Ninth Circuit granted rehearing *en banc* and vacated the panel decision granting the stay. *United States v. Idaho*, 82 F.4th (9th Cir. 2023). Shortly thereafter, on January 5, 2024, upon request by Idaho and the intervenors, the United States Supreme Court reinstated the stay of the district court's preliminary injunction, treated the stay request as a petition for certiorari before judgment, and granted that petition. *Idaho v. United States*, 144 S. Ct. 541 (2024) (mem.); *Moyle v. United States*, 144 S. Ct. 540 (2024) (mem.). Several months later, however, on June 27, 2024, the Supreme Court dismissed the writs of certiorari as improvidently granted and vacated the stay of the injunction. *Moyle v. United States*, 144 S. Ct. 2015 (2024) (mem.). As a result, Idaho's abortion law was briefly in full effect without any limiting injunction in place allowing providers to comply with EMTALA between September 28 and October 10, 2023, and again between January 5 and June 27, 2024. Since then, the *en banc* Ninth Circuit has heard argument on the appeal of the preliminary injunction, which is again in place, but has yet to issue a decision.

32.     Under Idaho's abortion law, "[e]very person who performs or attempts to perform an abortion . . . commits the crime of criminal abortion." *Id.* § 18-622(1). The crime of "criminal abortion" is a felony, punishable by two to five years imprisonment. *Id.*

33.     Idaho's law also requires that "[t]he professional license of *any* health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense." *Id.* (emphasis added).

34.     The Idaho law defines "[a]bortion" to mean "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." *Id.* § 18-604(1).

35.     The criminal prohibition in Idaho's law contains an exception for when abortion is necessary to prevent the pregnant patient's death, but there is no exception applicable in circumstances where an abortion is necessary to ensure the health of the pregnant patient—even where the patient faces serious medical jeopardy or permanent impairment or disability.

36.     Thus, the mere act of terminating a pregnancy in an emergency scenario could subject a provider to criminal prosecution. Physicians cannot be sure that prosecutors will not second-guess their "good faith medical judgments" that termination was necessary to prevent the death of a pregnant patient. *Id.* § 18-622(2)(a)(i). Indeed, both Idaho's Supreme Court and counsel for Idaho before the United States Supreme Court have acknowledged that Idaho prosecutors are free to—and very well may—do precisely that. *See Planned Parenthood Great Nw. v. Idaho*, 522 P.3d 1132, 1204 (Idaho 2023) ("Of course, a prosecutor may attempt to prove that the physician's subjective judgment … was not made in 'good faith' by pointing to other medical experts on whether the abortion was, in their expert opinion, medically necessary."); Tr. of Oral Arg. 29, *Moyle*, 144 S. Ct. 2015, https://tinyurl.com/55h456n7 (hereinafter "Tr. of Oral Arg.") (Justice Barrett: "What if the prosecutor thought, well, I don't think any good-faith doctor could draw that conclusion, I'm going to put on my expert?" Idaho's Counsel: "[T]hat, Your Honor, is the nature of prosecutorial discretion, and it may result in ... a case."); *see also* Tr. of Oral Arg. at 31-32 (Justice Alito: "I would think that the concept of good-faith medical judgment must take into account some objective standards .... That was how I interpreted what the—what the state supreme

court said."). And if a prosecutor *does* second-guess the physician's good-faith judgment, an accused physician must litigate their subjective judgment and bear the associated expense, uncertainty, and risk of imprisonment and license suspension.

37.    In addition, it is a requirement for the "necessary to prevent the [mother's] death" exception that the physician "performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman." *Id.* § 18-622(2)(a)(ii).

## IDAHO'S ABORTION LAW CONFLICTS WITH EMTALA.

38.    St. Luke's conscientiously complies with Medicare requirements and operates eight emergency departments, including six Time Sensitive Emergency departments.

39.    Idaho's criminal prohibition of all abortions, with narrow exceptions, conflicts with EMTALA. Idaho's criminal prohibition extends even to abortions that a physician determines are necessary stabilizing treatment that must be provided under EMTALA.

