WENDY J. OLSON, Bar No. 7634
wendy.olson@stoel.com
ALAINA HARRINGTON, Bar No. 11879
alaina.harrington@stoel.com
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID  83702
Telephone:  208.389.9000

LINDSAY C. HARRISON (*pro hac vice forthcoming*)
lharrison@jenner.com
JESSICA RING AMUNSON (*pro hac vice forthcoming*)
jamunson@jenner.com
SOPHIA W. MONTGOMERY (*pro hac vice forthcoming*)
smontgomery@jenner.com
RUBY C. GIAQUINTO (*pro hac vice forthcoming*)
rgiaquinto@jenner.com
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, D.C. 20001
Telephone:  202.639.6000

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD., | Case No. 1:25-cv-00015-DKG |
| Plaintiff, | **MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| RAÚL LABRADOR, Attorney General of the State of Idaho, | |
| Defendant. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................................ii

INTRODUCTION ....................................................................................................................1

BACKGROUND .....................................................................................................................2

I.      The Emergency Medical Treatment and Labor Act (EMTALA) .................................2

II.     Idaho Code § 18-622 .......................................................................................................4

III.    Procedural Background ....................................................................................................5

        a.      Initial Injunction in *United States v. Idaho* ......................................................5

        b.      Motion for Reconsideration ...............................................................................6

        c.      Injunction on Appeal .........................................................................................7

IV.     St. Luke's .........................................................................................................................7

STANDARD OF REVIEW .....................................................................................................10

ARGUMENT ...........................................................................................................................11

I.      St. Luke's is Likely to Succeed in Demonstrating that EMTALA Preempts Idaho's
        Abortion Law ...................................................................................................................11

        a.      Idaho's Abortion Ban Conflicts with EMTALA .............................................11

        b.      The Conflict Between Federal and State Law Has Not Changed Since This
                Court Initially Enjoined § 18-622 .....................................................................14

II.     The Remaining Factors Support Entry of a Preliminary Injunction .............................19

CONCLUSION .........................................................................................................................20

## TABLE OF AUTHORITIES

CASES

*AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682 (9th Cir. 2022) .......................................11

*Arizona v. United States*, 567 U.S. 387 (2012) ..............................................................................14

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015)......................................18

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) ................................. 13-14, 16

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2020) ..................................................19

*Draper v. Chiapuzio*, 9 F.3d 1391 (9th Cir. 1993) (per curiam)...............................................3, 13

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024)..................................................18

*Hardy v. New York City Health & Hospital Corp.*, 164 F.3d 789 (2d Cir. 1999) ..........................3

*Harry v. Marchant*, 291 F.3d 767 (11th Cir. 2002) .........................................................................3

*Moyle v. United States*, 144 S. Ct. 2015 (2024) (per curiam)..............................................7, 16, 19

*Moyle v. United States*, 144 S. Ct. 540 (2024)..................................................................................7

*Planned Parenthood Great Northwest v. State*, 522 P.3d 1132 (Idaho 2023)....................6, 13, 15

*Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, Kentucky v.
Labrador*, 122 F.4th 825 (9th Cir. 2024) .................................................................................19

*Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781 (9th Cir. 2001) ......................................20

*United States v. Idaho*, 623 F. Supp. 3d 1096 (D. Idaho 2022)...........................................5, 6, 11

*United States v. Idaho*, 82 F.4th 1296 (9th Cir. 2023)......................................................................7

*United States v. Idaho*, 83 F.4th 1130 (9th Cir. 2023), *vacated on reh'g*, 82 F.4th
1296 (9th Cir. 2023) (*en banc*) ..................................................................................................7

*United States v. Idaho*, No. 22-cv-00329, 2023 WL 3284977 (D. Idaho May 4,
2023) ..........................................................................................6, 7, 11, 13, 14, 15

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) ........................................................19

*Vargas ex rel. Gallardo v. Del Puerto Hospital*, 98 F.3d 1202 (9th Cir. 1996)...........................13

**STATUTES**

42 U.S.C. § 1395cc(a)(1)(I)(i) ................................................................................18

42 U.S.C. § 1395dd(a) ..............................................................................................2

42 U.S.C. § 1395dd(b)(1) ..........................................................................................2

42 U.S.C. § 1395dd(b)(2) ..........................................................................................3

42 U.S.C. § 1395dd(c)(1)(A)(ii) ................................................................................3

42 U.S.C. § 1395dd(d)(2) ....................................................................................9, 18

42 U.S.C. § 1395dd(e)(1) ..........................................................................................2

42 U.S.C. § 1395dd(e)(1)(A) ...................................................................................18

42 U.S.C. § 1395dd(e)(1)(A)(i) .................................................................................3

42 U.S.C. § 1395dd(e)(1)(A)(ii) ...............................................................................3

42 U.S.C. § 1395dd(e)(1)(A)(iii) ..............................................................................3

42 U.S.C. § 1395dd(e)(3)(A) ...............................................................................3, 12

42 U.S.C. § 1395dd(e)(4) ..........................................................................................3

42 U.S.C. § 1395dd(f) .............................................................................................13

Idaho Code § 18-604(1) .............................................................................................4

Idaho Code § 18-622(1) (2023) .................................................................................4

Idaho Code § 18-622(2) (2022) .................................................................................4

Idaho Code § 18-622(2)(a) (2023) ..........................................................................16

