WENDY J. OLSON, Bar No. 7634
wendy.olson@stoel.com
ALAINA HARRINGTON, Bar No. 11879
alaina.harrington@stoel.com
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID  83702
Telephone:  208.389.9000

LINDSAY C. HARRISON (*pro hac vice forthcoming*)
lharrison@jenner.com
JESSICA RING AMUNSON (*pro hac vice forthcoming*)
jamunson@jenner.com
SOPHIA W. MONTGOMERY (*pro hac vice forthcoming*)
smontgomery@jenner.com
RUBY C. GIAQUINTO (*pro hac vice forthcoming*)
rgiaquinto@jenner.com
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, D.C. 20001
Telephone:  202.639.6000

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD., <br><br> Plaintiff, <br><br> v. <br><br> RAÚL LABRADOR, Attorney General of the State of Idaho, <br><br> Defendant. | Case No.  1:25-cv-00015-DKG <br><br> **SUPPLEMENTAL DECLARATION OF STACY T. SEYB, M.D.** |

**SUPPLEMENTAL DECLARATION OF STACY T. SEYB, M.D., IN SUPPORT OF ST. LUKE'S HEALTH SYSTEM'S MOTION FOR A PRELIMINARY INJUNCTION**

1

I, Stacy T. Seyb, M.D., being first duly sworn under oath, state and depose upon personal knowledge as follows:

1. I am a board-certified Obstetrician-Gynecologist (Ob-Gyn) physician at St. Luke's Regional Medical Center in Boise, Idaho. In that capacity, I specialize in Maternal-Fetal Medicine. I submit this declaration in support of the Motion for Preliminary Injunction filed by St. Luke's Health System in the above-captioned matter. Unless otherwise stated, the facts set forth herein are true of my own personal knowledge, and if called as a witness to testify in this matter, I could and would testify competently thereto.

2. I graduated from the University of Kansas and subsequently completed my residency in Obstetrics and Gynecology at the University of Colorado and fellowship in Maternal Fetal Medicine at Northwestern University Feinberg School of Medicine. I practiced as a general Ob-Gyn and served as teaching faculty before completing my fellowship specializing in high risk and abnormal pregnancy management.

3. I have practiced as a Maternal Fetal Medicine provider in Idaho for 24 years, working not only on the front lines treating complicated pregnancies but also as a consultant to general Ob-Gyn providers and Family Medicine providers providing obstetric care, primarily in Southwest Idaho as well as across the state. I worked over a decade with the Idaho March of Dimes improving programming support and updating providers on evolving practices to improve the health of women and children in our state. Currently I serve as a state liaison to Idaho for the Society for Maternal Fetal Medicine.

4. Over the course of my nearly 37-year career as a practicing Ob-Gyn, I have treated thousands of pregnant women, delivered thousands of healthy babies, and managed a variety of life-threatening conditions in pregnancy.

5. I have reviewed the declarations submitted by Doctors Kylie Cooper, Lee Fleisher, and Emily Corrigan in *United States v. Idaho* and I agree with those doctors' assessments of the risks posed to pregnant patients by such conditions as pre-eclampsia, premature rupture of the membranes (PPROM), and placental abruption. Fundamentally, each of these conditions—and many more pregnancy complications—poses serious risks to pregnant patients, and termination is very often the only treatment available to address these risks and stabilize the patient. In some cases, these conditions can and do cause death. But sometimes, a physician may conclude that although there is *not* a high probability of the pregnant patient's death, the patient may experience impairment or severe dysfunction of bodily organs, including losing her reproductive capability, absent termination of her pregnancy. And often, it will simply not be possible for a physician to determine whether termination is necessary to prevent death, as opposed to some severe harm to the patient short of death.

### Effect of Idaho Code § 18-622

6. In *United States v. Idaho*, I submitted a declaration predicting that Idaho Code § 18-622, if it went into effect without any limiting injunction allowing emergency room providers to comply with EMTALA, would force physicians to delay treatment or otherwise act contrary to the generally accepted standard of care for fear of incurring criminal liability or loss

3

of licensure. To my great dismay, when § 18-622 temporarily went into effect, my prediction came to pass.

