**Trudy Hanson Fouser, ISB No. 2794**
tfouser@gfidaholaw.com
**Stephen L. Adams, ISB No. 7534**
sadams@gfidaholaw.com
**Madison N. Miles, ISB No. 9010**
mmiles@gfidaholaw.com
**GJORDING FOUSER HALL PLLC**
950 W. Bannock Street, Ste. 950
Boise, Idaho 83702
Telephone:  208.336.9777
E-service: gfcases@gfidaholaw.com

**Chad Golder** (*pro hac vice*)
cgolder@aha.org
**AMERICAN HOSPITAL ASSOCIATION**
2 City Center, Suite 400
800 10th Street, NW
Washington, DC  2001-4956
Telephone:  202-626-4624

*Attorneys for Amicus American Hospital
Association, America's Essential Hospitals, and the
American Association of Medical Colleges*

IN THE UNITED STATES DISTRICT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD.,<br><br>                    Plaintiff,<br><br>v.<br><br>RAÚL LABRADOR, Attorney General of the State of Idaho,<br><br>                    Defendant. | Case No.  1:25-cv-00015-DKG<br><br><br>**BRIEF FROM *AMICUS* AMERICAN HOSPITAL ASSOCIATION, ET AL** |

## CORPORATE DISCLOSURE STATEMENT

*Amici Curiae* the American Hospital Association, the Association of American Medical Colleges, and America's Essential Hospitals are non-profit organizations. They have no parent corporations and do not issue stock.

January 31, 2025                    /s/ Chad Golder
                                    Chad Golder
                                    Counsel of Record for *Amici Curiae*

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT                                          i

TABLE OF CONTENTS                                                      ii

STATEMENT OF INTEREST                                                   1

INTRODUCTION                                                            2

ARGUMENT                                                                5

I.   EMTALA and the ACA Preempt Idaho's Criminal Statute in the Narrow
     Domain of Emergency Care. ....................................................... 5

II.  Even Apart From The ACA, EMTALA Preempts Idaho's Criminal Statute In
     Narrow Emergency Circumstances ................................................ 15

CONCLUSION........................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Artuz v. Bennett*, 531 U.S. 4 (2000) ........................................................................ 14

*Barnett Bank v. Nelson*, 517 U.S. 25 (1996) ........................................................ 19

*Battle ex rel. Battle v. Mem'l Hosp.*, 228 F.3d 544 (5th Cir. 2000) ............................ 17

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ................................................ 8, 12, 14

*Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349 (4th Cir. 1996) ........... 15, 16

*Cantero v. Bank of Am., N.A.,* 602 U.S. 205, 144 S. Ct. 1290 (2024) ........................ 19

*Cherukuri v. Shalala*, 175 F.3d 446 (6th Cir. 1999) ................................................ 17

*CPSC v. GTE Sylvania, Inc.*, 447 U.S. 102 (1980) .................................................... 9

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) ..................... 19

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) ................................................ 19

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ............................................................. 15

*Great N. Ry. Co. v. United States*, 315 U.S. 262 (1942) ............................................ 6

*Harry v. Marchant*, 291 F.3d 767 (11th Cir. 2002) ............................................ 15, 16

*Holloway v. United States*, 526 U.S. 1 (1999) ........................................................ 13

*June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299 (2020) ............................................. 2

*Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006 (9th Cir. 2017) ................. 11

*King v. Burwell*, 576 U.S. 473 (2015) ......................................................... 6, 7, 13

*King v. St. Vincent's Hosp.*, 502 U.S. 215 (1991) ..................................................... 8

*Lawson v. FMR LLC*, 571 U.S. 429 (2014) ............................................................. 15

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) ....................................... 18

*Moyle v. United States*, 603 U.S. 324, 144 S. Ct. 2015 (2024) .......................... passim

*NLRB v. Federbush Co.*, 121 F.2d 954 (2d Cir. 1941) ............................................... 8

*Planned Parenthood Great Nw. v. State*, 522 P.3d 1132 (Idaho 2023) ..................... 11

*POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014) .................................... 19

*Pulsifer v. United States*, 601 U.S. 124 (2024) ....................................................... 13

*Smith v. Botsford Gen. Hosp.*, 419 F.3d 513 (6th Cir. 2005) ..................................... 17

*Tiger v. Western Inv. Co.*, 221 U.S. 286 (1911) ........................................................ 6

*United States v. Calvert*, 511 F.3d 1237 (9th Cir. 2008) ........................................... 13

*United States v. Idaho*, 623 F.Supp.3d 1096 (D. Idaho 2022) ......................... 2, 3, 10

*United States v. Idaho,* No. 22-cv-00329, 2023 WL 3284977 (D. Idaho May 4,
     2023) ............................................................................................... 3, 4, 5

*United States v. Stewart*, 311 U.S. 60 (1940)................................................. 9

