RAÚL R. LABRADOR
ATTORNEY GENERAL

James E. M. Craig, ISB #6365
Chief, Civil Litigation
and Constitutional Defense

Brian V. Church, ISB #9391
Lead Deputy Attorney General
David J. Myers, ISB #6528
Deputy Attorney General
Office of the Attorney General
P. O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
james.craig@ag.idaho.gov
brian.church@ag.idaho.gov
david.myers@ag.idaho.gov

*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD., <br><br> *Plaintiff*, <br><br> v. <br><br> RAÚL LABRADOR, Attorney General of the State of Idaho <br><br> *Defendant*. | Case No. 1:25-cv-00015-BLW <br><br> **CONSOLIDATED MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT [DKT. 1] AND OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION [DKT. 2]** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................................................I

TABLE OF AUTHORITIES...................................................................................... III

INTRODUCTION ......................................................................................................1

BACKGROUND.........................................................................................................2

I.    The *United States v. Idaho* litigation before the district court.................2

II.   The *United States v. Idaho* appeal. ........................................................4

III.  The status of the *United States v. Idaho* proceedings in the district court. ........5

IV.   St. Luke's lawsuit. ...................................................................................5

LEGAL STANDARD...................................................................................................6

I.    Motion to dismiss. ...................................................................................6

II.   Preliminary injunction.............................................................................7

ARGUMENT .............................................................................................................7

I.    St. Luke's claims are not justiciable.........................................................7

A.    St. Luke's lacks Article III standing. ...................................................7

1. In this pre-enforcement challenge, St. Luke's cannot meet the requirements for standing..........................................................................................7

2. The Attorney General does not enforce the medical boards' laws. ..............10

3. St. Luke's lacks third-party standing to sue on behalf of its providers. ........11

B.    This suit is not ripe...........................................................................12

C.    The Attorney General has sovereign immunity. ................................14

II.   St. Luke's claims fail on the merits.........................................................16

A.    St. Luke's interpretation of EMTALA violates the constitutional requirements for Spending Clause legislation. ......................................16

1. St. Luke's interpretation of EMTALA vitiates the volutary acceptance requirement. ........................................................................................18

2. St. Luke's interpretation of EMTALA violates the knowing acceptance requirement. ........................................................................................19

B.    St. Luke's lacks a cause of action and is foreclosed from seeking equitable relief. ..................................................................................20

C.    St. Luke's lacks a cognizable theory because EMTALA does not establish a standard of care...................................................................22

D.    EMTALA's text and purpose preclude reading it as a preempting abortion mandate. ..................................................................................23

1. EMTALA's text imposes a duty to "the unborn child."................................23

2. EMTALA's purpose and context have nothing to do with preempting abortion mandate.................................................................................................................25

E.    St. Luke's also cannot establish a likelihood of success for the reasons outlined in *United States v. Idaho* litigation.................................................................29

1. Clear-statement canons of construction foreclose interpreting EMTALA as a preempting abortion mandate....................................................................................29

2. The statutory structure precludes St. Luke's view of EMTALA. ...................29

F.    St. Luke's Complaint fails to state a claim for preemption because it is premised on speculation. .................................................................................................30

III.    St. Luke's cannot satisfy the other preliminary injunction factors. ..............32

A.    St. Luke's lacks an irreparable injury.................................................................32

B.    The third and fourth preliminary injunction factors do not weigh in favor of St. Luke's. .........................................................................................................................35

CONCLUSION ...........................................................................................................35

## TABLE OF AUTHORITIES

### CASES

*Allen v. Cooper,*
  589 U.S. 248 (2020)................................................................................15

*Am. Trucking Ass'ns., Inc. v. City of Los Angeles,*
  559 F.3d 1046 (9th Cir. 2009).................................................................32

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
  548 U.S. 291 (2006)................................................................................19

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015)...............................................................20, 21, 22, 32

*Baker v. Adventist Health, Inc.,*
  260 F.3d 987 (9th Cir. 2001)...................................................................27

*Bates v. United Parcel Serv., Inc.,*
  511 F.3d 974 (9th Cir. 2007).....................................................................6

*Beckington v. Am. Airlines, Inc.,*
  926 F.3d 595 (9th Cir. 2019).....................................................................7

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)..................................................................................6

*Bryant v. Adventist Health System/West,*
  289 F.3d 1162 (9th Cir. 2002).................................................................23

*Cal. Pro-Life Council, Inc. v. Getman,*
  328 F.3d 1088 (9th Cir. 2003).................................................................12

*Caribbean Marine Servs. Co., Inc. v. Baldrige,*
  844 F.2d 668 (9th Cir. 1988)...................................................................33

*Cf. Va. Uranium, Inc. v. Warren,*
  587 U.S. 761 (2019)................................................................................21

*Clegg v. Cult Awareness Network,*
  18 F.3d 752 (9th Cir. 1994).......................................................................6

*Correa v. Hosp. San Francisco,*
   69 F.3d 1184 (1st Cir. 1995) ..................................................................................23

*Coy v. U.S. Dep't of Veterans Affs.,*
   No. 1:18-cv-00524-EJL, 2019 WL 2146588 (D. Idaho May 16, 2019).....................6

*de Cristo Cano v. Biden,*
   598 F. Supp. 3d 921 (S.D. Cal. 2022) .....................................................................33

*Dobbs v. Jackson Women's Health Org.,*
   597 U.S. 215 (2022)...............................................................................2, 8, 11 35

*Drakes Bay Oyster Co. v. Jewell,*
   747 F.3d 1073 (9th Cir. 2014)................................................................................35

*E.E.O.C. v. Waffle House, Inc.,*
   534 U.S. 279 (2002).................................................................................................18

*Eberhardt v. City of Los Angeles,*
   62 F.3d 1253 (9th Cir. 1995).............................................................................23, 26

*FDA v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024)..................................................................................................12

*Gatewood v. Wash. Healthcare Corp.,*
   933 F.2d 1037 (D.C. Cir. 1991) ..............................................................................23

*Goldie's Bookstore, Inc. v. Superior Court,*
   739 F.2d 466 (9th Cir. 1984)...................................................................................33

*Goodman v. Sullivan,*
   891 F.2d 449 (2d Cir. 1989) ....................................................................................27

*Hall v. Rocky Mountain Emergency Physicians, LLC,*
   155 Idaho 322 (2013)...............................................................................................28

*Hardy v. N.Y.C. Health & Hosp. Corp.,*
   164 F.3d 789 (2d Cir. 1999) ....................................................................................23

*Hoye v. City of Oakland,*
   653 F.3d 835 (9th Cir. 2011)....................................................................................30

*Idaho v. Coer d'Alene Tribe of Idaho,*
   521 U.S. 261 (1997)..................................................................................................16

*John Doe No. 1 v. Reed,*
  561 U.S. 186 (2010) ............................................................................................ 32

*Jones v. L.A. Central Plaza LLC,*
  74 F.4th 1053 (9th Cir. 2023) .............................................................................. 6

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) .............................................................................................. 8

*Massachusetts v. Mellon,*
  262 U.S. 447 (1923) ............................................................................................ 18

*Matsumoto v. Labrador,*
  701 F.Supp.3d 1069 (D. Idaho 2023) ............................................................ 6, 11

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ............................................................................................ 32

*Medtronic, Inc. v. Lohr,*
  518 U.S. 470 (1996) ....................................................................................... 18, 26

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) ............................................................................................ 30

*Moyle v. United States,*
  603 U.S. 324 (2024) ...................................................................................... *passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022) ................................................................................................ 30

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) .................................................................................. 16, 17, 18

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................................................ 35

*Papasan v. Allain,*
  478 U.S. 265 (1986) .............................................................................................. 6

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.,*
  636 F.3d 1150 (9th Cir. 2011) ............................................................................ 34

*Peace Ranch LLC v. Bonta,*
  93 F.4th 482 (9th Cir. 2024) ............................................................8

*Pennhurst State Sch. & Hosp. v. Halderman,*
  451 U.S. 1 (1981) .............................................................16, 17, 19

*PennEast Pipeline Co., LLC v. New Jersey,*
  594 U.S. 482 (2021) .......................................................................15

*Pilz v. Inslee,*
  No. 3:21-cv-05735-BJR, 2022 WL 1719172 (W.D. Wash. 2022) ...........................31

*Planned Parenthood Great Nw. v. State,*
  171 Idaho 374 P.3d 1132 (Idaho 2023) ...........................................3, 8

*Powers v. Ohio,*
  499 U.S. 400 (1991) .......................................................................11

*Pride v. Correa,*
  719 F.3d 1130 (9th Cir. 2013) .......................................................6

*Safe Air for Everyone v. Meyer,*
  373 F.3d 1035 (9th Cir. 2004) .......................................................6