40.    In particular, EMTALA's definition of an emergency medical condition—for which St. Luke's would be required to facilitate stabilizing treatment—is broader than just those circumstances where treatment is "necessary to prevent . . . death" under Idaho law. For example, EMTALA requires stabilizing treatment where "the health" of the patient is "in serious jeopardy," or where continuing a pregnancy could result in a "serious impairment to bodily functions" or a "serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A)(i)-(iii). Idaho has criminalized terminating a pregnancy in those circumstances, even when a physician has

determined that is the necessary stabilizing treatment for a patient's emergency medical condition. The Idaho law therefore conflicts with federal law and is, in this respect, preempted.

41.     The Idaho law also conflicts with EMTALA because the only limited protection it affords for even life-saving terminations is a narrow exception that potentially requires physicians to litigate the line between life-saving care and care that is only necessary for the health of a patient. Idaho's law subjects every provider and employee who performs or assists in terminating a pregnancy to potential loss of their professional license unless, as relevant here, that abortion was "necessary to prevent . . . death"—and not only necessary to preserve the health of the pregnant patient. The Idaho law will deter St. Luke's physicians from terminating pregnancies even when they have determined that care is medically necessary and thus must be provided under federal law. This is true even in the limited situations in which terminating the pregnancy was in fact "necessary to prevent . . . death," because physicians may fear that prosecutors or jurors will not agree that the circumstances fit into this narrow exception.  Here, the law's obvious chilling effect on providers' willingness to provide care, even when that care is determined to be a necessary medical treatment, is itself an impediment to the accomplishment of EMTALA's goal of ensuring that patients receive emergency care.  The Idaho law is therefore preempted.

### IDAHO'S ABORTION LAW CAUSES INJURY TO ST. LUKE'S, PUBLIC HEALTH, AND FEDERAL INTERESTS.

42.     The Idaho abortion law was initially set to become effective on August 25, 2022; it is currently subject to a preliminary injunction.

43.     Following the Supreme Court's decision in *Dobbs*, the Governor of Idaho issued a press release stating that "Idaho has been at the forefront of enacting new laws" to restrict abortion, and specifically referencing § 18-622 as a bill that the Governor "signed into law" and "will go

into effect later this summer."[6] The Attorney General has also recently reaffirmed his view that "*Dobbs* clearly allowed states to protect the sanctity of life for unborn children" by enacting laws like § 18-622, and made clear that he intends to "enforce [§ 18-622] in the vast majority of circumstances" in accordance with his understanding of the limitations in place "*while the litigation continues*."[7]

44.    If the preliminary injunction issued in *United States v. Idaho* is no longer in place and the law goes into full effect, St. Luke's providers will once again immediately be subject to the threat of arrest, imprisonment, criminal liability, and loss of license for providing federally required care, and St. Luke's will immediately be at risk of losing its Medicare funding and facing civil litigation and liability.

45.    Severe harm will result from Idaho's law, which violates the Supremacy Clause. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366-67 (1989) (assuming that irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of . . . the express constitutional prescription of the Supremacy Clause" (citation omitted)).

> **I.    Idaho's Abortion Law Sharply Curtails the Ability of St. Luke's to Properly Care for Patients and thus Threatens Severe Public Health Consequences.**

46.    If Idaho's abortion law takes effect without a limiting injunction, St. Luke's medical providers will be threatened with prosecution under a state law that prohibits them from providing

---

[6] Press Release, Gov. Little Comments on SCOTUS Overrule of Roe v. Wade, Office of the Governor (June 24, 2022), https://gov.idaho.gov/pressrelease/gov-little-comments-on-scotus-overrule-of-roe-v-wade/.

[7] Raúl Labrador, *Labrador Letter: Idaho Is Committed to Protecting Life*, OFFICE OF THE ATTORNEY GENERAL (July 1, 2024), https://www.ag.idaho.gov/newsroom/labrador-letter-idaho-is-committed-to-protecting-life/ (emphasis added).

necessary stabilizing medical treatment required by EMTALA. St. Luke's medical providers will be faced with an untenable choice—either to withhold critical stabilizing treatment required under EMTALA or to risk criminal prosecution and potential loss of their professional licenses.

47.    If St. Luke's medical providers faced with this conflict choose the path that risks violating § 18-622, St. Luke's in turn risks losing its medical providers, hampering its ability to properly treat patients. If instead St. Luke's medical providers choose to violate EMTALA, St. Luke's may lose its Medicare funds—which would also jeopardize its ability to properly care for patients—or face civil liability and litigation brought by patients.