Idaho Code § 18-622(2)(a)(i) (2023) ........................................................................5

Idaho Code § 18-622(2)(a)(ii) (2023) ..................................................................5, 13

Idaho Code § 18-622(3) (2023) .................................................................................4

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 99-241, pt. 1 (1985), *as reprinted in* 1986 U.S.C.C.A.N. 579 ................................3

**OTHER AUTHORITIES**

42 C.F.R. § 489.24(a)(1)(i) ................................................................................................2

42 C.F.R. § 489.24(a)(1)(ii) ...............................................................................................2

42 C.F.R. § 489.24(d)(2)(i) .................................................................................................3

Brief for Respondent United States, *Moyle v. United States*, 144 S. Ct. 2015
    (2024), 2024 WL 1298046 ......................................................................................17

Idaho Hosp. Ass'n, A Guide to Idaho's Community Hospitals (2025 ed.),
    https://tinyurl.com/54p55ah3 ................................................................................8

Joint Stipulation, *Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana,
    Kentucky v. Labrador*, No. 23-cv-00142, ECF No. 182-1 (D. Idaho Dec. 18,
    2024) .......................................................................................................................19

Transcript of Oral Argument, *Moyle v. United States*, 144 S. Ct. 2015 (2024),
    https://tinyurl.com/55h456n7 ..........................................................................15, 17

Vital Statistics Cooperative Program. Accessed at https://bit.ly/3ZE4rEh (last
    visited Jan. 13, 2025) ..............................................................................................8

## INTRODUCTION

In *United States v. Idaho*, this Court enjoined the State of Idaho from enforcing its Defense of Life Act, Idaho Code § 18-622, as it applies to medical care required by the Emergency Medical Treatment and Labor Act (EMTALA). The request of Plaintiff St. Luke's Health System, Ltd., in this Motion is modest: it seeks an injunction identical to the one already in effect in *United States v. Idaho*, except that it would run against Idaho's Attorney General, Raúl Labrador, and his officers, employees, and agents.

It is widely anticipated that after the change in presidential administration on January 20, 2025, the United States will seek to vacate the injunction currently in effect and dismiss its complaint in *United States v. Idaho*. St. Luke's, its employees, and its patients will be immediately and irreparably harmed if Idaho's law goes into effect without a limiting injunction allowing emergency room providers to comply with EMTALA. Indeed, they already experienced such harm during the months this Court's injunction was stayed earlier this year. In that brief period when this Court's injunction was not in effect, St. Luke's—a not-for-profit health system that operates, among other facilities, eight emergency departments in Southwest and South-Central Idaho—was forced to transport six pregnant patients out of state due to the conflict between its medical providers' obligations under federal and state law. This uncertainty will reign again if the preliminary injunction this Court granted in *United States v. Idaho* is lifted.

With respect to the conflict between state and federal law, the legal landscape has not changed since this Court first entered a preliminary injunction. As the Court determined in denying Idaho's Motion for Reconsideration in the *United States v. Idaho* litigation, the Idaho Supreme Court's clarification of § 18-622's sweep did not bring the statute into alignment with federal law. Nor did the subsequent changes to the statute made by the Idaho Legislature, which were minimal

and partially redundant of the Idaho Supreme Court's ruling. Finally, the United States did not change the legal landscape by merely confirming in the course of litigation that EMTALA does not require abortion as stabilizing care in certain situations, such as after viability.

If the arguments and facts that follow seem familiar, it is because they are: with no material factual or legal changes to contend with, the Court can enter the injunction without hesitation.

## BACKGROUND

### I.    The Emergency Medical Treatment and Labor Act (EMTALA)

This Court is already familiar with the background of this matter. As the Court is aware, under EMTALA, when a patient arrives at an emergency department and requests treatment, the hospital must provide an appropriate medical screening examination "to determine whether or not an emergency medical condition" exists. 42 U.S.C. § 1395dd(a); *see also* 42 C.F.R. § 489.24(a)(1)(i). Congress defined an "emergency medical condition" as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
> > (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
> > (ii) serious impairment to bodily functions, or
> > > (iii) serious dysfunction of any bodily organ or part …
>
> (B) with respect to a pregnant woman who is having contractions—
> > (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or
> > (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.

42 U.S.C. § 1395dd(e)(1). If a hospital determines that an individual has an emergency medical condition, "the hospital must provide either (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility in accordance with" certain requirements. *Id.* § 1395dd(b)(1); *see also* 42 C.F.R. § 489.24(a)(1)(ii). The hospital may also

"admit[] th[e] individual as an inpatient in good faith in order to stabilize the emergency medical condition." 42 C.F.R. § 489.24(d)(2)(i). Under EMTALA, "to stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). "[T]ransfer" is defined to include discharge of a patient. *Id.* § 1395dd(e)(4). A hospital satisfies its obligations under EMTALA if, after being informed of the risks and benefits of treatment, the patient (or the patient's representative) does not consent to the treatment. *Id.* § 1395dd(b)(2).

In short, EMTALA requires that hospitals offer stabilizing treatment where "the health" of the patient is "in serious jeopardy," or where a condition could result in a "serious impairment to bodily functions" or a "serious dysfunction of any bodily organ or part." *Id.* § 1395dd(e)(1)(A)(i)-(iii). The hospital may also "transfer" such an individual, but only if, as relevant here, the medical benefits of the transfer outweigh the risks. *Id.* § 1395dd(c)(1)(A)(ii).