7. In 2023, before the injunction was stayed, St. Luke's had to airlift just a single pregnant patient presenting with a medical emergency out of state for care.

8. While § 18-622 was briefly in effect without a limiting injunction, six individual St. Luke's patients had to be airlifted out of state because in Idaho, we were unable to provide the full range of stabilizing care necessary to preserve the patient's health. I either treated these patients or have personally reviewed the details of their case in St. Luke's medical records.

9. One patient, who was 20 weeks pregnant, experienced PPROM. She presented with leaking fluid and an elevated white blood cell count and appeared to be suffering from a progressing infection. Antibiotics would not stop the progression of the infection toward sepsis. If the infection continued to progress, this patient could have suffered infertility and organ damage. The treating physician was unable to say that termination was necessary to prevent death but determined that, without termination, the patient's kidneys could stop functioning. This patient chose to be airlifted out of state to ensure she could receive the medically necessary care, including possible termination of her pregnancy.

10. A second patient presented with pre-eclampsia at 23 weeks. She presented with hypertension and was at risk of a stroke, possible heart failure, and kidney failure. It was very likely that she would require a cesarean section, which at her stage of pregnancy would lead to a scarred uterus, which would in turn affect future pregnancies. The fetus almost certainly would not be viable. This patient's pre-eclampsia was not necessarily life-threatening but had the

potential to become so; she therefore needed to be in a facility that could offer the full spectrum of care that she might need, including termination of her pregnancy, and so chose to be airlifted out of state.

11. A third patient, after experiencing PPROM at 20 weeks, presented with abdominal pain and cramping. She did not yet have an elevated white blood cell count, which would be indicative of infection, but her membranes were coming into her vagina. The fetus's heartbeat was detectable, but it was likely not viable. The treating physicians could not say, in their medical judgment, that termination was necessary to prevent her death, only that it was possible that her condition would advance to that point. Waiting until this patient's condition was life-threatening to terminate her pregnancy could have resulted in intrauterine infection and sepsis, which could in turn make it so that she could not have any future children. She chose to be airlifted out of state so that she could receive the full range of stabilizing care, including termination of her pregnancy.

12. A fourth patient, also diagnosed with PPROM, presented with vaginal bleeding and severe cramping at 18 weeks. The following week, fetal parts were visible in her cervix. The fetus had a normal heartrate but was almost certainly not going to be viable. With advanced cervical dilation and ruptured membranes, this patient's infection risk was growing. Physicians could not say that termination was necessary to prevent the patient's death, but it may have been necessary to prevent a host of severe health consequences. She was airlifted to a facility out of state that could offer the full range of stabilizing care, including termination of her pregnancy.

13. A fifth patient similarly experienced PPROM at 19 weeks. She presented with a bulging feeling in her vagina; an ultrasound showed the amniotic sac bulging into her vaginal canal. Her providers attempted a cerclage placement, which was unsuccessful. Her PPROM developed into an increased risk of subclinical intraamniotic infection. The fetus partly entered her vagina and was not viable, though it did have a detectable heartbeat. Physicians could not say that termination was necessary to prevent the patient's death, but it may have been necessary to prevent a host of severe health consequences. She, too, was airlifted out of state so that she could receive care physicians at St. Luke's could not provide.

14. A sixth patient, 22 weeks pregnant with twins, presented with vaginal bleeding. She had had rescue cerclage the previous week and wished to avoid intervention until at least 24 weeks. She was diagnosed with PPROM. After her bleeding increased, her treating physicians became concerned about placental abruption and the risk of infection, so she, like the other patients, was transferred to another state for further care. Termination was not necessary to prevent her death, and indeed she ultimately delivered the twins.