*Vickers v. Nash Gen. Hosp., Inc.*,
   78 F.3d 139 (4th Cir. 1996) ...................................................... 17

*Yates v. United States*, 574 U.S. 528 (2015)............................................. 13

## Statutes

26 U.S.C. § 501 .......................................................................... 13

42 U.S.C. § 1395dd.............................................................. passim

42 U.S.C. § 18023............................................................... passim

42 U.S.C. § 300gg-19a .................................................................. 13

Idaho Code § 18-608A ............................................................... 11

Idaho Code § 18-609A ............................................................... 11

Idaho Code § 18-622............................................................. passim

## Other Authorities

131 Cong. Rec. 28,491, 28,569 (1985)............................................. 16

A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS
   (2012) ....................................................................... 9, 18

A. Scalia, A MATTER OF INTERPRETATION (1997)......................................... 8

David M. Herszenhorn & Jackie Calmes, *Abortion Was at Heart of Wrangling*,
   N.Y. TIMES, Nov. 8, 2009............................................................ 7

John Cannan, *A Legislative History of the Affordable Care Act*, 105 L. LIB. J.
   131 (Spring 2013) ................................................................. 6

Sara Rosenbaum, *The Enduring Role of the Emergency Medical Treatment and
   Active Labor Act*, 12 HEALTH AFFS. 2075 (2013) ..................................... 8

SESAME STREET, *One of These Things (Is Not Like the Others)*, on SESAME
   STREET BOOK & RECORD (Columbia Records 1970) ............................... 11

Staff of the Washington Post, LANDMARK: THE INSIDE STORY OF AMERICA'S NEW
   HEALTH-CARE LAW AND WHAT IT MEANS FOR US ALL (2010) ....................... 7

## Regulations

42 C.F.R. § 489.24......................................................................... 17

## STATEMENT OF INTEREST[1]

The American Hospital Association represents nearly 5,000 hospitals, healthcare systems, and other healthcare organizations across the country. Its members are committed to improving the health of the communities they serve and to helping ensure that affordable care is available to all Americans. The AHA frequently participates as *amicus curiae* in cases with important consequences for AHA's members and the communities they serve. Thirty-seven of AHA's member hospitals operate in Idaho, ranging from one of the nation's most remote healthcare facilities in Salmon to tertiary facilities in Pocatello and Idaho Falls.

The Association of American Medical Colleges is dedicated to improving the health of people everywhere through medical education, healthcare, medical research, and community collaborations. Its members include all 159 medical schools accredited by the Liaison Committee on Medical Education; nearly 500 academic health systems and teaching hospitals; and more than seventy academic societies.

America's Essential Hospitals is dedicated to equitable, high-quality care for all people, including those who face social and financial barriers. Consistent with this safety-net mission, the association's more than 350 members provide a disproportionate share of the nation's uncompensated care, with three-quarters of their patients uninsured or covered by Medicare or Medicaid.

Virtually all of *Amici*'s member hospitals are subject to the Emergency Medical Treatment and Labor Act. On rare and tragic occasions, EMTALA requires the termination of a pregnancy to stabilize a patient's emergency condition—including in

---

[1]  Pursuant to FRAP 29, counsel has notified both parties of its intent to file this brief. No party's counsel authored any part of this brief, and no person other than *Amici* funded its preparation or submission.

circumstances that Idaho law criminalizes. Absent judicial relief, healthcare providers at *Amici*'s member hospitals will face the intolerable threat of criminal liability for doing what federal law requires. *Amici,* therefore, have a direct interest in this case.

## **INTRODUCTION**

This case involves underlying issues of great consequence and controversy. But it is, at bottom, an ordinary statutory interpretation case. It can be decided by basic textualist principles. "The real question" concerns the judiciary's "willingness to follow the traditional constraints" of textualism "when a case touching on abortion enters the courtroom." *June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 410 (2020) (Gorsuch, J., dissenting).

*Amici*'s members understand the legal and practical stakes of this case all too well. As this Court correctly recognized, "[p]regnant women in Idaho routinely arrive at emergency rooms experiencing severe complications." *United States v. Idaho*, 623 F.Supp.3d 1096, 1101 (D. Idaho 2022). When that happens, doctors, nurses, and other medical personnel must make split-second decisions about what care to give to those patients, who are at risk not only of death or serious lifelong impairment but also of losing their pregnancies. In those tragic situations, healthcare professionals must rely on their expertise, experience, ethical training, and ultimately their best medical judgment to provide emergency care. In exceedingly rare circumstances, termination is the *only* way to stabilize a pregnant patient.