*Sato v. Orange Cnty. Dep't of Educ.,*
  861 F.3d 923 (9th Cir. 2017) .........................................................7

*Scott v. Pasadena Unified Sch. Dist.,*
  306 F.3d 646 (9th Cir. 2002) .........................................................14

*Seminole Tribe of Fla. v. Florida,*
  517 U.S. 44 (1996) .........................................................................20

*Seyb v. Members of the Idaho Board of Medicine, et. al.,*
  No. 1:14-cv-00244-BLW (D. Idaho) ...........................................11, 12

*SNL Workforce Freedom All. v. Nat'l Tech. & Eng'g Sols. of Sandia, LLC,*
  No. 1:22-cv-00001-KWR-SCY, 2022 WL 2065062 (D.N.M. June 8, 2022) ...........................33

*Spears v. State,*
  278 So. 2d 443 (Miss. 1973) ..........................................................3

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) .......................................................................6

*Starbucks Corp. v. McKinney,*
  144 S. Ct. 1570 (2024) ................................................................7

*Stormans, Inc. v. Selecky,*
  586 F.3d 1109 (9th Cir. 2009) ..................................................12

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) .....................................................................8

*Texas v. Becerra,*
  89 F.4th 529 (5th Cir. 2024) ..............................23, 25, 27, 28

*Thomas v. Anchorage Equal Rts. Comm'n,*
  220 F.3d 1134 (9th Cir. 2000) ..................................................12

*Tingley v. Ferguson,*
  47 F.4th 1055 (9th Cir. 2022) ..................................................12

*Torretti v. Main Line Hosps., Inc.,*
  580 F.3d 168 (3d Cir. 2009) ......................................................23

*Twitter, Inc., v. Paxton,*
  26 F.4th 1119 (9th Cir. 2022) ....................................................7

*Twitter, Inc., v. Paxton,*
  56 F.4th 1170 (9th Cir. 2022) ..................................................12

*United States v. Jimenez,*
  191 F.Supp.3d 1038 (N.D. Cal. 2016) ..................................30

*United States v. Idaho,*
  No. 1:22-cv-00329-BLW (D. Idaho) ................................*passim*

*United States v. Idaho,*
  No. 23-35440 (9th Cir.) ....................................................*passim*

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,*
  535 U.S. 635 (2002) ..........................................15, 20, 21

*Viceroy Gold Corp. v. Aubry,*
  75 F.3d 482 (9th Cir. 1996) ......................................................11

*Vickery Jones,*
  100 F.3d 1334 (7th Cir. 1996) ..................................................16

CONSOLIDATED MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT
[DKT. 1] AND OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION [DKT. 2] — vii

*Wash. State Grange v. Wash. State Republican Party,*
   552 U.S. 442 (2008)................................................................................30

*Will v. Mich. Dep't of State Police,*
   491 U.S. 58 (1989)..................................................................................15

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................... 7, 32

*Wolfe v. Stankman,*
   392 F.3d 358 (9th Cir. 2004)....................................................................6

*Wyler Summit P'ship v. Turner Broad. Sys. Inc.,*
   135 F.3d 658 (9th Cir. 1998)....................................................................6

*Young v. Hawaii,*
   992 F.3d 765 (9th Cir. 2021)............................................................ 30, 32

IDAHO STATE CONSTITUTION

IDAHO CONSTITUTION art. IV, § 1 .............................................................33

STATUTES

Idaho Code § 18-622 ....................................................................*passim*

Idaho Code § 54-1814 .....................................................................11

Idaho Code § 54-1413 .....................................................................11

Idaho Code § 67-1406 .....................................................................10

Idaho Code § 67-2601 .....................................................................10

42 United States Code § 1395 ........................................................*passim*

42 United States Code § 1396 ...........................................................20

42 United States Code § 1983 ...........................................................20

**RULES AND REGULATIONS**

Rule 12(b)(1) ................................................................................................ 6, 7

Rule 12(b)(6) ................................................................................................. 6,7

Fed. R. Civ. P. 12(b)(6) ................................................................................... 6

Fed R. Civ. P. 65(d)(2)(B) ............................................................................. 33

**OTHER AUTHORITIES**

2020 Idaho Session Laws 827-28 ..................................................................... 2

## INTRODUCTION

The State of Idaho seeks to protect human life, including unborn children. As many criminal laws demonstrate, the preservation of life is a common reason for a state to exercise its police power. Here, the people of Idaho did so through the Defense of Life Act. That Act reflects an important balance related to the protection of life: it permits an abortion—the killing of the unborn child—if a physician in his good faith medical judgment deems it necessary to prevent the death of the mother. And that policy judgment appears to be paying off. In 2023, the first full year in which Idaho's laws were in effect, pregnancy-related deaths dropped by 44.4% compared to 2021.[1] Idaho's laws are saving lives.

In 2022, the United States sued to enjoin the Act as preempted by EMTALA, and this Court granted that injunction, which is now on appeal before the Ninth Circuit en banc. St. Luke's, fearful that the United States may change its position, now sues to obtain an "identical" injunction against the Attorney General of Idaho. But as this Court recognized, that was "based on speculation at the moment." Dkt. 12 at 2. As the Court said, "[i]t is not certain whether or when the new administration might move to vacate the injunction and dismiss the action." *Id.* The new administration has taken no such action. For this reason and many others, the Court should deny St. Luke's motion for preliminary injunction and dismiss this action.

First, St. Luke's claims are not justiciable. It lacks standing and its claims are unripe because the Attorney General has not threatened to enforce the Act against it—to the

---

[1] *See* Idaho MMRC Annual Report 2023, State of Idaho Division of Occupational and Professional Licenses, at 3 (2025), available at https://dopl.idaho.gov/wp-content/uploads/2025/01/Maternal-Mortality-Report-2023.pdf. The Court can take judicial notice of the report under Fed. R. Evid. 201.

contrary, the Attorney General is enjoined from doing so. And even if the United States were to change its position, it is pure speculation that it would enforce EMTALA against St. Luke's so as to give rise to a conflict between federal and state law. Plus, St. Luke's claims against the Attorney General are barred by sovereign immunity.

Second, St. Luke's is not likely to succeed on the merits—to the contrary, its claims fail as a matter of law. Its theory of preemption contravenes the limits of the Spending Clause power because Idaho receives no Medicare funds and EMTALA carries no clear and unambiguous statement of an abortion mandate. It lacks a cause of action to enforce either EMTALA or the Supremacy Clause. And it reads EMTALA in a manner contrary to the statute's plain text, purpose, structure, historical enforcement, and interpretive canons.

Third, St. Luke's cannot satisfy the other preliminary injunction factors. Without a cognizable injury, it has no irreparable harm, and the balance of equities tips sharply away from its novel theory.

For these reasons, the Court should dismiss St. Luke's Complaint and deny St. Luke's motion for a preliminary injunction.

**BACKGROUND**

### I.  The *United States v. Idaho* litigation before the district court.

This case concerns Idaho Code § 18-622, known today as the Defense of Life Act, and another lawsuit involving the federal government. Idaho Code § 18-622 took effect in August 2022, following the issuance of the decision in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 292 (2022). This law implements Idaho's policy of prohibiting abortion except when necessary to preserve the life of the pregnant woman. *See* 2020 Idaho Sess. Laws 827–28. Idaho

law has prohibited abortion except when necessary to save the life of the mother since Idaho's territorial days, for more than 100 years before the Supreme Court's *Roe* decision. *Planned Parenthood Great Nw. v. State*, 171 Idaho 374, 391, 522 P.3d 1132, 1149 (2023).

The United States sued the State of Idaho shortly before Idaho Code § 18-622 took effect, contending that the law was preempted by the Supremacy Clause and the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd, known as EMTALA. *See generally United States v. Idaho*, No. 1:22-cv-00329-BLW (D. Idaho) ("*United States v. Idaho*"), Dkt. 1. Following expedited proceedings, the court enjoined the relevant enforcement provisions of Idaho Code § 18-622 in the limited circumstance "as applied to medical care required by . . . EMTALA." *Id.*, Dkt. 95 at 38.