48.    More fundamentally, this conflict hampers the ability of St. Luke's to fulfill its mission of improving the health of people in the communities it serves because patients will suffer—including by losing access to necessary healthcare that is guaranteed under federal law or having their care delayed. Such delay may arise when physicians and non-physician attorneys must debate whether termination of a pregnancy is truly "necessary to prevent the death" of the patient or "only" necessary to avert a serious but non-lethal threat to the patient's health. Or delay may arise when providers wait to provide medically necessary treatment until the patient is close to death to avoid prosecution, even though the provider understands that the condition will likely worsen and even though the patient suffers in the meantime.

49.    Particularly in emergency circumstances, or when dealing with considerations of risk to an individual's life or health, delayed healthcare can pose serious harms and is exactly what EMTALA's requirements are designed to prevent. In short, the Idaho law compromises the ability of St. Luke's to provide medical care to its community and threatens severe public health consequences, including irreversible damage to the health of a pregnant patient in some instances, and in other cases could lead to death.

50.     The Idaho law will prevent St. Luke's medical providers from giving their pregnant patients necessary treatment required by EMTALA notwithstanding the Idaho law's exception for abortions "necessary to prevent the death of the pregnant woman."  Idaho Code § 18-622(2)(a)(i). Because that exception applies only under narrow circumstances, the law still subjects St. Luke's medical providers to the threat of criminal prosecution and potential loss of license for performing a life-saving abortion.  And even the exception does not allow for termination in emergency situations where pregnancy can reasonably be expected not to lead to death but to place the health of the pregnant patient in serious jeopardy, seriously impair the pregnant patient's bodily functions, or cause serious dysfunction of any bodily part or organ.

51.     These harms are not hypothetical. In all of 2023, during the periods when the injunction was in place prohibiting enforcement of Idaho's law to the extent it conflicts with EMTALA, only one pregnant patient presenting to St. Luke's with a medical emergency was airlifted out of state for care. Yet in the two short periods of time when Idaho's new abortion law was in effect without any limiting injunction, *six* pregnant St. Luke's patients with medical emergencies were transferred out of state for care that could include termination of their pregnancy. One patient presented with hypertensive disorder—i.e., severe preeclampsia—which occurs when a woman with previously normal blood pressure suddenly develops high blood pressure and protein in the urine or other problems such as impaired liver function or low platelet count after 20 weeks of gestation; if her blood pressure cannot be reduced, the patient can suffer severe liver failure, renal dysfunction, cerebral hemorrhage, and eventually, death. The other patients presented with PPROM—i.e., spontaneous rupture of the membrane containing a fetus before 22 weeks of gestation. PPROM too can be a life-threatening condition with high risk of infection, sepsis, and bleeding from placental abruption; the standard of care for PPROM includes termination. Prior to 22 weeks of

gestation, a neonatal intensive care unit would not even attempt to resuscitate, as the fetus could not survive. But neither of these conditions—preeclampsia or PPROM—*always* requires termination of pregnancy to prevent the death of the mother.

52.     The St. Luke's medical providers treating these patients when the law was in full effect faced a terrible choice: they could either wait until the risks to the patient's health became life-threatening, or they could transfer the patient out of state. The first option was medically unsound and dangerous because the conditions that patients experienced could cause serious health complications if untreated, including systemic bleeding, liver hemorrhage and failure, kidney failure, stroke, seizure, and pulmonary edema. Moreover, watching a patient suffer and deteriorate until death is imminent is intolerable to most medical professionals.

53.     Accordingly, under the circumstances, these patients were transferred out of state. Of course, airlifting patients also puts patients at risk due to significant delays in care while arranging medical transport out of state. And those delays could create a situation where the patient is no longer stable enough that the benefits of transfer outweigh the risks, again leaving St. Luke's medical providers to wait until termination is necessary to prevent the patient's death—even while knowing that the wait could have severe health consequences, including damage to the patient's future reproductive health. As a result, St. Luke's physicians described a constant fear that patients would present in an emergency room who were not stable enough to transfer, yet the medically indicated stabilizing care—termination—could not be provided because it was not yet needed to prevent the patient's death.