EMTALA contains an express preemption provision, preserving state laws "except to the extent that the requirement directly conflicts with a requirement of this section." *Id.* § 1395dd(f). The intent of this provision was to preserve "stricter state laws," i.e., state laws requiring emergency care beyond what EMTALA mandates. H.R. Rep. No. 99-241, pt. 1, at 4 (1985), *as reprinted in* 1986 U.S.C.C.A.N. 579, 582; *Harry v. Marchant*, 291 F.3d 767, 773-74 (11th Cir. 2002). For purposes of EMTALA, "[a] state statute directly conflicts with federal law in either of two cases: first, if 'compliance with both federal and state regulations is a physical impossibility,' or second, if the state law is 'an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993) (per curiam) (citations omitted); *accord Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999).

## II.    Idaho Code § 18-622

In 2020, Idaho enacted a law that severely restricts abortion and threatens criminal prosecution against anyone who performs the procedure. Under § 18-622, both as originally enacted and as later amended, "[e]very person who performs or attempts to perform an abortion ... commits the crime of criminal abortion," a felony punishable by two to five years imprisonment. Idaho Code § 18-622(2) (2022); § 18-622(1) (2023). The law also requires that "[t]he professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense." *Id.* § 18-622(1) (2023). Idaho law defines "[a]bortion" to mean "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." *Id.* § 18-604(1).

As originally enacted, Idaho's law did not contain any exceptions. *See id.* § 18-622(2) (2022). The termination of a pregnancy—in *any* scenario—would subject providers to criminal prosecution and require them to assert one of the law's "affirmative defense[s]" at trial. *Id.* § 18-622(3).

The Idaho legislature amended § 18-622, effective July 1, 2023. As relevant here, the law's affirmative defense became an exception to liability. A physician may now determine, "in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman," and may "perform[] or attempt[] to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive,

unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman." *Id.* § 18-622(2)(a)(i)-(ii) (2023).

## III.    Procedural Background

### a.    Initial Injunction in *United States v. Idaho*

The United States filed suit against Idaho to enjoin the State from enforcing § 18-622 insofar as it prohibits the stabilizing care that EMTALA requires. On August 24, 2022, this Court enjoined "the State of Idaho, including all of its officers, employees, and agents" from enforcing § 18-622 "as applied to medical care required by [EMTALA]." *United States v. Idaho*, 623 F. Supp. 3d 1096, 1117 (D. Idaho 2022). Specifically, the Court barred the initiation of criminal proceedings against "any medical provider or hospital based on their performance of conduct that ... is defined as an 'abortion' under" Idaho law, "but that is necessary to avoid, (i) 'placing the health of' a pregnant patient 'in serious jeopardy'; (ii) a 'serious impairment to bodily functions' of the pregnant patient; or (iii) a 'serious dysfunction of any bodily organ or part' of the pregnant patient." *Id.*

This Court held that, in some circumstances, "it is impossible to comply with both statutes." *Id.* at 1109. "[W]hen pregnant women come to a Medicare-funded hospital with an emergency medical condition" that seriously threatens their health, EMTALA obligates the hospital to provide stabilizing treatment, which sometimes includes "abortion care." *Id.* But § 18-622 would allow pregnancy termination only when "*necessary* to prevent the patient's death." *Id.* The Court explained that EMTALA's requirement to provide care is "broader" than § 18-622's necessary-to-prevent-death exception on "two levels": EMTALA requires care (i) "to prevent injuries that are more wide-ranging than death," and (ii) "when the patient could 'reasonably be expected' to suffer injury." *Id.*

Relying on declarations of medical experts, this Court found that pregnancy termination can be the EMTALA-required stabilizing treatment for several emergency conditions in circumstances where that treatment would be a felony under Idaho law. Those conditions include:

- rupture of the amniotic sac ("preterm premature rupture of the membranes" (PPROM)), which can result in infection, sepsis, or organ failure;
- "preeclampsia," which can result in the "onset of seizures" or "hypoxic brain injury";
- "placental abruption," which can result in "uncontrollable bleeding" or "organ disfunction";
- "uncontrollable uterine hemorrhage," which can "requir[e] hysterectomy" or result in "kidney failure requiring lifelong dialysis."

*Id.* at 1101, 1104. The Court held that EMTALA preempts § 18-622 in circumstances where EMTALA "requires the provision of care and state law criminalizes that very care." *Id.* at 1109. This Court also concluded that § 18-622 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 1111 (citation omitted). Section 18-622 would deter EMTALA-required stabilizing care, this Court explained, because it often would require a "medically impossible" determination in emergency circumstances that pregnancy termination is "necessary to prevent the patient's death." *Id.* at 1113–14.