15. In these instances, each patient was experiencing an emergency medical condition that placed her health in serious jeopardy, risked serious impairment to her bodily functions, or risked serious dysfunction to bodily organs or parts. The treating physician—either one of my colleagues or I—would have offered and/or recommended termination as a treatment option, consistent with the standard of care, but believed that we could not do so consistent with § 18-622.

16. In each instance, the treating physician was deeply concerned that waiting to offer termination as an option until it would be necessary to prevent death was dangerous and medically unsound. The conditions these patients faced could cause serious additional health complications if untreated, including systemic bleeding, liver hemorrhage and failure, kidney failure stroke, seizure, and pulmonary edema, among other things.

17. Arranging an airlift to transfer a patient out of state is not without risk or cost. It takes time. During that time, the patient's condition could deteriorate to the point of no longer being stable for transport. Once a patient is no longer stable enough for transport, the risks of transfer may outweigh the benefits, placing the treating physician once again in the position of deciding whether to wait until termination is necessary to prevent death, even though the wait could pose severe health consequences, including damage to the patient's future reproductive health. During the relevant period of time, my colleagues and I lived in constant fear that patients would present in an emergency room who were not stable enough to transfer, yet the medically indicated stabilizing care—termination—could not be provided because it was not yet needed to prevent the patient's death.

### Idaho Code § 18-622 Still Prohibits Necessary Emergency Care

18. No changes to Idaho or federal law since 2022 have changed the fact that it is impossible to discern the point at which Idaho law allows the provision of stabilizing pregnancy terminations.

19. From the perspective of physicians, the Idaho Supreme Court's interpretation of the state law in *Planned Parenthood Great Northwest v. State* did not meaningfully clarify

doctors' obligations. I understand that even if physicians make a good faith medical judgment about the necessity of care, there is no way for those of us making treatment decisions to know at what point a patient's symptoms push them into the category of *necessitating* care to not just stabilize their health but prevent their death under Idaho law. Doctors can reasonably disagree with each other about cases, and certainly may disagree with a prosecutor who lacks medical training.

20. The Idaho legislature's changes to § 18-622 do not provide physicians like me any meaningful comfort. As described above, treatment providers are faced with an enormous amount of uncertainty regarding what treatment to provide pregnant patients facing serious medical emergencies and when. And our medical judgments can be tested in court according to "objective" evidence in the form other others' medical opinions. Given those uncertainties, providers will be deterred from stabilizing patients with emergent conditions, as our lived experience in early 2024 shows.

21. I also understand that the United States took several positions regarding what kind of stabilizing care EMTALA requires in arguments before the Supreme Court. Those positions are consistent with my longstanding experience and my understanding of the relevant standards of care. As the United States confirmed in front of the Supreme Court, mental health conditions, non-acute conditions, and pregnancy complications after viability do not call for abortion as stabilizing care.

22. Neither I nor my colleagues are aware of a single case in which a patient received termination of her pregnancy as stabilizing care for a mental health emergency. In my experience

8

and medical judgment, pregnancy termination is not a treatment for mental health emergencies according to the generally accepted standard of care. Mental health emergencies are treated as mental health conditions; when a pregnant patient comes to the emergency room with, for instance, symptoms of psychosis, our protocol is to treat the psychosis.

23. Neither I nor my colleagues are aware of any case of emergency abortion occurring after viability. The standard of care for a patient presenting after viability with a condition like those described above would be to deliver the baby.

24. Maintaining the ability throughout the state of Idaho to provide the full range of stabilizing care for pregnant patients who present to emergency rooms is important. Without this option, or if it was limited to only some of the hospitals that presently provide that care, pregnant patients would be forced to travel long distances to get emergency care, which could be detrimental to their health and well-being. The hospitals that could provide stabilizing treatment would experience increased patient care needs and increased staffing needs in their emergency rooms, which may affect patient care at those hospitals.

I declare under penalty of perjury under the laws of the State of Idaho that the foregoing is to the best of my knowledge true and correct. Executed this 11th day of January 2024, in Boise, Idaho.

1-11-25

Date

Stacy T. Seyb, M.D.