When that happens, federal law, as reflected in EMTALA and reinforced by the Affordable Care Act, requires hospitals to perform that tragic emergency service. Specifically, EMTALA requires that providers assess "reasonable medical probability" and offer "necessary stabilizing treatment" to patients experiencing an

"emergency medical condition," including in situations where the health or safety of "a pregnant woman" and her "unborn child" is in "serious jeopardy." 42 U.S.C. § 1395dd(b), (e). The ACA eliminated any doubt that Congress considered termination to be an "emergency service" under EMTALA. In a section dealing *entirely* with abortion and using that word *nineteen times*, the ACA provided: "Nothing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including section 1867 of the Social Security Act (popularly known as 'EMTALA')." 42 U.S.C. § 18023(d).

Idaho Code § 18-622 conflicts with EMTALA and the ACA. Section 18-622 makes it a crime for providers to terminate a pregnancy. It includes an exception when termination is "necessary to prevent the death of the pregnant woman." But it does *not* include an exception for stabilizing services necessary to prevent "material deterioration" of medical conditions that, absent immediate medical attention, would result in serious jeopardy to the patient's health, serious impairment to her bodily functions, or serious dysfunction of her bodily organs, as EMTALA requires. *See generally United States v. Idaho,* No. 22-cv-00329, 2023 WL 3284977, at *4 (D. Idaho May 4, 2023).

To be clear: *Amici*'s members regularly care for patients who arrive at the ER with medical conditions that seriously threaten their health (but not necessarily their lives) and for which termination is the only definitive emergency service. Plaintiff's declarations plainly demonstrate this, as this Court previously recognized. *See* Supp. Decl. of Stacy T. Seyb ¶5 (Dkt 2-2) ("[E]ach of these conditions— and many more pregnancy complications—poses serious risks to pregnant patients, and termination is very often the only treatment available to address these risks and stabilize the patient.")' *see also Idaho*, 623 F.Supp.3d at 1113 n.4; *See United States v. Idaho,* No.

22-cv-00329, 2023 WL 3284977, at *5 (D. Idaho May 4, 2023) (listing additional complications and scenarios). In addition to those examples, *Amici*'s members have indicated that pregnant women regularly present during their pre-viability/pre-deliverability period with *chorioamnionitis* or acute vaginal bleeding from *placenta previa*, *placenta accreta*, or *placenta percreta*—all of which could seriously threaten not only a patient's health, but also her future fertility, bladder condition, and other bodily functions. All could require emergency termination to stabilize her.

Nevertheless, providers who seek to comply with EMTALA (and the ACA) but violate § 18-622 are subject to felony charges, a mandatory minimum of two years imprisonment, and revocation of their professional licenses. And as Idaho represented to the Supreme Court (but did not disavow on remand), §18-622 gives individual criminal prosecutors the freedom to second-guess medical judgments made by healthcare providers in their efforts to stabilize patients in extreme duress:

> JUSTICE BARRETT: What if the prosecutor thought differently? What if the prosecutor thought, well, I don't think any good-faith doctor could draw that conclusion, I'm going to put on my expert?

> MR. TURNER: And that, Your Honor, is the nature of prosecutorial discretion….

Tr. of Oral Arg. at 29, *Moyle v. United States*, No. 23-726 (S. Ct. Apr. 24, 2024); *see also Idaho,* 623 F.Supp.3d at 1113 ("One prosecutor's promise to refrain from enforcing the law as written, therefore, offers little solace to physicians attempting to navigate their way around both EMTALA and Idaho's criminal abortion laws.").

*Amici* submit this brief to explain why EMTALA and the ACA preempt Idaho's criminal statute. Our previous amicus brief in the *United States v. Idaho* case (Dkt.

39-1) explained why Idaho's decision to criminalize medically necessary emergency care is so profoundly harmful to hospitals, physicians, and patients. Here, we focus on legal arguments, *which the Court did not previously consider*, making clear that Plaintiff is likely to succeed on the merits. These arguments: 1) decisively refute Idaho's textual defense of § 18-622, particularly its emphasis on EMTALA's use of the term "unborn child"; 2) conclusively prove why a preliminary injunction should be granted; and 3) will further insulate this Court's decision from appellate and Supreme Court review.

## <u>ARGUMENT</u>

EMTALA, as reinforced by the ACA, has long been a workable legal regime in the narrow context of emergency stabilizing care. It does not govern—and never mandates—"elective" abortions. Instead, it provides rules for hospitals confronted with medical emergencies. Idaho's criminal statute conflicts with the EMTALA/ACA rime. It is therefore preempted.

**I.** **EMTALA and the ACA Preempt Idaho's Criminal Statute in the Narrow Domain of Emergency Care.**

Plaintiff and Justice Kagan's concurring opinion in *Moyle* persuasively explain why EMTALA itself preempts § 18-622. *Amici* begin with the ACA, however, because it so directly defeats the principal textual arguments offered by Idaho and the *Moyle* dissenters. It is, as the saying goes, the shortest path from Point A to Point B.