The State sought reconsideration of the district court's decision for a variety of reasons, including an intervening ruling by the Idaho Supreme Court rejecting a challenge to Idaho's abortion laws, including Idaho Code § 18-622.[2] *See Planned Parenthood*, 171 Idaho 374, 522 P.3d

---

[2] The Idaho Supreme Court made four key determinations applicable to § 18-622. *First*, the court clarified that the termination of ectopic and non-viable pregnancies did not fall within the statutory definition of abortion. *Planned Parenthood*, 171 Idaho at 444–45, 522 P.3d at 1202–03. *Second*, the court rejected a vagueness challenge to the phrase "necessary to prevent the death of the pregnant woman." That language "leaves wide room for the physician's 'good faith medical judgment' on whether the abortion was 'necessary to prevent the death of the pregnant woman' based on those facts known to the physician at that time." *Id.* at 445, 522 P.3d at 1203. *Third,* the court also rejected any assertion that the law required "*objective* certainty, or a particular level of immediacy," noting instead the law used broad language "to allow for the 'clinical judgment that physicians are routinely called upon to make for proper treatment of their patients.'" *Id.* (quoting *Spears v. State*, 278 So. 2d 443, 445 (Miss. 1973)). *Fourth*, the court rejected any argument that the statute contained any requirement of a "certain percent chance" that death will occur. *Id.* at 446, 522 P.3d at 1204.

1132. However, the district court denied reconsideration of its preliminary injunction. *United States v. Idaho*, Dkt. 135.

## II. The *United States v. Idaho* appeal.

After the district court rejected the request to reconsider its preliminary injunction, the State and the Legislature appealed. *Id.*, Dkts. 137, 141. The Legislature requested a stay of the injunction, which a panel of the Ninth Circuit granted. *United States v. Idaho*, No. 23-35440 (9th Cir.) ("9th Cir. Appeal"), Dkt. 49. After the federal government moved for emergency reconsideration of that order en banc, the Ninth Circuit took the appeals en banc and vacated the stay, and the en banc court entered an order denying the motion to stay. *Id.*, Dkts. 53, 69, 73. The State and the Legislature sought certiorari and a stay of the injunction from the Supreme Court of the United States, and the high court took up the matter and issued a stay of the injunction. *Id.*, Dkt. 101. After oral argument, the Supreme Court vacated the stay and dismissed the petitions for writ of certiorari as improvidently granted. *Moyle v. United States*, 603 U.S. 324 (2024).

Following the Supreme Court's actions, the Ninth Circuit requested replacement briefing. 9th Cir. Appeal, Dkt. 116. After the parties submitted replacement briefing, the en banc court heard argument on the appeal in December 2024. The matter is still pending.

### III. The status of the *United States v. Idaho* proceedings in the district court.

Based upon concessions made by the United States in the *Moyle* Supreme Court proceedings,[3] the State of Idaho moved the district court to modify its preliminary injunction to account for the status quo. *United States v. Idaho*, Dkts. 166, 169. Contrary to St. Luke's contentions, *see* Dkt. 2-1 at 7, the Court has not yet ruled on that motion.

### IV. St. Luke's lawsuit.

Recently, St. Luke's, a Medicare provider, filed this suit against the Attorney General. *See generally* Dkt. 1. St. Luke's says it is pursuing an equitable cause of action against the Attorney General because, in its words, "Idaho Code § 18-622 violates the Supremacy Clause and is preempted to the extent it is contrary to EMTALA." *Id.* ¶ 66. It seeks declaratory and injunctive relief. *Id.* at 23–24. St. Luke's seeks a preliminary injunction "identical" to the injunction this Court issued in *United States v. Idaho*. Dkt. 2. St. Luke's also moved to consolidate its case with the *United States v. Idaho* action, Dkt. 4, and the Attorney General has responded to that motion separately. Apparently fearing the change in presidential administrations, St. Luke's filed a motion to expedite the issuance of the preliminary injunction. Dkt. 3. This Court denied the motion as speculative. Dkt. 12. Now, the Attorney General opposes St. Luke's motion for a preliminary injunction and also moves for dismissal of the Complaint.

---

[3] In the *Moyle* proceedings, the federal government (1) "disavowed the notion that an abortion is ever required as stabilizing treatment for mental health conditions"; (2) explained that post-viability, "EMTALA requires delivery, not abortion"; (3) argued that "EMTALA requires abortion only in an 'emergency acute medical situation,' where a woman's health is in jeopardy if she does not receive an abortion 'then and there'"; and (4) "clarified that federal conscience protections, for both hospitals and individual physicians, apply in the EMTALA context." *See Moyle*, 603 U.S. at 335–36 & n.* (Barrett, J., concurring).

LEGAL STANDARD

## I.  Motion to dismiss.

"Challenges to Article III standing are properly raised in a Rule 12(b)(1) motion to dismiss." *Matsumoto v. Labrador*, 701 F. Supp. 3d 1069, 1073 (D. Idaho 2023) (citing *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007)). A facial attack "challenges that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction." *Id.* (citing *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004); *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)). The allegations in the Complaint are accepted as true and inferences are drawn in favor of the plaintiff. *Id.* at 1074 (citing *Jones v. L.A. Cent Plaza LLC*, 74 F.4th 1053, 1056 n.1 (9th Cir. 2023); *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013)). To survive a Rule 12(b)(1) facial challenge at the pleading stage, "the Complaint must 'clearly allege facts demonstrating each element' of standing." *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) "tests the sufficiency of a party's claim for relief." *Coy v. U.S. Dep't of Veterans Affs.*, No. 1:18-cv-00524-EJL, 2019 WL 2146588, at *2 (D. Idaho May 16, 2019). A plaintiff's complaint must include enough facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "On a motion to dismiss, all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). Courts do not accept as true legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994). "Dismissal is appropriate when the

complaint lacks a cognizable legal theory or sufficient factual allegations to support a cogniza-

ble legal theory." *Beckington v. Am. Airlines, Inc.*, 926 F.3d 595, 604 (9th Cir. 2019) (cleaned up).

The Ninth Circuit has described prudential ripeness as a non-merits threshold issue.

*See Twitter, Inc. v. Paxton*, 26 F.4th 1119, 1124 (9th Cir. 2022) (citation omitted). In the same

vein, sovereign immunity is a quasi-jurisdictional issue that may may be raised via Rule 12(b)(1)

or Rule 12(b)(6). *Sato v. Orange Cnty. Dep't of Educ.*, 861 F.3d 923, 927 n.2 (9th Cir. 2017).

## II. Preliminary injunction.

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded

as of right.'" *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (quoting *Winter v. Nat.

Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "[A] plaintiff seeking a preliminary injunction must

make a clear showing that '[1] he is likely to succeed on the merits, [2] that he is likely to suffer

irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his

favor, and [4] that an injunction is in the public interest.'" *Id.* (quoting *Winter*, 555 U.S. at 20).

ARGUMENT

## I. St. Luke's claims are not justiciable.

### A. St. Luke's lacks Article III standing.

#### 1. *In this pre-enforcement challenge, St. Luke's cannot meet the requirements for standing.*

St. Luke's lacks standing because it concedes its claims are hypothetical and conditional.

Acknowledging the existence and current applicability of the *United States v. Idaho* injunction,

St. Luke's expresses its concern that "*If* the preliminary injunction issued in *United States v.

Idaho* is no longer in place and [Idaho Code § 18-622] goes into full effect" then its providers

could be subject to possible criminal liability and it could face losing Medicare funding. Dkt.

1 ¶ 44 (emphasis added); *accord id.* ¶ 46. That hasn't happened. This Court lacks jurisdiction to adjudicate a controversy involving hypothetical events.

Article III standing requires injury in fact, causation, and a likelihood that a favorable decision redresses the plaintiff's alleged injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Where, as here, the alleged injury "is the anticipated enforcement of the challenged statute in the future," then the suit is based on alleged pre-enforcement standing. *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024).

The Ninth Circuit recently clarified that the *Driehaus* test applies in considering pre-enforcement standing. *Id.* (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)). The *Driehaus* test has three elements: "[1] A plaintiff must first allege an intention to engage in a course of conduct arguably affected with a constitutional interest. [2] The intended future conduct must be arguably proscribed by [the challenged] statute. [3] And finally, the threat of future enforcement must be substantial." *Peace Ranch*, 93 F.4th at 487 (citations omitted and cleaned up). St. Luke's cannot meet these requirements.

**No constitutional interest.** St. Luke's has not alleged that committing abortion is "arguably affected with a constitutional interest." And for good reason. The *Dobbs* Court held "that the Constitution does not confer a right to abortion," full stop. *Dobbs*, 597 U.S. at 292; *see also Planned Parenthood*, 171 Idaho at 390, 522 P.3d at 1148 ("the Idaho Constitution, as it currently stands, does not include a fundamental right to abortion"). Even framing the intended course of conduct as providing "stabilizing treatment" does St. Luke's no favor either, because again it has not alleged or shown that such action is "arguably affected with a

constitutional interest." Rather, all St. Luke's has arguably shown is its desire to comply with a *contract* (St. Luke's' Medicare agreement) that the Attorney General is not a party to.