54.     Airlifting these patients was the medically appropriate course of action to avoid a conflict between the stabilizing treatment required by federal law and Idaho's law. Notwithstanding Idaho's limited exception to prevent the death of the patient, the law does not permit termination

where necessary to otherwise stabilize the patient's health. In those situations, if a patient has no option but to continue their pregnancy, they will suffer—potentially gravely. The conditions that call for termination can be extremely painful. If untreated, they can cause serious health complications, including systemic bleeding, liver hemorrhage and failure, kidney failure, stroke, seizure, pulmonary edema, and more. And when the Idaho law was temporarily in effect, it was patients with wanted pregnancies who had to make the heart-wrenching decision to terminate to avoid these complications—including, in some cases, to preserve their future ability to have children.

## II.    Idaho's Law Interferes with EMTALA Obligations under the Federal Medicare Program.

55.    As discussed above, Idaho's abortion law directly conflicts with the important federal policy reflected in EMTALA, 42 U.S.C. § 1395dd, through which Congress codified a guarantee of necessary stabilizing medical treatment for patients with emergency medical conditions, including pregnant patients, who seek care at emergency departments. *See id.* § 1395dd(a), (b), (e)(1), (g).

56.    Congress intended EMTALA to govern nationwide in every hospital that accepts Medicare funds, as confirmed by its express preemption of conflicting state laws. *Id.* § 1395dd(f). Idaho's law frustrates Congress's objective of guaranteeing nationwide emergency medical care at Medicare hospitals like St. Luke's, because Idaho law prohibits a particular form of medical treatment—even when that treatment is necessary to stabilize a patient experiencing an emergency medical condition. The federal government has a strong sovereign interest in ensuring that states do not disrupt the federal objectives embodied in EMTALA, particularly when states seek to hold medical providers criminally liable for providing stabilizing emergency treatment required under federal law.

57.    The federal government has an interest in protecting the integrity of the funding it provides under Medicare and ensuring that hospitals who are receiving Medicare funding will not refuse to provide stabilizing treatment to patients experiencing medical emergencies.  From 2019 to 2020, HHS paid approximately 74 million dollars for emergency department care in Idaho hospitals enrolled in Medicare.  A condition of hospitals' enrollment in Medicare is that they agree to comply with EMTALA.  *See id.* § 1395cc(a)(1)(I)(i).  Thus, part of the United States' bargain when it agrees to provide Medicare reimbursement to hospitals is that those hospitals will, in return, provide all forms of stabilizing treatment to emergency department patients, consistent with EMTALA.

58.    Idaho's law prevents the United States from receiving the benefit of its bargain, however, by affirmatively prohibiting Idaho hospitals from complying with certain obligations under EMTALA.  Thus, Idaho's law undermines the overall Medicare program and the funds that the United States provides in connection with that program, by precluding the United States from receiving one of the benefits to which it is entitled under the Medicare program.

59.    Idaho's law also improperly interferes with the United States' pre-existing agreements with hospitals under Medicare.  Under these agreements, each hospital (including St. Luke's) must certify that it "agrees to conform to the provisions of section 1866 of the Social Security Act and applicable provisions in 42 CFR," CMS Form 1561, and those referenced provisions likewise include obligations to comply with EMTALA.[8]

60.    Approximately 48 hospitals in Idaho have signed Medicare agreements, and approximately 40 of those hospitals have emergency departments that must comply with

---

[8] DEP'T OF HEALTH & HUMAN SERVS., HEALTH INSURANCE BENEFIT AGREEMENT, https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1561.pdf.

EMTALA—including the 8 emergency departments operated by St. Luke's. Compliance with Idaho's law would force these hospitals to violate their agreements with the United States because Idaho criminalizes the provision of stabilizing medical services required by EMTALA, and thus Idaho's law likewise interferes with the United States' interests.

61.     Waiting for patients to sue St. Luke's or St. Luke's medical providers would likely have significant negative consequences on public health, including because such actions could be pursued only after St. Luke's or its medical providers had first denied emergency care to an individual in need.  Meanwhile, St. Luke's would continue to be constrained in its ability to care for patients, who would be denied important medical care, resulting in needless suffering, long-term disability, and even loss of life.  St. Luke's and its medical providers should not be placed in the untenable position of risking criminal prosecution under state law or subjecting themselves to enforcement actions under federal law.  And  pregnant patients who arrive at an emergency department  are  entitled  to  the  stabilizing  emergency  care  ensured  under  federal  law  when experiencing emergency medical conditions.