  b. <u>Motion for Reconsideration</u>

The State and Legislature moved for reconsideration. They relied in part on the Idaho Supreme Court's decision in *Planned Parenthood Great Northwest v. State*, 522 P.3d 1132 (Idaho 2023), a case decided after the preliminary injunction issued. They focused on two aspects of the state court's interpretation: "that the affirmative defense is subjective rather than objective, and that the Total Abortion Ban does not apply to ectopic or other nonviable pregnancies." *United States v. Idaho*, No. 22-cv-00329, 2023 WL 3284977, at *3 (D. Idaho May 4, 2023). This Court was not persuaded that the state-court ruling undermined this Court's reasoning in entering the injunction in any way. It explained that *Planned Parenthood* "confirmed—rather than eliminated—the conflict"

between EMTALA and state law. *Id.* at *4. As interpreted by the Idaho Supreme Court, § 18-622's necessary-to-prevent-death exception covers "a narrower scope of conduct than [what] EMTALA covers," because EMTALA requires stabilizing treatment "when a patient faces serious health risks that may stop short of death." *Id.*

        c.   <u>Injunction on Appeal</u>

The State and Legislature filed a consolidated appeal. While a panel of the Ninth Circuit initially stayed the district court's injunction, *United States v. Idaho*, 83 F.4th 1130 (9th Cir. 2023), the *en banc* Court vacated that stay, *United States v. Idaho*, 82 F.4th 1296 (9th Cir. 2023). Before *en banc* argument could take place, however, the U.S. Supreme Court stayed the preliminary injunction and granted certiorari. *Moyle v. United States*, 144 S. Ct. 540 (2024). The stay went into effect on January 5, 2024. *Id.* On June 27, 2024, the Supreme Court dismissed the writ as improvidently granted, vacated its stay, and reinstated the preliminary injunction without modification. *Moyle v. United States*, 144 S. Ct. 2015 (2024) (per curiam). The case was remanded to the *en banc* Ninth Circuit, which heard argument on December 10 and took the matter under consideration.

After the Supreme Court decision and before argument on remand to the Ninth Circuit, the State and Legislature moved to modify the preliminary injunction. Motion for Modification, *United States v. Idaho*, ECF No. 166. They argued that "[m]uch has changed since this Court preliminarily enjoined Idaho's Defense of Life Act," including that the United States had made statements to the Supreme Court about EMTALA's reach that "narrowed—dramatically and materially—the scope of any potential conflict." *Id.* at 1. This Court rejected the motion as it had no jurisdiction to modify the injunction pending appeal. *See* Mem. & Op., *United States v. Idaho*, ECF No. 168.

**IV.   St. Luke's**

St. Luke's is the largest Idaho-based, not-for-profit, community-owned and community-

led health system; it operates hospitals, clinics, and other health facilities across Southwest and South-Central Idaho, including eight emergency departments. Nine trauma centers in Southwest and South-Central Idaho are designated Time Sensitive Emergency centers; St. Luke's operates six of them. St. Luke's employs more than 18,000 people and is the largest private employer in Idaho. St. Luke's medical providers treat patients millions of times each year, including over 740,000 hospital outpatient visits, more than 59,000 inpatient admissions, 242,000 emergency department visits, and 2.2 million clinic visits in 2024 alone.[1] Many of those patients are pregnant women: In 2023, St. Luke's helped welcome more than 8,920 newborns, representing 40% of live births in Idaho.[2] In 2024, St. Luke's helped welcome 9,455 newborns.

St. Luke's is certified as a Medicare provider by the United States Department of Health and Human Services. Nearly a quarter of St. Luke's patients have Medicare coverage; if St. Luke's did not participate in Medicare, 144,200 people St. Luke's cared for in 2024 would have had to seek primary care, specialty clinic care, emergency care, and inpatient care alike elsewhere.

Because St. Luke's participates in Medicare, it is required to comply with EMTALA. And because Idaho Code § 18-622 creates a direct conflict with EMTALA, it places St. Luke's in the precarious position of risking the criminal liability and medical licenses of its providers simply for complying with federal law. Alternatively, complying with § 18-622 risks violating EMTALA and the ability of St. Luke's to participate in Medicare. St. Luke's could also be subject to civil monetary penalties. And complying with § 18-622 further exposes St. Luke's to litigation by private plaintiffs,

---

[1] In 2023, with 232,000 emergency room visits, St. Luke's provided 38% percent of the 610,368 hospital emergency visits in the state. *See* Idaho Hosp. Ass'n, A Guide to Idaho's Community Hospitals 2 (2025 ed.), https://tinyurl.com/54p55ah3.

[2] CDC National Center for Health Statistics, National Vital Statistics System, Natality on CDC WONDER Online Database. Data are from the Natality Records 2016-2023, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program. Accessed at https://bit.ly/3ZE4rEh (last visited Jan. 13, 2025).

who may sue under EMTALA's private right of action. 42 U.S.C. § 1395dd(d)(2). As a result, St. Luke's and its medical providers are faced with an irreconcilable conflict.

The stakes of this conflict are real. In 2023, before this Court's injunction was stayed, St. Luke's airlifted just a single pregnant patient presenting with a medical emergency out of state for care. Supp. Decl. of Stacy T. Seyb (attached hereto as Ex. A) ¶ 7. Yet in the two very short periods of time when the Ninth Circuit panel and then the Supreme Court lifted this Court's injunction against § 18-622, St. Luke's transferred *six* pregnant patients with medical emergencies out of state to ensure they were provided with proper care. *Id.* ¶¶ 8-15. One patient presented with hypertensive disorder—i.e., severe preeclampsia—which occurs when a woman with previously normal blood pressure suddenly develops high blood pressure and protein in the urine or other problems such as impaired liver function or low platelet count after 20 weeks of gestation; if her blood pressure cannot be reduced, the patient can suffer severe liver failure, renal dysfunction, cerebral hemorrhage, and eventually, death. *Id.* ¶¶ 5, 10. The other five patients presented with PPROM—i.e., spontaneous rupture of the membrane containing a fetus before 22 weeks of gestation. *Id.* ¶¶ 9, 11-14. PPROM, too, can be a life-threatening condition with high risk of infection, sepsis, and bleeding from placental abruption; the standard of care includes termination. *Id.* ¶ 5. But neither condition—preeclampsia or PPROM—*always* requires termination of pregnancy *to prevent the death* of the mother. *Id.*