1.    Idaho and the *Moyle* dissenters have contended that "EMTALA obligates Medicare-funded hospitals to *treat*, not abort, an '"unborn child."' *Moyle v.*

*United States*, 144 S. Ct. 2015, 2028 (2024) (Alito, J., dissenting). Their argument boils down to a simple proposition: Because the statute includes the term "unborn child" but "does not mention abortion," "EMTALA requires the hospital at every stage to protect an 'unborn child' from harm." *Id.* at 2029.

*Amici*'s answer boils down to an equally simple proposition: If the ACA contemplates "abortion" as an EMTALA-mandated "emergency service," then EMTALA's use of "unborn child" cannot have the significance ascribed to it. As a matter of logic given the nature of emergency termination, the term "unborn child" must give way. Put differently, if EMTALA—as reinforced by the ACA—requires hospitals to perform abortions in rare and tragic circumstances, then EMTALA cannot require them to "protect an 'unborn child'" in the way Idaho and the dissenters insist.

The ACA does exactly that. If there were any doubt that "abortion" qualifies as an "emergency service" under EMTALA, the ACA puts it to rest. *See Great N. Ry. Co. v. United States*, 315 U.S. 262, 277 (1942) ("It is settled that 'subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject.'" (quoting *Tiger v. Western Inv. Co.*, 221 U.S. 286, 309 (1911))).

"Abortion had proved a contentious issue throughout the health care debate." John Cannan, *A Legislative History of the Affordable Care Act*, 105 L. Lib. J. 131, 167 (Spring 2013). Unlike other provisions of the ACA that may "not reflect the type of care and deliberation that one might expect of such significant legislation," *King v.*

*Burwell*, 576 U.S. 473, 492 (2015), the provisions addressing abortion were meticulously negotiated and given the closest attention, *see* Staff of the Washington Post, LANDMARK: THE INSIDE STORY OF AMERICA'S NEW HEALTH-CARE LAW AND WHAT IT MEANS FOR US ALL 31–33 (2010); David M. Herszenhorn & Jackie Calmes, *Abortion Was at Heart of Wrangling*, N.Y. TIMES, Nov. 8, 2009, at A24.

In a section entitled "Special rules," the ACA uses the word "abortion" *nineteen times*. See 42 U.S.C. § 18023. It is the primary ACA section addressing abortion. In fact, it is virtually the *only* ACA section addressing abortion in the Act's 900 pages. Section 18023 covers topics like "State opt-out of abortion coverage" and "Special rules relating to coverage of abortion services." The section also preserves federal conscience protections and prohibitions on the use of federal funds for "abortion services." 42 U.S.C. § 18023 (c)(2).

Importantly, § 18023 contains a final subsection entitled "Application of emergency services laws." Having established in preceding subsections that insurance companies and the federal government could not be required to *pay for* abortions, subsection (d) makes certain that patients could still receive that service in *emergency* situations. It states: "Nothing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including section 1395dd of this title (popularly known as 'EMTALA')." 42 U.S.C. § 18023 (d). Thus, in a section of the ACA that deals entirely with the topic of "abortion" and uses the term repeatedly, the Act expressly references "EMTALA"

and ensures that its "emergency services" requirements for "providers" remain undisturbed. *See* Sara Rosenbaum, *The Enduring Role of the Emergency Medical Treatment and Active Labor Act*, 12 HEALTH AFFS. 2075, 2075 (2013) ("The Affordable Care Act reaffirmed EMTALA's preeminent position in American health law through provisions that clarify hospitals' emergency care duties in abortion cases.").

Section 18023 (d)'s text and context, therefore, make clear that Congress understood that pregnancy terminations would sometimes occur during the provision of "emergency service[s]" under "EMTALA." *See Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring) ("[T]he meaning of a word depends on the circumstances in which it is used. To strip a word from its context is to strip that word of its meaning.") (citation omitted); A. Scalia, A MATTER OF INTERPRETATION 37 (1997) ("In textual interpretation, context is everything"). Indeed, the only sensible way to read its text and context is that EMTALA recognized that "abortion" may be a stabilizing "emergency service." *See King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used." (quoting *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) (L. Hand, J.))).[2] Or, to use

---

[2]    *See also AFL-CIO v. NLRB*, 57 F.4th 1023, 1032-33 (D.C. Cir. 2023) ("[T]he subsections surrounding 10(f) make explicit their concern with unfair labor practices.… This context suggests that, like its sister provisions, 10(f) is concerned solely with unfair labor practices."); *AFL-CIO v. NLRB,* 466 F. Supp. 3d 68, 84 (D.D.C. 2020) ("[B]ecause the *entirety* of section 160 solely focuses on NLRB orders on unfair

the exact words of § 18023 (d): hospitals are not "relieve[d]" of that legal duty under "EMTALA." At the very least, this "subsequent *legislation*," which "declar[es] the intent of an earlier statute[,] is entitled to great weight in statutory construction." *CPSC v. GTE Sylvania, Inc.*, 447 U.S. 102, 118, n.13 (1980); *see United States v. Stewart*, 311 U.S. 60, 64–65 (1940) ("That these two acts are *in pari materia* is plain. Both deal with precisely the same subject matter…. The later act can therefore be regarded as a legislative interpretation of the earlier act … in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting. It is therefore entitled to great weight in resolving any ambiguities and doubts."); *see generally* A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 254–55 (2012) ("The meaning of an ambiguous provision may change in light of a subsequent enactment.").