**No substantial threat of enforcement.** Because enforcement of Idaho Code § 18-622 is enjoined relevant to this lawsuit, there is no "substantial" threat of future enforcement. In its Complaint, St. Luke's points to the Attorney General's July 1, 2024, letter where he says he will "enforce [the law] in the vast majority of circumstances." Dkt. 1 ¶ 15 & n.4. But this statement simply recognizes the current state of the law: the Defense of Life Act is a valid enactment of the Idaho Legislature that has only been enjoined in a limited context, and thus the Attorney General will enforce the law in the vast majority of circumstances. *See Moyle*, 603 U.S. at 337 ("Now, based on the parties' representations, it appears that the injunction will not stop Idaho from enforcing its law in the vast majority of circumstances."). The Attorney General acknowledges the current *United States v. Idaho* injunction, and nothing St. Luke's has cited shows otherwise.

Even St. Luke's theory of hypothetical harm fails. St. Luke's claims are premised on the possibility that the United States may change its position regarding the enforcement of EMTALA and seek to dismiss its case against Idaho. *See* Dkt. 2-1 at 1. But even if such a change in position were to result in vacating this Court's injunction, it would also result in removing any threat. St. Luke's is not subject to any threat of impossibility conflict if the United States no longer enforces the view that EMTALA may require abortions prohibited by state law. And St. Luke's theory that, after a hypothetical change in position by this administration, a hypothetical future administration may change positions yet again piles speculation upon speculation that does not amount to an injury in fact. *See id.* And because the events that

St. Luke's claims give rise to its injury are entirely hypothetical at this time, the Attorney General seeks leave to submit supplemental briefing on these questions in response to any change in position by the United States.

### 2. The Attorney General does not enforce the medical boards' laws.

St. Luke's asks that the Court also enjoin the Attorney General from enforcing Idaho Code § 18-622 as it pertains to the professional licenses of its medical providers. But problematic for St. Luke's is that the Attorney General does not enforce the relevant boards' laws and rules, or serve as a prosecutor for the various boards under the Division of Occupational and Professional Licensing. *See generally* Idaho Code § 67-1406(2) (noting agencies not required to use the services of the Attorney General); Idaho Code § 67-2601(2)(h); Idaho Code § 67-2604 (noting the authority of the Administrator of the Division of Occupational and Professional Licensing).

St. Luke's, in a footnote, refers to the members of the boards of medicine and nursing entering a stipulation in another case to "take no disciplinary action against a licensee pursuant to § 18-622 absent a criminal conviction." Dkt. 2-1 at 19 n.5 (citation omitted). And so St. Luke's alleges that "[t]he Attorney General's decision to bring a criminal case is therefore also a precondition to imposition of these deterrent licensure penalties." *Id.* But the fact that a criminal conviction is, according to the members of the boards, a condition precedent to a board taking licensing action does not change the fact that it is the boards themselves that

have the enforcement authority of their statutes.[4] The Attorney General does not.[5]

### 3.   *St. Luke's lacks third-party standing to sue on behalf of its providers.*

St. Luke's, it appears, also purports to bring claims on behalf of its providers. *See, e.g.*, Dkt. 1 ¶¶ 44, 46, 47, 50. To have standing to raise third-party claims, the litigant (St. Luke's) must have suffered an injury in fact, must have a close relation to the third party, and "there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991). As discussed above, St. Luke's does not have an injury for the pre-enforcement challenge it raises. Whether St. Luke's has a close relationship with its providers is something the Court need not address because there is no hindrance to a provider raising his or her own interests. *See Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 489 (9th Cir. 1996) (noting there must be a "genuine obstacle," something more than a lack of motivation or lack of individual economic stake); *see also Dobbs*, 597 U.S. at 286–87 (criticizing the Supreme Court's earlier abortion cases that "have ignored the Court's third-party standing doctrine"). In fact, one of St. Luke's providers has filed a lawsuit, that this Court presides over, against numerous defendants seeking to invalidate the Defense of Life Act in certain circumstances. *See generally Seyb*, No. 1:14-cv-00244-BLW.

---

[4] In a recent argument in *Seyb v. Members of the Idaho Board of Medicine*, No. 1:24-cv-00244-BLW (D. Idaho), the Court questioned whether a conviction was actually a condition precedent to the boards enforcing their statutes.

[5] The fact that the Attorney General lacks a connection to the enforcement of the board disciplinary statutes is also a reason why he is not a proper *Ex parte Young* defendant for such purposes. *Compare* Idaho Code §§ 54-1814, 54-1413 (assigning disciplinary authority to the boards) *with Matsumoto v. Labrador*, 122 F.4th 787, 796 (9th Cir. 2024) (concluding that criminal enforcement role under the challenged statute made the Attorney General a proper defendant).

Any claim asserted by a physician to enforce EMTALA would also be futile. "EM-TALA does not impose obligations on individual doctors." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 389 (2024). And so there is nothing of EMTALA for the physicians to "enforce" as against the Attorney General.

**B.   This suit is not ripe.**

Even apart from the lack of Article III standing, St. Luke's claims are prudentially un-ripe.[6]

Prudential ripeness has two components: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Tingley v. Ferguson*, 47 F.4th 1055, 1070 (9th Cir. 2022) (quoting *Thomas v. Anchorage Equal Right's Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (en banc)). For the first component, the Court examines whether the issues raised are primarily legal, which do not require further factual development, and whether the challenged action is final. *Id.* (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009)). The Ninth Circuit "consider[s] … 'whether the action has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate compliance with its terms.'" *Id.* For the second component of prudential ripeness, the Ninth Circuit considers whether the law "requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to

---

[6] The doctrine of ripeness includes constitutional and prudential ripeness. Constitutional ripe-ness is "synonymous with the injury-in-fact prong of the standing inquiry." *Twitter, Inc. v. Pax-ton*, 56 F.4th 1170, 1173 (9th Cir. 2022) (quoting *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 n.2 (9th Cir. 2003)).

noncompliance." *Id.* at 1071. Hardship to the government from allowing a case to move forward is also a consideration. *Id.*

In this case, further factual development is required before the suit is ready for adjudication by the Court. As three members of the Supreme Court noted in *Moyle*, both the United States and State of Idaho "dramatic[ally] narrow[ed] … the dispute." *Moyle*, 603 U.S. at 337 (Barrett, J., concurring). In that suit, "[t]he United States identified PPROM, placental abruption, pre-eclampsia, and eclampsia as conditions for which EMTALA requires an emergency abortion to be available." *Id.* at 335–36 (Barrett, J., concurring). The State acknowledged that each of these conditions could be treated by an abortion where it was necessary to prevent the death of the mother "even if the threat to the woman's life is not imminent." *Id.* at 336 (citing briefing and transcript) (Barrett, J., concurring).

Here, St. Luke's presents a declaration from a doctor identifying six women St. Luke's transferred out of state—at least more than six months ago—who had preeclampsia and PPROM. *See* Dkt. 2-1 at 9 (summarizing Dkt. 2-2 ¶¶ 5–14). St. Luke's also alleges that "[s]evere harm will result from Idaho's law." Dkt. 1 ¶ 45. Further factual development is needed to understand why St. Luke's transferred these women out of state, why St. Luke's providers did not provide an abortion in Idaho if they determined if was necessary to save the life of the mother, why St. Luke's contends its providers must wait "until death is imminent" even though the Idaho Supreme Court has held this understanding of the law to be incorrect, and why St. Luke's believes that Idaho's law will result in severe harm. This is especially true given the fact that in 2023, the first full year in which Idaho's laws were in effect, there was a 44.4% decrease in pregnancy related deaths compared with 2021, the last full year in which Roe was

in place, and that medical error and denial of care were not contributing fac-tors in any of the deaths.[7] Plus, how St. Luke's would respond to a pregnant woman suffering PPROM or from preeclampsia in the future is unclear, *after* the Supreme Court ruling, which again counsels in favor of further factual development. To put it differently, given what the Supreme Court has considered at most to be a narrow conflict between EMTALA and state law, further factual development is needed to show whether St. Luke's brought a case within the bounds of that alleged, narrow conflict.

And there is no hardship to St. Luke's if this Court were to pass on this case at this time. The Complaint acknowledges that Idaho Code § 18-622, in relevant part, is (today and when the Complaint was filed) enjoined as relevant to this suit. Because any alleged harm here is contingent on uncertain future actions by the United States, a non-party to this suit, "that may not occur as anticipated, or indeed may not occur at all," any claim for equitable relief by St. Luke's is not yet ripe for judicial resolution. *See Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 662 (9th Cir. 2002) (noting that prudential ripeness considerations "are amplified where constitutional issues are concerned" and collecting cases).

### C. The Attorney General has sovereign immunity.

The only defendant in this suit is the Attorney General sued in his official capacity. Dkt. 1 ¶ 14. This is a suit against "the official's office" and "is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citations omitted).