62.     The law likewise stands as an obstacle to Congress's goal of ensuring that patients receive effective emergency care by threatening the professional license of *any* healthcare professional who "assists" in performing or attempting to perform an abortion.  Idaho Code § 18-622(2).  In particular, the law threatens a six-month suspension of the license of any healthcare professional who assists in an abortion or, on a second offense, threatens to permanently bar these providers from their professional practice.  A pregnant patient who arrives in a St. Luke's emergency department with an emergency condition is likely to encounter not just emergency department physicians but also triage nurses, scrub nurses, lab techs, radiologists, anesthesiologists, and others whose role in any procedure could constitute "assisting" in the performance of an abortion.  By

threatening the license of other hospital employees whose care is critical to providing emergency department care, Idaho's law impedes EMTALA's goal of ensuring that patients receive effective emergency care.

## CLAIMS FOR RELIEF

### Count I: Equitable Relief

63.     Plaintiff hereby incorporates paragraphs 1 through 62 as if fully set forth herein.

64.     The Supreme Court has recognized an equitable cause of action exists allowing suit "to enjoin unconstitutional actions by state and federal officers," which is a "creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

65.     The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . .any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

66.     EMTALA expressly preempts state laws "to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). Idaho Code § 18-622 violates the Supremacy Clause and is preempted to the extent it is contrary to EMTALA.

67.     The law imposes requirements that are contrary to EMTALA and impedes the accomplishment and execution of the full purposes and objectives of federal law and is therefore preempted.

68.     The Idaho law therefore violates the Supremacy Clause and is preempted under federal law to the extent that it conflicts with EMTALA.

**Count II: Declaratory Relief**

69.     Plaintiff hereby incorporates paragraphs 1 through 68 as if fully set forth herein.

70.     For the reasons above, Idaho Code § 18-622 violates the Supremacy Clause and is preempted under federal law to the extent that it conflicts with EMTALA and thereby subjects Plaintiff to dueling injuries: St. Luke's can either comply with Idaho law and face civil liability, *see* 42 U.S.C. § 1395dd(d)(2), or a loss of Medicare funding, *see id.* § 1395cc(a)(1)(I)(i), or it can direct its providers to comply with EMTALA, exposing them to criminal liability and, by extension, itself to staffing shortages that would hamper its ability to provide care and recoup costs of doing so.

71.     With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

72.     This Court can and should exercise its equitable power to enter a declaration stating that Idaho Code § 18-622 violates the Supremacy Clause and is preempted, and therefore invalid, to the extent that it conflicts with EMTALA; and that Defendant may not enforce the law based on providers' termination of any pregnancy to stabilize an emergency medical condition within the scope of EMTALA.

**PRAYER FOR RELIEF**

WHEREFORE, St. Luke's Health System respectfully requests the following relief:

   a.   A declaratory judgment stating that Idaho Code § 18-622 violates the Supremacy Clause and is preempted and therefore invalid to the extent that it conflicts with EMTALA;

   b.   A declaratory judgment stating that Defendant may not initiate a prosecution against, seek to impose any form of liability on, or attempt to revoke the professional license of any

medical provider based on that provider's termination of any pregnancy to stabilize an emergency medical condition within the scope of EMTALA;

c.  A preliminary and permanent injunction against Defendant's enforcement of Idaho Code § 18- 622 to the extent that it conflicts with EMTALA;

d.  Any and all other relief necessary to fully effectuate the injunction against Idaho Code § 18-622's enforcement to the extent it conflicts with EMTALA;

e.  Plaintiff's costs in this action; and

f.  Any other relief that the Court deems just and proper.

DATED: January 14, 2025               STOEL RIVES LLP


                                      /s/ Wendy J. Olson
                                      Wendy J. Olson
                                      Alaina Harrington


                                      JENNER & BLOCK LLP


                                      /s/ Lindsay C. Harrison
                                      Lindsay C. Harrison
                                      Jessica Ring Amunson
                                      Ruby C. Giaquinto
                                      Sophia W. Montgomery

                                      Attorneys for Plaintiff