The St. Luke's medical providers treating these six patients when the law was fully in effect faced a terrible choice: they could either wait until the risks to the patient's health became life-threatening or transfer the patient out of state. The first option was medically unsound and dangerous because these patients' conditions could cause serious health complications if untreated, including systemic bleeding, liver hemorrhage and failure, kidney failure, stroke, seizure, and pulmonary edema. *Id.* ¶¶ 5, 15–16. Moreover, watching a patient suffer and deteriorate until death is imminent

is intolerable to most medical professionals. Accordingly, under the circumstances, these patients were given the option and chose to be transferred out of state. Of course, airlifting patients also put patients at risk due to significant delays in care while arranging medical transport out of state. And those delays could create a situation where the patient is no longer stable enough that the benefits of transfer outweigh the risks, again leaving Idaho medical providers to wait until termination is necessary to prevent the patient's death—even while knowing that the wait could have severe health consequences, including damage to the patient's future reproductive health. *Id.* ¶ 17. As a result, St. Luke's physicians described a constant fear that patients would present in an emergency room who were not stable enough to transfer, yet the medically indicated stabilizing care—termination—could not be provided because it was not yet needed to prevent the patient's death. *Id.*

Airlifting these patients was the medically appropriate course of action to avoid a conflict between the stabilizing treatment required by federal law and the prohibition against providing such stabilizing treatment under Idaho's law. Notwithstanding Idaho's limited exception to prevent the death of the patient, the law does not permit termination where necessary to otherwise stabilize the patient's health. In those situations, if a patient has no option but to continue their pregnancy, the patient will suffer—potentially gravely. The conditions that call for termination can be extremely painful. If untreated, they can cause serious health complications, including systemic bleeding, liver hemorrhage and failure, kidney failure, stroke, seizure, pulmonary edema, and more. And when this Court's injunction was temporarily stayed, it was patients with wanted pregnancies who had to make the heart-wrenching decision to terminate to avoid these complications—including, in some cases, to preserve their future ability to have children.

## STANDARD OF REVIEW

To obtain a preliminary injunction, "a party must show: (1) it will likely succeed on the

merits, (2) it will likely suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in its favor, and (4) the public interest favors an injunction." *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 688 (9th Cir. 2022).

## ARGUMENT

### I.   St. Luke's is Likely to Succeed in Demonstrating that EMTALA Preempts Idaho's Abortion Law.

St. Luke's has a clear likelihood of success on its claim. EMTALA requires St. Luke's emergency departments to provide stabilizing treatment for emergency conditions—stabilizing treatment this Court has already determined can include pregnancy termination. Idaho's law conflicts with EMTALA by subjecting medical providers to criminal prosecution for terminating a pregnancy as stabilizing care unless (as relevant here) it was "necessary to prevent the death of the pregnant woman"—which is far narrower than the standard EMTALA requires for the provision of medically necessary care. Thus, Idaho's law conflicts directly with EMTALA, and is preempted in the context of EMTALA-mandated care. This, too, the Court has already recognized. The core deficiency in Idaho's law has never changed, and it requires this Court's remedial action.

### a.   Idaho's Abortion Ban Conflicts with EMTALA.

This Court has already concluded several times over that § 18-622 conflicts with EMTALA and is preempted both as to the impossibility of compliance with both state and federal law and because state law stands as an obstacle to the accomplishment of federal law. *See Idaho*, 623 F. Supp. 3d at 1109–14; *Idaho*, 2023 WL 3284977, at *3–5; *see also* Mem. & Op., *United States v. Idaho*, ECF No. 168. As it relates to preemption, this challenge by St. Luke's is indistinguishable from the United States' challenge. Whether framed as impossibility or obstacle preemption, the infirmity in Idaho's statute flows from the Court's inescapable conclusion that it is "impossible" for health care providers "to comply with both statutes." *Idaho*, 623 F. Supp. 3d at 1109.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - 11

In the *United States v. Idaho* proceedings, St. Luke's physicians attested to several examples that illustrate this impossibility: two patients with preeclampsia with severe features, Decl. of Kylie Cooper ¶ 6, *United States v. Idaho*, ECF No. 17-7; Decl. of Stacy T. Seyb ¶¶ 9-10, *United States v. Idaho*, ECF No. 17-8; two patients with HELLP syndrome, Cooper Decl. ¶¶ 8, 10; a patient with septic abortion, Seyb Decl. ¶¶ 7-8; and a patient in hypovolemic shock due to blood loss, *id*. ¶¶ 11-12.[3] In each case, a fetal heartbeat was detected when the patient presented in the emergency department. In each case, the health of the pregnant patient was in serious jeopardy. In each case, physicians determined that termination of the clinically diagnoseable pregnancy was the standard of care "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result." 42 U.S.C. § 1395dd(e)(3)(A). As a result, in each case, physicians were compelled by EMTALA to recommend termination of the pregnancy (with patient consent) knowing that the termination would result in fetal death.