2. Idaho has no serious answer to § 18023(c)(1). Its *only* argument before the Ninth Circuit was that § 18023(c)(1) "contains an express savings clause stating that it is not to be construed to preempt state laws about abortion." Appellant's Br. at 40. More specifically, when faced with questioning about the ACA during the *en banc* oral argument, counsel for Idaho stated (before speeding up to quickly change the subject): "Subsection (c) … says that we should not construe the Affordable Care Act to preempt state laws about abortion procedural requirements, for example, that

---

labor practice disputes, the only reasonable construction of subdivision (f) takes into account that it only concerns NLRB orders on unfair labor practice disputes as well.").

you can't perform an abortion unless the mother's life is in danger." Oral Arg. Recording 1:08:19-1:08:32, *United States v. Idaho*, 23-35440 (Dec. 10, 2024), *at* https://www.ca9.uscourts.gov/media/video/?20241210/23-35440/.

As an initial matter, it is near-dispositive that Idaho does *not* question that § 18023 (d) addresses emergency terminations, and it *never* did so in any brief or oral argument in the *United States v. Idaho* litigation. *See, e.g.*, Reply Br. for the Petr. 13-14, *Moyle v. United States*, No. 23-726 (arguing only that "the administration skips over the intervening subsection (c), which contains an express savings clause for state law about abortion"). Idaho accepts the twin premises that 1) § 18023 deals entirely with abortion and, as a result; 2) § 18023(d) confirms Congress's intention that EMTALA's requirements apply to emergency termination services. Idaho's *only* argument in response to the ACA is that § 18023(c)(1) somehow saves its state law from § 18023(d). Put another way, throughout the entire two-and-a-half year litigation over § 18-622, Idaho has never disputed that § 18023(d) of the ACA would preempt a state law that imposes more than just "procedural requirements." It contends only that § 18-622 is the kind of narrow "procedural requirement" that brings Idaho's law outside of § 18023(d)'s (and EMTALA's) preemptive ambit.

But that contention does not pass the laugh test. Contrary to Idaho's borderline-disingenuous representation before the Ninth Circuit, Idaho's law is in no way a "procedural requirement." Section 18-622 is a ban on the *performance* of abortion—not the imposition of any "procedural requirements" related to abortion.

The Idaho Legislature knows how to enact a "procedural requirement" related to abortion when it wants to. *E.g.*, Idaho Code § 18-609A (parental consent requirement); Idaho Code § 18-608A (persons authorized to perform abortions).  In crystal-clear contrast to those "procedural requirements," § 18-622 creates a sweeping "felony for anyone to perform, attempt to perform, or assist with an abortion." *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1152 (Idaho 2023); *see Idaho*, 623 F.Supp.3d., at 1101 (noting that § 18-622 "bans *all* abortions" (emphasis in original)). For this reason, the Idaho Supreme Court literally called this law a "Total Abortion Ban." *Planned Parenthood Great Nw.,* at 1147.

Section 18023(c)(1) does not address state law bans on the *performance* of abortions—and certainly not "Total Abortion Bans" or even bans on the performance of abortions in EMTALA emergencies. By its own terms, § 18023(c)(1) covers state laws about "coverage, funding, or procedural requirements related to abortion." And the subsection expressly provides examples of "procedural requirements," including laws requiring "parental notification or consent for the performance of an abortion on a minor." *Id*. Idaho's "Total Abortion Ban" is fundamentally different from those statutory examples. "Even a child can tell that one of these things is not like the others." *Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1018–19 (9th Cir. 2017) (citing SESAME STREET, *One of These Things (Is Not Like the Others)*, on SESAME STREET BOOK & RECORD (Columbia Records 1970)). Section 18023(c)(1) is therefore *wholly inapplicable* to Idaho's "Total Abortion Ban" at issue here.

At bottom, Idaho's response to the ACA contains all that's needed to decide this case. The State correctly accepts that § 18023(d) entirely addresses abortion and confirms that EMTALA's requirements apply to emergency termination services. But the State incorrectly insists that Idaho's "Total Abortion Ban" is a "procedural requirement" to which § 18023(c)(1) would apply. If this is Idaho's best answer to § 18023(d), that is just further proof that the ACA is the most direct way to resolve this case.