---

[7] *See* Idaho MMRC Annual Report 2023, State of Idaho Division of Occupational and Profes-sional Licenses, at 3 (2025), available at https://dopl.idaho.gov/wp-content/up-loads/2025/01/Maternal-Mortality-Report-2023.pdf. The Court can take judicial notice of the report under Fed. R. Evid. 201.

However, under the constitutional system of the United States, "a federal court generally may not hear a suit brought by any person against a nonconsenting State." *Allen v. Cooper*, 589 U.S. 248, 254 (2020). This is because as a sovereign entity, each state is not amenable to suit absent consent, and "that fundamental aspect of sovereignty constrains federal 'judicial authority.'" *Id.* at 254–55 (citations omitted). The State and its officials, including the Attorney General, are thus protected from suit by the State's sovereign immunity.[8]

To be sure, the Supreme Court of the United States "has permitted a federal court to entertain a suit against a nonconsenting State on two conditions"—the first being that Congress unequivocally legislated a statutory abrogation of a state's immunity from suit and second that a constitutional provision must have allowed Congress to abrogate this aspect of sovereignty. *Id.* at 255. But neither condition applies in this case.

So that it is clear, the Attorney General does not consent and has not consented to this suit, and St. Luke's does not claim any consent. *See generally* Dkts. 1, 2-1. Nor has St. Luke's identified any statutory abrogation of the Attorney General's sovereign immunity here or expressed how such would be consistent with the Constitution of the United States. Thus, this suit is barred by sovereign immunity.

The *Ex parte Young* fiction applies only if the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521

---

[8] The Attorney General uses "sovereign immunity" in this opposition, recognizing that some courts refer to this as Eleventh Amendment Immunity. *See generally PennEast Pipeline Co., LLC v. New Jersey*, 594 U.S. 482, 509–12 (2021) (Gorsuch, J., dissenting) (discussing structural immunity and the immunity derived from the Eleventh Amendment).

U.S. 261, 296 (1997) (O'Conner, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment)); *accord, e.g., Vickery v. Jones*, 100 F.3d 1334, 1346 (7th Cir. 1996) ("[T]he *Young* exception permits relief against state officials only when there is an ongoing or threatened violation of federal law."). That is not true here. *First*, the Complaint does not allege that the Attorney General is currently or is about to violate federal law. EMTALA does not apply to the Attorney General, and the Supremacy Clause does not command him to do anything. *Second,* the Complaint acknowledges the existence of the *United States v. Idaho* injunction, which it admits is in force today. Dkt. 1 ¶¶ 31, 42; *see also id.* ¶¶ 5, 7. That injunction enjoins the Attorney General from enforcing Idaho Code § 18-622 as relevant here. As such, there is no threatened or ongoing violation of federal law. Moreover, St. Luke's has not alleged any enforcement action taken by the Attorney General in contravention of that injunction or that was otherwise taken to enforce Idaho Code § 18-622, nor any threat to violate the injunction.

## II.  St. Luke's claims fail on the merits.

### A.  St. Luke's interpretation of EMTALA violates the constitutional requirements for Spending Clause legislation.

The legitimacy of Congress's exercise of the spending power "rests on whether the *State voluntarily and knowingly* accepts the terms of the 'contract.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) (emphasis added) (opinion of Roberts, C.J.) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

### 1. St. Luke's interpretation of EMTALA vitiates the voluntary acceptance requirement.

A state's acceptance of Spending Clause conditions must be voluntary. *Sebelius*, 567 U.S. at 577 (opinion of Roberts, C.J.) (quoting *Pennhurst State Sch. & Hosp.*, 451 U.S. at 577). St. Luke's claim that private actors' agreements with the federal government override state law, regardless of whether the state voluntarily assented, makes spending power limitations wholly illusory. Indeed, in *Moyle*, the federal government told the Supreme Court that the spending power gives it the authority to regulate the practice of medicine in every state. *Moyle*, No. 23-276 (April 24, 2024) (Oral Arg. Tr. at 99–100).[9] All the federal government must do to preempt Idaho law, it says, is pay private hospitals, even if Idaho takes no funds. It even acknowledged the implications of this view: through this mechanism, the spending power would allow the government either to ban or to mandate abortion or gender-reassignment surgeries for minors nationwide. *Id.*[10] So much for "the historic primacy of state regulation of matters of health and

---

[9] JUSTICE GORSUCH: [C]ould the federal government essentially regulate the practice of medicine of the states through the Spending Clause . . . Congress could prohibit gender reassignment surgeries across the nation, it could ban abortion across the nation, through the use of its Spending Clause authority, right?

GENERAL PRELOGAR: Congress does have broad authority under the Spending Clause. And, yes, if it satisfies the conditions that the Spending Clause themself -- itself requires, then I think that that would be valid legislation.

[10] Three Justices have highlighted just a few of the "far-reaching" "potential implications of permitting preemption" where Idaho is not even a party to the conditional grant of federal funds:

> Congress could apparently pay doctors to perform not only emergency abortions but also third-trimester elective abortions or eugenic abortions. It could condition Medicare funds on hospitals' offering assisted suicide even in the vast

safety." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). The government's and St. Luke's extraordinary view of the spending power would vastly "undermine the status of the States as independent sovereigns in our federal system" and "runs contrary to our system of federalism." *Sebelius*, 567 U.S. at 577–78 (opinion of Roberts, C.J.); *see also id.* at 675 (the "formidable power [of the Spending Clause], if not checked in any way, would present a grave threat to the system of federalism created by our Constitution") (joint dissent of Scalia, Kennedy, Thomas, and Alito, JJ.).

Courts reasonably expect "the States to defend their prerogatives by adopting 'the simple expedient of not yielding' to federal blandishments when they do not want to embrace the federal policies as their own." *Id.* at 579 (opinion of Roberts, C.J.) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923)). But St. Luke's would bind states to bargains they have refused simply because *private entities* yield to federal blandishments. That would allow the United States to preempt not just an internal hospital regulation but a democratically enacted state law. The United States' contract with a private hospital cannot bind a nonconsenting state, any more than any contract can bind a nonparty. *See, e.g.*, *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty.").

---

majority of States that ban the practice. It could authorize the practice of medicine by any doctor who accepts Medicare payments even if he or she does not meet the State's licensing requirements.

*Moyle*, 603 U.S. at 357 (joint dissent of Alito, Thomas, and Gorsuch, JJ.).

### 2. *St. Luke's interpretation of EMTALA violates the knowing acceptance requirement.*

The Spending Clause's clear-notice requirement ensures that a state knowingly accepts federal conditions. To be binding, a condition must be set out "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *see also Moyle*, 603 U.S. at 347 (joint dissent of Alito & Thomas, JJ.) ("even if there were some ambiguity in the statutory text, we would be obligated to resolve that ambiguity in favor of the State because EMTALA was enacted under the Spending Clause, and as we have held time and again, conditions attached to the receipt of federal funds must be unambiguous."). In fact, "[t]here can . . . be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Pennhurst State Sch. & Hosp.*, 451 U.S. at 17. Nor may Congress change the terms of the bargain through a post-acceptance "surpris[e]." *Id.* at 25. Such a modification would negate the requirement that States knowingly consent to federal conditions on the front end.

Here, Idaho never knowingly agreed to be bound by EMTALA. The State has no public hospitals that accept Medicare funding. The United States conceded at oral argument before the United States Supreme Court that Idaho never accepted EMTALA's conditions. *Moyle*, No. 23-276 (April 24, 2024) (Oral Arg. Tr. at 70)[11]; see also *Moyle*, 603 U.S. at 356 (joint dissent of Alito, Thomas, & Gorsuch, JJ.) ("Even if it were possible to read EMTALA as requiring

---

[11] GENERAL PRELOGAR: [W]hat Idaho has done here is directly interfered with the ability of the *regulated parties* who have taken these funds, federal funds with conditions attached, from being able to comply with the federal law that governs *their* behavior. And this was an essential part of the bargain that the federal government struck *with hospitals* in substantially investing in their hospital systems. (Emphasis added.)

abortions prohibited by Idaho law, it is beyond dispute that such a requirement is not unam-biguously clear.").

That ends the matter. Just as some other state's acceptance of EMTALA conditions can't bind Idaho, neither can St. Luke's acceptance of such conditions.

### B. St. Luke's lacks a cause of action and is foreclosed from seeking equitable re-lief.

This is *not* a suit under 42 U.S.C. § 1983. Nor is this a suit under any other statutorily created private cause of action. Nor can this be some implied right of action under the Su-premacy Clause to the United States Constitution, as none exists. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Nor is this even some suit to "enforce" EMTALA against the Attorney General, since he has no obligation or duty under EMTALA. Instead, St. Luke's asserts it "has an equitable cause of action to seek an injunction of a state law that violates the Supremacy Clause." Dkt. 2-1 at 18 (citing *Armstrong*, 575 U.S. at 327).