These are just some of the emergency conditions that can place a pregnant patient's health in serious jeopardy or threaten bodily functions or organs. *See* Decl. of Lee A. Fleisher ¶¶ 22-23, *United States v. Idaho*, ECF No. 17-3. Despite these conditions' serious risks, it may not be possible for a physician to know whether treatment is "necessary to prevent the death" of the pregnant patient. *Id.* ¶¶ 13-21. Absent the stabilizing treatment EMTALA requires, however, the risk is extremely serious that, for example, an infection could turn into sepsis and cause organ failure, seizures from eclampsia might prove uncontrollable, or a blood clot could lead to kidney failure. *Id.*

Additionally, as both Dr. Seyb and Dr. Cooper explained, some of their patients may have

---

[3] In lieu of refiling declarations already submitted to the Court, St. Luke's requests the Court to consider the record presented in the *United States v. Idaho* proceeding, in addition to one updated declaration by Doctor Stacy Seyb appended to this motion. *See* Supp. Seyb Decl. If the Court would prefer, St. Luke's can refile the already-submitted declarations.

survived without a termination, but would have been at risk for severe health problems, including renal failure and clotting disorder, Seyb Decl. ¶¶ 7-8, and stroke, seizure, pulmonary edema, and kidney failure, Cooper Decl. ¶¶ 6, 10. Thus, in many cases where termination is necessary to "stabilize" a patient under EMTALA because the *health*, but not necessarily the *life*, of the mother is in serious jeopardy, § 18-622 prohibits it unless "necessary to prevent the death of the pregnant woman." *See Idaho*, 2023 WL 3284977, at *4 ("[I]f the pregnant patient does not face death," the Idaho law "offers no protection to a physician who performs an abortion.").

Because § 18-622 makes it a crime to perform an abortion even when a physician concludes that such procedure is the necessary stabilizing treatment under EMTALA, Idaho's law is preempted under EMTALA's plain text, which provides that "any State or local law requirement" is preempted "to the extent [it] directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f).

Moreover, in circumstances for which Idaho law offers an exception—where the procedure is "necessary to prevent the death of the pregnant woman," Idaho Code § 18-622(2)(a)(ii)—the law nevertheless threatens criminal proceedings and sanctions that are "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Draper*, 9 F.3d at 1394. Even where a physician determines that the procedure was necessary stabilizing treatment under EMTALA, the Idaho law subjects that determination to scrutiny by "other medical experts," who the state may call in a criminal proceeding to opine on "whether the abortion was, in their expert opinion, medically necessary." *Planned Parenthood*, 522 P.3d at 1204. Creating an exception to liability so uncertain in scope poses an obstacle to EMTALA's "overarching purpose of ensuring that patients ... receive adequate emergency medical care," *Vargas ex rel. Gallardo v. Del Puerto Hosp.*, 98 F.3d 1202, 1205 (9th Cir. 1996), because exposure to criminal prosecution will render medical providers less inclined or entirely unwilling to risk providing treatment. *See Buckman Co.*

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - 13

*v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350-51 (2001) (holding that fear of being "expose[d] ... to unpredictable civil liability" under state law, for conduct condoned by federal law, was sufficient for preemption); *Arizona v. United States*, 567 U.S. 387, 408 (2012) (preempting a state law authorizing the arrest of aliens, because "[t]he result could be unnecessary harassment of some aliens ... who federal officials determine should not be removed").

For each of these reasons, § 18-622 conflicts directly with EMTALA, and St. Luke's has demonstrated a likelihood of success on its preemption claim. The law is preempted to the extent it allows the initiation of criminal prosecutions against, attempts to revoke the license of, or imposition of any other form of liability on, medical providers with respect to EMTALA-covered care.

> **b.** <u>The Conflict Between Federal and State Law Has Not Changed Since This Court Initially Enjoined § 18-622.</u>

St. Luke's is requesting an injunction that is, in all material respects, the same as the one already granted by this Court. The Idaho law—as amended and as interpreted by the Idaho Supreme Court—still prohibits abortions necessary to stabilize certain patients and still creates an obstacle to federal law by deterring pregnancy termination to stabilize an emergency medical condition, unless it is necessary to prevent death. EMTALA has not changed either: the United States' representations about its requirements did not depart from the law's plain text, practice on the ground, or the government's prior representations. That the Idaho law has been amended slightly and EMTALA's limits confirmed in subsequent litigation does not change the basic fact that, just as when the court initially enjoined § 18-622, Idaho's law conflicts with federal dictates in EMTALA.

*First*, as this Court has already concluded, the Idaho Supreme Court's decision did not eliminate the conflict. Quite the opposite, it "confirm[ed] each of the fundamental principles that underpinned this Court's decision enjoining" the law. *Idaho*, 2023 WL 3284977, at *3. That is so because it explained that § 18-622 "does *not* include the broader 'medical emergency' exception for

abortions" contained in other statutes, and that EMTALA's broader definition of medical emergency "explains to medical providers" when "the Total Abortion Ban cannot be enforced," thus recognizing the gap between the laws. *Planned Parenthood*, 522 P.3d at 1196, 1207 (emphasis added).