3.    The *Moyle* dissenters fare no better.  Unlike Idaho, they do not concede that § 18023(d) entirely addresses abortion or reaffirms EMTALA's requirements as to emergency termination services. But their analysis of the ACA fails just the same because it violates the basic interpretive principle that "context … includes common sense." *Biden*, 143 S. Ct. at 2379 (Barrett, J., concurring).

For starters, the dissent would have us believe that the placement of Section 18023(d) was somehow coincidental. It insists that it is "totally unwarranted" to infer that "[b]ecause this provision was placed in a section of the Act concerning abortion, … it reflects a congressional understanding that EMTALA sometimes requires abortions." *Moyle*, 144 S. Ct. at 2032. In essence, the dissent maintains that *of all the places* in "the entire massive Affordable Care Act" that Congress could have "reaffirm[ed] the duty of participating hospitals to comply with EMTALA," *it just happened* to choose a section that is devoted entirely to abortion and uses the word

nineteen times. *Id.* at 11. But that is not how courts interpret statutes.[3] And even for a statute that is "far from a *chef d'oeuvre* of legislative draftsmanship," *Burwell*, 576 U.S. at 483 n.3 (citation omitted), the dissent's assertion defies commonsense.[4]

Next, the dissenters argue that "[t]he provision in question refers to the entire massive Affordable Care Act, not just the relatively few provisions concerning abortion." *Moyle*, 144 S. Ct. at 2032. To support this reading, the dissent compares 18023(d) with 18023(c), which it says "refer[s] more narrowly to 'this subsection.'" *Id.* But the dissent cherry-picks language from subsection 18023(c)(3), and in so doing fails to "consider[] the paragraph's text in its legal context." *Pulsifer v. United States*, 601 U.S. 124, 141 (2024). Critically, the dissent omits any discussion of subsections 18023(c)(1) and (c)(2), both of which: (1) refer to "this Act"; (2) link those references to "abortion"; and (3) are included under the title "Application of State and Federal laws regarding abortion." What's more, the reference to "this subsection" in (c)(3) is

---

[3] *E.g.*, *Yates v. United States*, 574 U.S. 528, 540-41 (2015) ("This placement accords with the view that Congress' conception of § 1519's coverage was considerably more limited than the Government's."); *United States v. Calvert*, 511 F.3d 1237, 1243 (9th Cir. 2008) ("The placement of certain prohibited acts in [Chapter 73] strongly indicates that the intent to commit such an act amounts to an intent to obstruct justice."); *see generally Holloway v. United States*, 526 U.S. 1, 6, (1999) ("In interpreting the statute at issue, we consider not only the bare meaning of the critical word or phrase but also *its placement* and purpose in the statutory scheme." (emphasis added)).

[4] EMTALA is referenced elsewhere in the ACA. *See* 26 U.S.C. § 501(r)(4)(B); 42 U.S.C. § 300gg-19a(b)(2)(A), (B). The dissent does not explain why Congress did not reaffirm EMTALA's requirements in *those* sections or even in its *own* section. Thus, the ACA's broader context—and not just commonsense—undercuts the dissent's reading of § 18023(d).

textually significant, but for a reason the dissent overlooks. Functioning as a carveout from the preceding subsections, subsection (c)(3) ensures that the provisions of (c)(1) and (c)(2) do not disturb the requirements of a particular federal law: Title VII of the Civil Rights Act.[5]

Accordingly, the dissent's overemphasis on the word "Act" underscores the wise reminder that "[c]ase reporters and casebooks brim with illustrations of why literalism—the antithesis of context-driven interpretation—falls short." *Biden*, 143 S. Ct. at 2379 (Barrett, J., concurring). The interpretive question here is whether § 18023(d)'s reference to "emergency services" contemplates "abortion" as one of those services. Stressing "this Act" versus "this subsection"—while trivializing the abortion-related language throughout Section 18023—is orthogonal to that question and antithetical to "context-driven" textualism. *Id.*

Finally, the *Moyle* dissenters cite statements by President Reagan as evidence that he would not have "happily signed EMTALA into law." *Moyle*, 144 S. Ct. at 2031. *Amici* doubt the interpretive value of presidential statements disconnected from EMTALA or the broader Consolidated Omnibus Budget Reconciliation Act of which it was a part. *See Artuz v. Bennett*, 531 U.S. 4, 10 (2000) (explaining that a statute's final wording "may, for all we know, have slighted policy concerns on one or the other

---

[5]    The dissent argues in footnote 13 that § 18023(d) "demands compliance with state emergency care requirements," and Idaho's law is such a requirement. But § 18-622 requires healthcare professionals to *not provide* emergency services. There is no provision-requirement to "relieve" them from. *See* § 18023(d).

side of the issue as part of the legislative compromise that enabled the law to be enacted"); *Lawson v. FMR LLC*, 571 U.S. 429 (2014) (Scalia, J, concurring) (rejecting reliance on enactment history because "we are a government of laws, not of men"); *cf. Gonzales v. Carhart*, 550 U.S. 124, 153 (2007) ("It is true this longstanding maxim of statutory interpretation has, in the past, fallen by the wayside when the Court confronted a statute regulating abortion."). But if one believes it appropriate to consider a president's general views on the subject matter of a piece of legislation, nothing about *President Obama's* signing of § 18023(d) into law "beggars belief." *Moyle*, 144 S. Ct. at 2031.