In *Armstrong*, the respondents argued that they could sue in equity to enforce § 30(A) of the Medicaid Act. The Supreme Court first noted that "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limita-tions." 575 U.S. at 327 (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996)). The Court held that the Medicaid Act implicitly precluded private enforcement of § 30(A) and that the respondents could not "circumvent Congress's exclusion of private enforcement" through equity. *Id.* at 328. The Court identified two aspects that established "Congress's 'intent to fore-close' equitable relief." *Id.* (citing *Verizon*, 535 U.S. at 647): first, that Congress provided for the withholding of Medicaid funds, *id.* (citing 42 U.S.C. § 1396c), and second that § 30(A) was "judicially unadministrable." *Id.*

In this case, St. Luke's agues it can sue in equity to enforce 42 U.S.C. § 1395dd(b)(1)(A). But like the *Armstrong* case, at least two aspects of EMTALA "establish Congress's 'intent to foreclose' equitable relief." *Id.* at 328 (citing *Verizon*, 535 U.S. at 647).

First, Congress provided EMTALA-specific civil enforcement mechanisms for the federal government to exercise. Under one of the mechanisms, the federal government can impose a monetary civil penalty for each negligent violation of EMTALA by a participating hospital. 42 U.S.C. § 1395dd(d)(1)(A). Under another, the federal government can impose a monetary penalty on a physician, in a participating hospital, who negligently violates a requirement. *Id.* § 1395dd(d)(1)(B). The physician is also subject to an equitable enforcement mechanism of "exclusion from participat[ing]" in Medicare and state health care programs, depending on the severity or recidivism of the negligent violation.

Second, Congress expressly provided two private causes of action within EMTALA. The first cause of action permits a person who suffers personal harm resulting from a participating hospital's violation of EMTALA to obtain damages "and such equitable relief as is appropriate." 42 U.S.C. § 1395dd(d)(2)(A). The second permits any medical facility that suffers a financial loss as a result of a participating hospital's violation of EMTALA to obtain damages "and such equitable relief as is appropriate." 42 U.S.C. § 1395dd(d)(2)(B). Under both scenarios, the private cause of action is against the participating hospital, not a third party. Had Congress wanted to allow a patient, provider, or hospital to otherwise be able to enforce the provisions of EMTALA, Congress certainly could have done so; but it chose to limit the private causes of action. *Cf. Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 765 (2019) (Opinion of

Gorsuch, J.) ("In this, as in any field of statutory interpretation, it is our duty to respect not only what Congress wrote but, as importantly, what it didn't write.").

Taken together, these two aspects of EMTALA signify Congress's intent to preclude private enforcement of 42 U.S.C. § 1395dd(a)(1) against a state law. By designating EMTALA-specific administrative enforcement mechanisms and EMTALA-specific private causes of action, neither of which authorize the suit here, Congress has affirmatively manifested an intent contrary to private enforcement of 42 U.S.C. § 1395dd(a)(1). *See Armstrong*, 575 U.S. at 329 (commenting that affirmative manifestation is *not* required).

### C.  St. Luke's lacks a cognizable theory because EMTALA does not establish a standard of care.

St. Luke's takes the position that EMTALA requires that physicians must provide care consistent with some unidentified standard of care, but not state law.[12] *See* Dkt. 2-1 at 17 (noting that abortion "is not an accepted treatment for mental health emergencies"), 17–18 (noting that "standard of care under EMTALA" post viability would not be abortion). In short, St. Luke's asserts that EMTALA establishes a standard of care.

But the courts of appeal are unanimous in holding that EMTALA does not establish a national standard of care. The Fifth Circuit recently rejected the federal government's attempt to construe EMTALA as an abortion mandate, concluding that "EMTALA does not impose

---

[12] The Complaint may have identified a different theory, where EMTALA requires the physician to be permitted to provide whatever care the physician believes appropriate. Dkt. 1 ¶¶ 40, 41. Such a theory conflicts with the United States' concessions. A similar theory was raised by the United States, but then dropped in the Ninth Circuit, post-Supreme Court briefing in favor of the theory that hospitals must follow "accepted clinical standards." *Compare* 9th Cir. Appeal, Dkt. 35 at 18 (pre-Supreme Court brief) *with id.*, Dkt. 194 at 15, 28 ("evidence-based clinical standards").

a national standard of care." *Texas v. Becerra*, 89 F.4th 529, 543 (5th Cir. 2024), *cert denied*, ---
S. Ct. ---, 2024 WL 4426546 (U.S. Oct. 7, 2024) (Mem.). The Ninth Circuit has held the same:
EMTALA "was not enacted to establish … a national standard of care." *Bryant v. Adventist
Health System/West*, 289 F.3d 1162, 1166 (9th Cir. 2002). Indeed, it "clearly declines" to do so.
*Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995).

Because EMTALA does not impose a standard of care, it does not require any specific
medical procedure (other than the requirement of delivery for active labor). Instead, it de-
mands that hospitals treat all patients on the same footing, prohibiting "disparate" treatment,
*Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995), by imposing a legal duty "to
provide emergency care to all," *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 792–93
(2d Cir. 1999). Rather than creating a "national …standard of care," *Torretti v. Main Line Hosps.,
Inc.*, 580 F.3d 168, 173–74 (3d Cir. 2009), EMTALA creates a cause of action merely "for what
amounts to failure to treat" based on the treatments permitted by state law. *Gatewood v. Wash.
Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991).

## D. EMTALA's text and purpose preclude reading it as a preempting abortion mandate.[13]

### 1. EMTALA's text imposes a duty to "the unborn child."

EMTALA's plain language forecloses the argument that EMTALA mandates abor-
tions. EMTALA does not even mention abortion, much less require it. Quite the opposite:
EMTALA demands that covered hospitals care for both "the woman" and "her unborn child."
42 U.S.C. § 1395dd(e)(1)(A)(i). The United States' (and St. Luke's) attempt to cobble together

---

[13] To avoid unnecessary repetition, the Attorney General incorporates by reference the
preemption-related arguments Idaho made in this Court in *United States v. Idaho.*

an abortion mandate from a statute that disclaims it is "plainly unsound." *Moyle*, 603 U.S. at 347 (joint dissent of Alito, Thomas, and Gorsuch, J.J.); *id.* ("Far from requiring hospitals to perform abortions, EMTALA's text unambiguously demands that Medicare-funded hospitals protect the health of both a pregnant woman *and* her 'unborn child.'").

The statutory duty to the unborn child is woven throughout EMTALA's screening, stabilization, and transfer requirements. First, in screening for whether "an emergency medical condition … exists," 42 U.S.C. § 1395dd(a), EMTALA demands that Medicare-funded hospitals evaluate whether the condition may "plac[e] … the health of the woman or her unborn child … in serious jeopardy." *Id.* § 1395dd(e)(1)(A)(i). EMTALA thus expressly references the health of the unborn child and requires providers to screen for conditions that place the child in jeopardy.

Second, if the child has such a condition, the hospital must "stabilize" the condition "within the staff and facilities available at the hospital[.]" *Id.* § 1395dd(b)(1)(A). Notably, the duty is not to stabilize the patient, but to stabilize the condition, which again, includes a condition that places the unborn child's health in "jeopardy." *Id.* § 1395dd(e)(1)(A)(i). "[A]borting an 'unborn child' does not protect it from jeopardy." *Moyle*, 603 U.S. at 349 (joint dissent of Alito, Thomas, and Gorsuch, J.J.).

Third, if a hospital chooses instead to transfer a pregnant woman in labor to another facility, it must again consider the unborn child. EMTALA requires the hospital to certify that the expected benefits of transfer outweigh any "increased risks" to the woman "and, in the case of labor, to the unborn child." 42 U.S.C. §§ 1395dd(c)(1)(A)(ii), (e)(1)(B). So "regardless of whether a hospital chooses to treat or transfer a pregnant woman, it must strive to protect

her 'unborn child' from harm." *Moyle*, 603 U.S. at 350 (joint dissent of Alito, Thomas, and Gorsuch, J.J.); *see also United States v. Idaho*, 83 F.4th at 1135[14] ("EMTALA does not preempt section 622," because it is not impossible to comply with both EMTALA and Idaho Code § 18-622 and because § 18-622 does not pose an obstacle to the purpose of EMTALA)[15]; *Texas v. Becerra*, 89 F.4th at 541–42 (rejecting HHS's (and St. Luke's) argument that, under EMTALA, "a physician must provide an abortion when that care is the necessary stabilizing treatment for an emergency medical condition"; "Congress expressly prohibits HHS from 'direct[ing] or prohibit[ing] any [particular] kind of treatment or diagnosis' in its administration of Medicare.").[16]

### 2. EMTALA's purpose and context have nothing to do with a preempting abortion mandate.

The purpose and context of EMTALA reinforce the text.