To start, *Planned Parenthood* interpreted the Idaho law as inapplicable to ectopic pregnancies. *Id.* at 1202–03. But this Court was correct to note the existence of many other pregnancy-related complications for which the only available stabilizing care is termination of pregnancy. *Idaho*, 2023 WL 3284977, at *4–5 (listing preeclampsia, PPROM, elevated blood pressure, blood clots, and placental abruption as examples).

Moreover, the state court's adoption of a subjective, good faith medical judgment standard under the Idaho law does not cure the uncertainty regarding what Idaho law allows medical professionals to do. *See* Supp. Seyb Decl. ¶ 19. Even though a doctor is excepted from liability under the Idaho statute if, in their subjective medical judgment, pregnancy termination was necessary to prevent the death of a pregnant patient, that subjective medical judgment is not the end of the inquiry according to *Planned Parenthood*. Rather, the state's prosecutors may call "other medical experts," to opine on "whether the abortion was, in their expert opinion, medically necessary" as a way of calling into question the doctor's good faith. *Planned Parenthood*, 522 P.3d at 1204. Doctors are not the only people who take this to mean that their judgments are hardly beyond reproach in the criminal process. *See* Tr. of Oral Arg. 29, *Moyle*, 144 S. Ct. 2015, https://tinyurl.com/55h456n7 (hereinafter "Tr. of Oral Arg.") (Justice Barrett: "What if the prosecutor thought, well, I don't think any good-faith doctor could draw that conclusion, I'm going to put on my expert?" Idaho's Counsel: "[T]hat, Your Honor, is the nature of prosecutorial discretion, and it may result in ... a case."); *id.* at 31-32 (Justice Alito: "I would think that the concept of good-faith medical judgment must take into account some objective standards .... That was how I interpreted what the—what the state supreme

court said."). This Court's concern that the Idaho law will deter the provision of necessary, stabilizing terminations thus remains potent.

*Second*, the Legislature's 2023 amendment to § 18-622 did not bring state law into harmony with EMTALA, either. Aside from codifying *Planned Parenthood*'s exception of ectopic pregnancy,[4] the only relevant change to the law was converting what was previously an affirmative defense into an exception to liability. *See* § 18-622(2)(a) (2023). To begin, that change does nothing to bring the two laws closer together in what they prohibit and require, respectively. Taking PPROM as an example, it appears a majority of the Supreme Court accepted that a conflict still exists after amendment. *See Moyle*, 144 S. Ct. at 2017 (Kagan, J., concurring) (noting that "when a woman comes to an emergency room with PPROM, the serious risk she faces may not be of death but of damage to her uterus, preventing her from having children in the future," and "Idaho has never suggested that its law would allow an abortion in those circumstances"); *id.* at 2037-38 (Alito, J., dissenting) (acknowledging that "in PPROM cases, there may be an important conflict between what Idaho law permits and what EMTALA, as interpreted by the Government, demands").

The amendment likewise does not eliminate the deterrent effect of § 18-622 on provision of care required by EMTALA. Section 18-622 imposes severe sanctions for violations, including a mandatory minimum of two years' imprisonment and license suspension. Those sanctions, in conjunction with the continued uncertainty regarding the scope of the exception, push medical providers to withhold even "medically necessary, life-saving care" that EMTALA requires and § 18-622 theoretically permits. *See, e.g.*, *Buckman Co.*, 531 U.S. at 350-51 (holding that fear of being "expose[d] ... to unpredictable civil liability" under state law, for conduct condoned by federal law,

---

[4] Notably, just as *Planned Parenthood* did not confirm that medical providers may treat conditions like PPROM and preeclampsia with termination of pregnancy when necessary, the Legislature likewise chose not to grant these treatments explicit protection in its amendment.

was sufficient for preemption). This is not conjecture; as explained above, for several months in early 2024, Idaho medical providers were put to the impossible task of ensuring their actions complied with both federal and state law. During that time, with the potential for criminal penalties hanging over them and legal uncertainty as to the conflict between state law and EMTALA, St. Luke's transferred six pregnant patients out of state for emergency care. Supp. Seyb Decl. ¶¶ 8-15.

*Third*, EMTALA's requirements have not changed. The United States did not make any representations before the Supreme Court that were not already true about EMTALA's scope. It explained that: (1) EMTALA does not require pregnancy termination as stabilizing care to treat mental health conditions, *see* Brief for Respondent United States at 26 n.5, *Moyle*, 144 S. Ct. 2015, 2024 WL 1298046; Tr. of Oral Arg. 77-78; (2) EMTALA does not require abortion after viability since post-viability, the pregnancy can terminate through delivery, Tr. of Oral Arg. 76; (3) EMTALA requires treatment only when a medical situation is acute, *id.* at 79-80; and (4) EMTALA does not override conscience protections, *id.* at 89-92. But these points were always true about EMTALA; the EMTALA this Court confronts today is unchanged and its injunction's scope remains correct.

Idaho cannot point to any evidence that pregnancy termination has been used in emergency rooms to treat mental health concerns or post-viability pregnancy complications, let alone any authority suggesting that EMTALA *required* that treatment prior to the government's representations before the Supreme Court. St. Luke's doctors have *never* seen a patient receive termination as stabilizing care for a mental health emergency, and they agree with the Solicitor General's statement that pregnancy termination is not an accepted treatment for mental health emergencies. *See* Tr. of Oral Arg. 77-78; Supp. Seyb Decl. ¶ 22. So, too, they are unaware of any case of emergency pregnancy termination occurring after viability and concur that the standard of

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - 17

care under EMTALA generally would be to deliver the baby to end the pregnancy after viability to address severe health consequences for the mother. Supp. Seyb Decl. ¶ 23.