## II.     Even Apart From The ACA, EMTALA Preempts Idaho's Criminal Statute In Narrow Emergency Circumstances

Turning to EMTALA itself, the statute contains two features that are critical to the preemption analysis. Bearing those two features in mind, it is clear that EMTALA, on its own, preempts § 18-622.

1.     *First*, EMTALA applies only in emergency situations. The Act's stabilization requirement is triggered when "an individual at a hospital has an emergency medical condition." 42 U.S.C. § 1395dd(c)(1).

Significantly, EMTALA does not set a national standard of care for all medical services. Instead, it "was meant to supplement state law solely with regard to the provision of limited medical services to patients in emergency situations." *Harry v. Marchant*, 291 F.3d 767, 773 (11th Cir. 2002) (en banc); *see Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 352 (4th Cir. 1996) ("It seems manifest to us that

the stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment."); 131 Cong. Rec. 28,491, 28,569 (1985) (statement of Sen. Dole) ("Under the provision of this amendment, a hospital is charged only with the responsibility of providing an adequate first response to a medical crisis. That means the patient must be evaluated and, at a minimum, provided with whatever medical support services and/or transfer arrangements that are consistent with the capability of the institution and the well-being of the patient. We should expect nothing less.").

"Once EMTALA has met [its] purpose of ensuring that a hospital undertakes stabilizing treatment for a patient who arrives with an emergency condition, … the legal adequacy of that care is then governed not by EMTALA but by the state malpractice law that everyone agrees EMTALA was not intended to preempt." *Bryan*, 95 F.3d at 351; *see Harry*, 291 F.3d at 774 (same). EMTALA "cannot plausibly be interpreted to regulate medical and ethical decisions outside that narrow context." *Bryan*, 95 F.3d at 352. Put another way, EMTALA's preemptive force ends as soon as a patient receives stabilizing treatment. Here, the conflict between EMTALA and § 18-622 exists only in this narrow domain of emergency medical care.

*Second*, EMTALA focuses on "stabilizing" care. Crucially, EMTALA's stabilization requirement turns on the exercise of expert medical judgment. EMTALA's definition of "to stabilize" requires emergency providers "to provide such medical treatment of the condition as may be necessary to assure, *within reasonable*

*medical probability*, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(1)(A) (emphasis added). The plain text of this statutory definition relies on the "reasonable" medical judgments of emergency providers.

EMTALA neither requires nor prohibits any *specific* form of care in a given case. But it does call for medical professionals to assess probabilities and determine the best course of stabilizing care consistent with their "reasonable" medical assessments. *See Moyle*, 144 S. Ct. at 2018 (Kagan, J., concurring) ("The statute does not list particular treatments…. What it instead requires is the treatment that is medically appropriate to stabilize the patient."); *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 144 (4th Cir. 1996) (EMTALA requires emergency "treatment based on diagnostic medical judgment."); *Cherukuri v. Shalala*, 175 F.3d 446, 454 (6th Cir. 1999) ("The statutory definition of 'stabilize' requires a flexible standard of reasonableness that depends on the circumstances."). And as the Fifth Circuit has correctly recognized, the "reasonable medical probability" standard calls for "'[t]reatment that *medical experts* agree would prevent the threatening and severe consequence' of the patient's emergency medical condition while in transit." *Battle ex rel. Battle v. Mem'l Hosp.*, 228 F.3d 544, 559 (5th Cir. 2000) (emphasis added) (alteration in original); *see Smith v. Botsford Gen. Hosp.*, 419 F.3d 513, 519 (6th Cir. 2005) ("[C]ompliance with EMTALA's stabilization requirements entails medical judgment[.]"); *accord* 42 C.F.R. § 489.24(h)(2)(v) (a peer review organization must

provide CMS with an "expert medical opinion" to establish an EMTALA violation under the process set forth in 42 U.S.C. § 1395dd(d)(3)).

EMTALA's definition of "to stabilize" is both flexible and deferential, but for good reason. Congress recognized that untrained legislators never could have specified *every* form of care that might be needed for *every* type of medical emergency a hospital might confront. Instead, Congress accounted for the endless variability of care that may be needed in emergency situations while expressly respecting providers' expertise about the particular form of care that any emergency situation may require. In so doing, EMTALA strikes a careful balance by mandating a goal— stabilization—but deferring to "reasonable" medical judgment for how to achieve it.