---

[14] The panel decision granting a stay of injunction was vacated in lieu of en banc consideration (which is still pending) and is therefore not binding, but the panel's reasoning was correct.

[15] The Ninth Circuit panel also concluded that, "[e]ven if the federal government were correct that EMTALA requires abortions as 'stabilizing treatment' in limited circumstances, EMTALA still would not conflict with Idaho's law" because of the "exception allowing abortion when a 'physician determine[s], in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion [is] necessary to prevent the death of the pregnant woman.'" *Id.* at 1136. The panel believed that any ambiguity or "gaps" between EMTALA's requirements and the Idaho statute had been resolved, "given the Idaho Legislature's recent amendment to the statute and clarification from the Supreme Court of Idaho." *Id.* at 1137–38.

[16] The Fifth Circuit affirmed an injunction against the July 11, 2022, HHS Guidance's interpretation of EMTALA, post-*Dobbs*, that Medicare providers are obligated to provide abortions regardless of state law. (This is the same Guidance on which St. Luke's relies. Dkt. 1 ¶ 28 & n.5.). The court held that the Guidance exceeded EMTALA and violated the Administrative Procedure Act and the Medicare Act.

"Congress designed EMTALA to solve a particular problem—preventing private hospitals from turning away patients who are unable to pay for medical care. And none of many briefs submitted in this suit has found any suggestion in the proceedings leading up to EMTALA's passage that the Act might also use the carrot of federal funds to entice hospitals to perform abortions." *Moyle*, 603 U.S. at 352 (citations omitted) (joint dissent of Alito, Thomas, and Gorsuch, J.J.). The context of EMTALA also included that the Hyde Amendment was in effect when EMTALA was being enacted and amended, and that it was President Reagan who signed the law into effect. The Hyde Amendment prohibited the use of federal funds from facilitating abortions except when necessary to save the life of the pregnant woman, and President Reagan and his HHS department "steadfastly oppose[d]" encouraging, promoting, or financing abortions. *Id.* at 352–53. It is not plausible to understand EMTALA as promoting an abortion mandate that its supporters vehemently opposed.

The Ninth Circuit panel in *United States v. Idaho* began with the fact that "Congress's 'clear and manifest' purpose confirms that EMTALA does not impose specific methods of 'stabilizing treatment[.]'" 83 F.4th at 1136. As a result, courts "must assume 'that the historic police powers of the States [are] not to be superseded by' EMTALA." *Id.* (quoting *Medtronic*, 518 U.S. at 485). The panel determined that the purpose of EMTALA is "not to impose specific standards of care—such as requiring the provision of abortion—but simply to 'ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay.'" *Id.* (quoting *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995)). "To read EMTALA to require a specific method of treatment, such as abortion, pushes the statute far

beyond its original purpose, and therefore is not a ground to disrupt Idaho's historic police powers." *Id.*

The panel also held that Idaho's law does not pose an obstacle to the purpose of EM-TALA because EMTALA was "not intended to create a national standard of care for hospitals or to provide a federal cause of action akin to a state law claim for medical malpractice." *Id.* at 1138 (quoting *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001)). Specifically:

> It is not the purpose of EMTALA to force hospitals to treat medical conditions using certain procedures. Instead, EMTALA seeks to prevent hospitals from neglecting poor or uninsured patients with the goal of protecting "the health of the woman" and "her unborn child." Section 622's limitations on abortion services do not pose an obstacle to EMTALA's purpose because they do not interfere with the provision of emergency medical services to indigent patients.

*Id.* at 1138–39 (citation omitted).

"Indeed, the purpose of EMTALA is to provide emergency care to the uninsured." *Texas*, 89 F.4th at 542 (quoting *Goodman v. Sullivan*, 891 F.2d 449, 451 (2d Cir. 1989) (per curiam)). "EMTALA does not mandate any specific type of medical treatment, let alone abortion." *Id.* This means that "[a] medical provider can nonetheless comply with both EMTALA and state law by offering stabilizing treatment *in accordance with state law*." *Id.* (emphasis added); *see also id.* at 545 ("EMTALA leaves the balancing of stabilization to doctors, *who must comply with state law*.") (emphasis added). HHS's arguments were contrary to history and to federalism, as are St. Luke's here: "medical treatment is historically subject to police power of the States, not to be superseded unless that was the clear and manifest purpose of Congress ... Congress has not manifested that purpose in EMTALA, or the Medicare Act for that matter. The

opposite is true: EMTALA does not impose a national standard of care." *Id.* at 542–43 (citations omitted).[17]

> In sum, EMTALA does not govern the practice of medicine. This is reflected in its purpose, and the prohibition under the Medicare Act from federal agents interfering with the practice of medicine. While EMTALA directs physicians to stabilize patients once an emergency medical condition has been diagnosed, *the practice of medicine is to be governed by the states*. HHS's argument that "any" type of treatment should be provided is outside EMTALA's purview.

*Id.* at 543 (citations omitted) (emphasis added).

As St. Luke's does here, HHS argued that the Texas Human Life Protection Act was preempted because it directly conflicted with EMTALA. The Fifth Circuit disagreed: "the purpose of EMTALA is to prevent 'patient dumping' for both a pregnant woman and her unborn child. Texas's law does not undermine that purpose; it does not compel the 'rejection of patients.'" *Id.* at 544. (citations omitted).

Accordingly, the Fifth Circuit's answer to the question whether EMTALA "mandates physicians to provide abortions when that is the necessary stabilizing treatment for an emergency medical condition" was, "It does not," and the court declined to expand the scope of EMTALA. *Id.* at 545.

This Court should reach the same result in this case.

---

[17] Idaho law, including the Defense of Life Act, sets the standard of care. *See, e.g.*, *Hall v. Rocky Mountain Emergency Physicians, LLC*, 155 Idaho 322, 330 (2013) (holding that a state criminal law "does establish a statewide standard of care governing medical professionals"); *Hayward v. Jack's Pharmacy Inc.*, 141 Idaho 622, 628, 115 P.3d 713, 719 (2005) (holding that the medical standard of care "includes the minimum standards set by applicable state and federal law").

**E. St. Luke's also cannot establish a likelihood of success for the reasons outlined in *United States v. Idaho* litigation.**

Because this Court has already ruled on these arguments, or the Ninth Circuit is about to, the Attorney General raises the following issues in a summary manner as he asserts that these are also reasons to deny St. Luke's motion for a preliminary injunction, and he seeks to preserve these arguments for any appeal. He incorporates the relevant arguments cited below.

**1. Clear-statement canons of construction foreclose interpreting EMTALA as a preempting abortion mandate.**

First, the presumption against preemption of the states' historic police powers forecloses St. Luke's expansive reading of EMTALA. 9th Cir. Appeal, Dkt. 133-1 at 26–27. Second, under principles of the Major Questions doctrine, St. Luke's cannot show "clear congressional authorization" for the purported abortion mandate. *Id.* at 28–29.

**2. The statutory structure precludes St. Luke's view of EMTALA.**

EMTALA does not displace state medical standards; instead, when EMTALA imposes a federal duty to treat, it takes state law as it finds it. *Id.* at 32–33. First, EMTALA does not impose a national standard of care; rather it requires hospitals to treat patients on the same footing. *Id.* at 33–35. Second, EMTALA's stabilization requirement looks to state law, as do enforcement provisions of EMTALA itself and of supplementary statutes that establish the enforcement regime. *Id.* at 35–37. Third, St. Luke's interpretation would lead to nonsensical results. *Id.* at 37–38. Fourth, the enforcement history shows that there is no abortion mandate. *Id.* at 38–41.

### F. St. Luke's Complaint fails to state a claim for preemption because it is premised on speculation.

St. Luke's claims that the Defense of Life Act is preempted "to the extent that it conflicts with EMTALA." Dkt. 1 ¶¶ 68, 72. To succeed on the claim, St. Luke's must show, at a minimum, that 1) a specific patient of St. Luke's is in present need of an abortion that EMTALA authorizes or requires and 2) application of the Defense of Life Act to that situation directly conflicts with EMTALA. While St. Luke's has pled that there "can" be situations in which the two laws conflict—*id.* ¶¶ 2, 49, 51, 54—it has not identified any actual situation in which the conflict exists. The Complaint therefore fails to state a cognizable claim.