As for the United States' other representations about EMTALA, both have always been clear based on the statute itself and other authorities. EMTALA expressly limits stabilizing treatment of all kinds, including pregnancy termination, to acute circumstances. *See* 42 U.S.C. § 1395dd(e)(1)(A) (defining "emergency medical condition" as "manifesting itself by acute symptoms" requiring "immediate medical attention"). And as the Supreme Court has recently confirmed, based on the plain text, "EMTALA does not require doctors to perform abortions or provide abortion-related medical treatment" against their conscience. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 389 (2024). There is therefore no need to reconsider the scope of the injunction already in place.

*Fourth*, that St. Luke's has brought this suit rather than the United States is no cause for reconsideration. St. Luke's has an equitable cause of action to seek an injunction of a state law that violates the Supremacy Clause. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (recognizing cause of action "to enjoin unconstitutional actions by state and federal officers," which is a "creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England"). St. Luke's also has standing to pursue this relief. By directing its medical providers to comply with § 18-622, St. Luke's faces civil liability, *see* 42 U.S.C. § 1395dd(d)(2), or a loss of Medicare funding, *see id.* § 1395cc(a)(1)(I)(i). By directing its providers to comply with EMTALA, St. Luke's risks exposing them to criminal liability and, by extension, itself to staffing shortages that would hamper its ability to provide care and recoup costs of doing so. These dueling injuries are directly traceable to the conflict between federal and state law, and thus to Attorney General Labrador, who enforces Idaho law and is

therefore a proper defendant.[5] Indeed, the Ninth Circuit has specifically held that the Attorney General is a proper defendant with respect to his enforcement of this statute. *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 843 (9th Cir. 2024).

## II.    The Remaining Factors Support Entry of a Preliminary Injunction.

The remaining factors all support entry of a preliminary injunction, because allowing the Idaho law to go back into effect without a limiting injunction would result in irreparable harm to St. Luke's, its medical providers, and the Idaho public, while the Attorney General will suffer no cognizable harm from keeping the currently applicable preliminary injunction in place. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2020) ("When the government is a party, [the balance of the equities and public interest] factors merge."). The Supreme Court implicitly recognized this when it restored the injunction after dismissing the writ of certiorari as improvidently granted. *Moyle*, 144 S. Ct. 2015. The only meaningful change from the Court's initial entry of an injunction is that because Idaho's law was temporarily stayed, it is now clear just how swiftly and drastically irreparable harm will follow if the law once more goes into full effect. *See Valle del Sol v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("It is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available." (modifications omitted)).

As discussed above, St. Luke's and its providers already experienced such harm during the time when this Court's injunction was briefly stayed. St. Luke's had to airlift *six* pregnant patients with medical emergencies to neighboring states where they could receive the full range of stabilizing

---

[5] In a separate case, the Idaho Boards of Medicine and Nursing stipulated that they will take no disciplinary action against a licensee pursuant to § 18-622 absent a criminal conviction.  Joint Stipulation, *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, No. 23-cv-00142, ECF No. 182-1 (D. Idaho Dec. 18, 2024).  The Attorney General's decision to bring a criminal case is therefore also a precondition to imposition of these deterrent licensure penalties.

care warranted by their conditions—care that St. Luke's medical providers were not permitted to provide due to Idaho law. Supp. Seyb Decl. ¶¶ 8-15. Given that Idaho has approximately 22,000 births per year, and a large number of high-risk pregnancies due to surrogacy, it is virtually guaranteed that these emergency medical conditions will occur for a sizeable number of pregnant patients within Idaho. Decl. of Emily Corrigan ¶¶ 8, 19, *United States v. Idaho*, ECF No. 17-6; Fleisher Decl. ¶¶ 36-38. Allowing the law to go back into full effect would discourage St. Luke's medical providers from providing necessary care in emergency circumstances, resulting in significant and irreparable harm.

On the other side of the ledger, Attorney General Labrador will suffer no cognizable harm as a result of the requested preliminary relief. Idaho's abortion law is not currently in effect where it conflicts with EMTALA, and therefore enjoining the Attorney General from enforcing it as applied to EMTALA-mandated care would simply preserve the status quo during the short period necessary for further litigation. *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001) ("A preliminary injunction is … a device for preserving the status quo and preventing the irreparable loss of rights before judgment."). Given the significant harms that would result if the Idaho law were to go into effect to prohibit EMTALA-mandated care—both for pregnant individuals as well as St. Luke's and its medical providers—and the corresponding lack of harm to the Attorney General from a temporary injunction, the equitable factors plainly favor entry of preliminary relief.

## CONCLUSION

For these reasons, St. Luke's requests entry of a preliminary injunction against Attorney General Labrador and his officers, employees, and agents identical to that currently entered against the State of Idaho.

DATED:  January 14, 2025

STOEL RIVES LLP


/s/ Wendy J. Olson
Wendy J. Olson
Alaina Harrington


JENNER & BLOCK LLP


/s/ Lindsay C. Harrison
Lindsay C. Harrison
Jessica Ring Amunson
Ruby C. Giaquinto
Sophia W. Montgomery

Attorneys for Plaintiff