Idaho has essentially ignored the statutory term "reasonable." Idaho's brief before the *en banc* Ninth Circuit, for example, cited the word only twice. *See* Appellant's Br. 8, 36. But it is central to any textual understanding of EMTALA. Congress's use of "reasonable" evinces an intention to defer to the expertise of medical professionals. Indeed, the Supreme Court recently explained that the term "reasonable" confers "a degree of discretion" and "flexibility." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024). Idaho's repeated failure to grapple with this statutory term, yet again, is inconsistent with good textualism. *E.g.*, A. Scalia & B. Garner, Reading Law 26 ("Textualism, in its purest form, begins and ends with what the text says and fairly implies.").

2.    Section 18-622 is preempted because it criminalizes an emergency

service option that federal law flexibly leaves to the "reasonable" judgment of medical professionals. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 878, 881 (2000) (finding conflict preemption where federal "standard deliberately sought variety … and allowing manufacturers to choose among" ways of attaining safety goals); *Barnett Bank v. Nelson*, 517 U.S. 25, 32–33 (1996) (holding that when federal law affords regulated entities a choice of options, state law that would forbid particular options is conflict-preempted); *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 155–56 (1982) (same); *see also Cantero v. Bank of Am., N.A.,* 602 U.S. 205, 216-17, 144 S. Ct. 1290, 1299 (2024) (explaining that *de la Cuesta* held a California law to be preempted because it "interfered with the flexibility given to the savings and loan by federal law"); *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 120 (2014) ("In *Geier*, the agency enacted a regulation deliberately allowing manufacturers to choose between different options…. The Court concluded that the [state law] action was barred because it directly conflicted with the agency's policy choice to encourage flexibility.").

Specifically, § 18-622 criminalizes an EMTALA-mandated stabilizing treatment in the rare case when termination is necessary to prevent "material deterioration" of a medical condition that can be expected to result in "serious jeopardy" to a patient's health, "serious impairment to bodily functions," or "serious dysfunction of any bodily organ or part," 42 U.S.C. § 1395dd. Where withholding treatment will mean material deterioration of an *already*-severe emergency medical

condition, and a physician accordingly determines that termination is medically necessary, EMTALA's provisions are clear: Clinicians must stabilize the patient even if that requires the tragic performance of an emergency termination. Idaho law, however, is equally clear: Emergency termination is a crime.

Medical professionals therefore face an impossible choice. On the one hand, they can provide emergency services that are medically necessary and federally mandated, but expose themselves to the discretion of Idaho prosecutors armed with § 18-622's criminal and professional sanctions. On the other hand, they can steer clear of prosecutorial scrutiny, but only by withholding medically necessary and federally mandated emergency services that would prevent *further* serious jeopardy to a pregnant patient's health, serious impairment of her bodily functions, or serious dysfunction of her organs. In other words, Idaho law takes away from physicians the emergency service option that affords, in a provider's judgment, the best possible outcome in a tragic situation. That presents an irreconcilable conflict, and EMTALA (as reinforced by the ACA) therefore preempts § 18-622 when narrowly applied to emergency medical services.

## **<u>CONCLUSION</u>**

This Court should grant the preliminary injunction.

DATED this 31ˢᵗ day of January, 2025.

GJORDING FOUSER HALL PLLC

_____
/s/ Trudy Hanson Fouser
Trudy Hanson Fouser – Of the Firm
Madison N. Miles – Of the Firm
Stephen L. Adams – Of the Firm

AMERICAN HOSPITAL ASSOCIATION

_____
/s/ Chad Golder
Chad Golder (*pro hac vice*)
*Attorneys for Amicus American Hospital Association, America's Essential Hospitals, and the American Association of Medical Colleges*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 31st day of January, 2025., a true and correct copy

of the foregoing was served on the following by the manner indicated:

| | |
|---|---|
| Wendy J. Olson<br>Alaina Harrington<br>STOEL RIVES LLP<br>101 S. Capitol Boulevard, Suite 1900<br>Boise, ID 83702<br>*Attorneys for Plaintiff* | ☐    Email:  wendy.olson@stoel.com;<br>alaina.harrington@stoel.com<br>☒    iCourt E-File |
| Lindsay C. Harrison<br>*(pro hac vic)*<br>Jessica Ring Amunson<br>*(pro hac vice)*<br>Ruby C. Giaquinto<br>*(pro hac vice)*<br>Sophia W. Montgomery<br>*(pro hac vice)*<br>JENNER & BLOCK LLP<br>1099 New York Avenue, NW, Suite 900<br>Washington, D.C. 20001 | ☐    Email:  lharrison@jenner.com;<br>jamunson@jenner.com; rgiaquinto@jenner.com;<br>smontgomery@jenner.com<br>☒    iCourt E-File |

/s/ Heather Perry
Heather Perry