An as-applied challenge depends on the application of particular facts to particular litigants. *See e.g., United States v. Jimenez*, 191 F. Supp. 3d 1038, 1041 (N.D. Cal. 2016) (as-applied challenge for vagueness "must be examined in the light of the facts of the case at hand"). Courts reject as-applied challenges that require "speculat[ion] as to prospective facts." *Hoye v. City of Oakland*, 653 F.3d 835, 859 (9th Cir. 2011) (collecting cases); *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) ("For a host of good reasons, courts usually handle constitutional claims case by case, not en masse.") (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008)).

The Ninth Circuit rejected an as-applied challenge in *Young v. Hawaii* because "although Young peppered his pleadings with the words 'application' and 'enforcement,' he never pleaded facts to support an as-applied challenge." 992 F.3d 765, 779 (9th Cir. 2021) (cert. granted, vacated and remanded on other grounds, 142 S.Ct. 2895 (mem.) in light of *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)). To the extent St. Luke's brings an as-applied challenge here, its "facts" in support of future injunctive and declaratory relief are all

speculative facts relating to speculative patients, without any information regarding a specific patient who claims a present need for an abortion authorized by EMTALA but not authorized by Idaho law. *See Pilz v. Inslee*, No. 3:21-cv-05735-BJR, 2022 WL 1719172, at *3 (W.D. Wash. May 27, 2022) (rejecting as-applied challenge based on "generalized references" to "uneven application" "'peppered' throughout the complaint").

With no facts regarding actual patients whose actual doctors believe an abortion is necessary to treat an "emergency medical condition," the Court cannot determine whether an abortion is required under EMTALA. Without being able to make that determination, the Court is unable to proceed to the next step of determining whether Idaho's law is in fact preempted. The determination whether a pregnant woman might need an abortion is an individualized determination based on the specific patient's individual health situation. It may turn out, based on the evidence before the Court and in making this individualized determination, that (a) the proposed abortion is outside the scope of Idaho Code § 18-622 and therefore permissible (such as a molar or ectopic pregnancy), or (b) the abortion can fairly be described under the statutory standard as being necessary to prevent the death of the woman. In either situation, there is no conflict with EMTALA. But without specific facts relating to specific patients and specific medical situations, the Court cannot make the individualized determination necessary for an as-applied challenge. Instead, the Court is being asked improperly to answer an abstract question, and its answer may well be wrong as a result.

Given the absence of non-hypothetical facts, St. Luke's claim must be treated as a facial challenge to the Defense of Life Act. "The important point is that plaintiffs' claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs. They

must therefore satisfy our standards for a facial challenge to the extent of that reach." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). To succeed on a facial challenge, St. Luke's must show that the Defense of Life Act is preempted "in all of its applications." *Young*, 992 F.2d at 779. The Court's review "would be limited to the text of the statute itself." *Id.*

St. Luke's claim therefore includes challenges as to every "emergency medical condition" that could place any pregnant woman's "'health in serious jeopardy' or risk 'serious impairment to bodily functions' or 'serious dysfunction of any bodily organ or part.'" Dkt. 1 ¶ 1. Plaintiffs must therefore show that the Act directly conflicts with EMTALA in all those applications, including in situations in which the risk is to the mother's life. It is not possible for St. Luke's to make such a showing.

### III.  St. Luke's cannot satisfy the other preliminary injunction factors.

#### A.  St. Luke's lacks an irreparable injury.

St. Luke's must establish that it is *likely* to suffer irreparable harm in the absence of *its* requested injunction. *Winter*, 555 U.S. at 20. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). This Court cannot issue an injunction "merely because it is possible that there will be an irreparable injury . . . it must be likely that there will be." *Am. Trucking Ass'ns., Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). And "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."

*Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citing *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984)).

St. Luke's cannot meet its required showing for at least two reasons. First, the injunction it seeks already exists. This Court "restrain[ed] and enjoin[ed] the State of Idaho, including all of its officers, employees, and agents, from enforcing Idaho Code § 18-622(2)-(3) as applied to medical care required by the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd." *United States v. Idaho*, Dkt. 95 at 38. As St. Luke's acknowledges, "it seeks an injunction identical to the one already in effect in *United States v. Idaho*, except that it would run against Idaho's Attorney General, Raúl Labrador, and his officers, employees, and agents." Dkt. 2-1 at 1; *see* Fed. R. Civ. P. 65(d)(2)(B). But seeking an injunction in this case against a defendant who is already enjoined[18] because of a speculative concern that the United States *might* cause its injunction to be vacated does not mean that St. Luke's is *likely* to suffer irreparable harm.

The fact that this very Court issued the exact injunction sought by St. Luke's, which covers the defendant before this Court, means that St. Luke's will not suffer irreparable injury absent the Court granting *its* requested injunction. *See de Cristo Cano v. Biden*, 598 F. Supp. 3d 921, 923–24 (S.D. Cal. 2022); *SNL Workforce Freedom All. v. Nat'l Tech. & Eng'g Sols. of Sandia, LLC,* No. 1:22-cv-00001-KWR-SCY, 2022 WL 2065062, at *3 (D.N.M. June 8, 2022) ("Because the *Georgia v. Biden* nationwide injunction enjoins nationwide vaccine mandates based on

---

[18] The Attorney General is already subject to the injunction in *United States v. Idaho*. The Attorney General is an officer of the State of Idaho. IDAHO CONST. art. IV, § 1. As an officer of the State, he is enjoined by the text of the injunction, and by operation of Fed. R. of Civ. P. 65(d)(2)(B).

Executive Order 14042, and Defendants have paused their vaccine mandate, Plaintiffs have failed to show a significant, certain risk of irreparable harm.").

The other problem for St. Luke's is that any harm it alleges is based on the possibility that a nonparty in this case, the United States, will cause the *United States v. Idaho* injunction to be vacated. St. Luke's proclaimed in its brief that "[i]t is widely anticipated that after the change in presidential administration on January 20, 2025, the United States will seek to vacate the injunction currently in effect and dismiss its complaint in *United States v. Idaho*." Dkt. 2-1 at 1. But the basis for this "wide[] anticipat[ion]" was left unsaid, and this Court itself recognized the speculative nature of this assertion when it denied the motion to expedite that the Court said was "based on speculation at the moment" where "[i]t is not certain whether or when the new administration might move to vacate the injunction and dismiss the action." Dkt. 12 at 2. This is a theorical harm based on speculation.

To put it differently, it is uncertain whether, when, or even if, the United States would do something that would cause the *United States v. Idaho* injunction to be vacated. Speculating about what *could* happen and what St. Luke's asserts will then happen to it after that does not mean that such injury is likely, but rather is only a mere possibility based on uncertain potential actions that could be taken by a nonparty to this lawsuit. Theoretical injury fails to satisfy *Winter*'s requirement. *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("An injunction will not issue if the person or entity seeking injunctive relief shows a mere possibility of some remote future injury ... or a conjectural or hypothetical injury.") (cleaned up).

**B. The third and fourth preliminary injunction factors do not weigh in favor of St. Luke's.**

The remaining factors also do not support the redundant, second injunction that St. Luke's seeks. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (noting that the third and fourth factors merge when a government is a party). Idaho enacted the Defense of Life Act to implement the State's strong interest in protecting unborn children. *See Dobbs*, 597 U.S. at 301 (describing legitimate interests supporting Mississippi's law, including "respect for and preservation of prenatal life at all stages of development, the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, or disability.") (citation omitted). The protection of unborn children is an interest that the State had exercised for more than 100 years before *Roe* and now exercises again. Each day that the Act is enjoined undermines the public interest. Likewise, the State should be able to exercise its powers reserved to it in the United States Constitution without unnecessary interference from federal overreach.

## CONCLUSION

The Court should dismiss St. Luke's Complaint and deny its motion for a preliminary injunction.

DATED: February 6, 2025.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By: _/s/ Brian V. Church_____
BRIAN V. CHURCH
Lead Deputy Attorney General

By: _/s/ David J. Myers_____
DAVID J. MYERS
Deputy Attorney General

## CERTIFICATE OF SERVICE

I Hereby Certify that on February 6, 2025, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Wendy J. Olson
wendy.olson@stoel.com

Alaina Harrington
alaina.harrington@stoel.com

Lindsay C. Harrison
lharrison@jenner.com

Jessica Ring Amunson
jamunson@jenner.com

Sophia W. Montgomery
smontgomery@jenner.com

Ruby C. Giaquinto
rgiaquinto@jenner.com

*Attorneys for Plaintiff St. Luke's Health System*

Stephen L. Adams
sadams@gfidaholaw.com

Chad Golder
cgolder@aha.org

*Attorneys for Proposed Amici American Hospital Association, America's Essential Hospitals, and the American Association of Medical Colleges*

/s/ *Brian V. Church*
Brian V. Church