WENDY J. OLSON, Bar No. 7634
wendy.olson@stoel.com
ALAINA HARRINGTON, Bar No. 11879
alaina.harrington@stoel.com
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID  83702
Telephone:  208.389.9000

LINDSAY C. HARRISON*
lharrison@jenner.com
JESSICA RING AMUNSON*
jamunson@jenner.com
SOPHIA W. MONTGOMERY*
smontgomery@jenner.com
RUBY C. GIAQUINTO*
rgiaquinto@jenner.com
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, D.C. 20001
Telephone:  202.639.6000
*admitted pro hac vice

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD.,<br><br>Plaintiff,<br><br>v.<br><br>RAÚL LABRADOR, Attorney General of the State of Idaho,<br><br>Defendant. | Case No. 1:25-cv-00015-BLW<br><br><br>ST. LUKE'S HEALTH SYSTEM'S CONSOLIDATED OPPOSITION TO MOTION TO DISMISS COMPLAINT [DKT. 25] AND REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION [DKT. 2] |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.      This Court Should Deny the Attorney General's Motion to Dismiss. ................................. 2

        A.      St. Luke's Has Article III Standing ........................................................................ 2

                i.      St. Luke's Has Adequately Alleged Injury in Fact. ..................................... 2

                ii.     The Attorney General is a Proper Defendant for the Requested
                        Relief. .......................................................................................................... 7

        B.      This Suit is Ripe for Adjudication by This Court. .................................................. 8

        C.      The Attorney General Is Not Immune from Suit. ................................................. 11

        D.      St. Luke's Has a Cause of Action for Equitable Relief. ....................................... 13

        E.      St. Luke's Has Stated a Claim of Preemption ....................................................... 15

                i.      St. Luke's Adequately Alleges the Existence of a Non-
                        Speculative Conflict. .................................................................................. 16

                ii.     EMTALA's Text, Context, and Purpose Show that EMTALA
                        Requires Stabilizing Care that Sometimes Includes Pregnancy
                        Termination. .............................................................................................. 19

                iii.    The Conflict Is Apparent from EMTALA's Text and Does Not
                        Depend on a Freestanding National Standard of Care. ............................. 22

                iv.     The Spending Clause Does Not Give States Veto Power Over
                        Federal Policy Objectives. ........................................................................ 24

II.     This Court Should Grant the Preliminary Injunction. ....................................................... 26

        A.      St. Luke's Is Likely to Succeed on the Merits. .................................................... 26

        B.      St. Luke's Satisfies the Other Preliminary Injunction Factors. ........................... 28

CONCLUSION ................................................................................................................. 30

# TABLE OF AUTHORITIES

CASES

*Albright v. Oliver*, 510 U.S. 266 (1994) ...................................................................5

*Arizona v. Yellen*, 34 F.4th 841 (9th Cir. 2022)...........................................................5

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015)............................12, 13, 14, 15

*In re Baby K*, 16 F.3d 590 (4th Cir. 1994)..................................................................27

*Baker v. Adventist Health, Inc.*, 260 F.3d 987 (9th Cir. 2001) .....................................26

*Bennett v. Arkansas*, 485 U.S. 395 (1988) (per curiam) ..............................................25

*Bennett v. Spear*, 520 U.S. 154 (1997) .......................................................................7

*Bryant v. Adventist Health System/West*, 289 F.3d 1162 (9th Cir. 2002) ....................23

*California v. Trump*, 963 F.3d 926 (9th Cir. 2020) ......................................................7

*California v. United States*, No. 05-328, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008) .......................................................................................................................28

*Cayuga Nation v. Tanner*, 824 F.3d 321 (2d Cir. 2016)...............................................5

*Correa v. Hospital San Francisco*, 69 F.3d 1184 (1st Cir. 1995)................................21

*Cotto v. Campbell*, 126 F.4th 761 (1st Cir. 2025).......................................................12

*Coventry Health Care of Missouri, Inc. v. Nevils*, 581 U.S. 87 (2017)........................25

*Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022) ...........................24

*Dittman v. California*, 191 F.3d 1020 (9th Cir. 1999)..................................................5

*Doe 2 v. Mattis*, 344 F. Supp. 3d 16 (D.D.C. 2018) ............................................6, 11, 29

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) ................................29

*Eberhardt v. City of Los Angeles*, 62 F.3d 1253 (9th Cir. 1995)............................21, 23

*Educational Credit Management Corp. v. Coleman (In re Coleman)*, 560 F.3d 1000 (9th Cir. 2009)..................................................................................................10

*Florida Ass'n of Rehabilitation Facilities, Inc. v. Florida Department of Health & Rehabilitative Services*, 225 F.3d 1208 (11th Cir. 2000)........................................11

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133 (2d Cir. 2016) ...............................................................................................14

*Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037 (D.C. Cir. 1991) ............................21

*Gonzales v. Oregon*, 546 U.S. 243 (2006) .................................................................................25

*Green v. Mansour*, 474 U.S. 64 (1985) ......................................................................................12

*Hardy v. New York City Health & Hospitals Corp.*, 164 F.3d 789 (2d Cir. 1999) .......................21

*Isaacson v. Mayes*, 84 F.4th 1089 (9th Cir. 2023) .......................................................................5

*Lawrence County v. Lead-Deadwood School District No. 40-1*, 469 U.S. 256 (1985) ..................................................................................................................................25

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) .......................................................6

*Matsumoto v. Labrador*, 122 F.4th 787 (9th Cir. 2024) ...........................................................7, 8

*Mayes v. Biden*, 67 F.4th 921 (9th Cir.), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023) ...................................................................................................................... 26-27

*Montana Medical Ass'n v. Knudsen*, 119 F.4th 618 (9th Cir. 2024) ...................................... 16-17

*Moyle v. United States*, 603 U.S. 324 (2024)..............................................6, 10, 15, 16, 19, 20, 22

*National Audubon Society, Inc. v. Davis*, 307 F.3d 835 (9th Cir.), *amended on denial of reh'g by* 312 F.3d 416 (9th Cir. 2002) ...........................................................3

*National Press Photographers Ass'n v. McCraw*, 90 F.4th 770 (5th Cir. 2024)...........................3

*New York v. United States Department of Health & Human Services*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019) .........................................................................................28

*Nexus Pharmaceuticals, Inc. v. Cent. Admixture Pharmacy Services, Inc.*, 48 F.4th 1040 (9th Cir. 2022) .........................................................................................................4

*Nielsen v. Preap*, 586 U.S. 392 (2019) ................................................................................. 5-6, 11

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) ...............................................................5, 11

*Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission*, 461 U.S. 190 (1983) ............................................................................8

*Peace Ranch, LLC v. Bonta*, 93 F.4th 482 (9th Cir. 2024)...........................................................4

*Planned Parenthood Arizona Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013) ..............................27

*Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825 (9th Cir. 2024) ....................................................... 5, 11, 12

*Planned Parenthood Great Northwest v. State*, 522 P.3d 1132 (Idaho 2023) .............................. 18

*Poe ex rel. Poe v. Labrador*, 709 F. Supp. 3d 1169 (D. Idaho 2023) ........................................ 2, 13

*R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th 542 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 979 (2023) ............................................................................... 26

*Restoration Risk Retention Group, Inc. v. Gutierrez*, 880 F.3d 339 (7th Cir. 2018) .................... 15

*Ritten v. Lapeer Regional Medical Center*, 611 F. Supp. 2d 696 (E.D. Mich. 2009) ................... 28

*Ross v. Blake*, 578 U.S. 632 (2016) ............................................................................................. 27

*Silva v. Farrish*, 47 F.4th 78 (2d Cir. 2022) ............................................................................... 12

*Southland Corp. v. Keating*, 465 U.S. 1 (1984) ........................................................................... 26

*Stavrianoudakis v. United States Fish & Wildlife Service*, 108 F.4th 1128 (9th Cir. 2024) ........................................................................................................................... 9

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ........................................................... 10

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ............................................................ 2

*Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134 (9th Cir. 2000) (en banc) .......................................................................................................................... 9

*Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) .................................................................... 8

*United States v. Butler*, 297 U.S. 1 (1936) ............................................................................. 24, 25

*United States v. Idaho*, 623 F. Supp. 3d 1096 (D. Idaho 2022) ................. 1, 8, 9, 15, 16, 17, 19, 23

*United States v. Idaho*, No. 22-cv-00329, 2023 WL 3284977 (D. Idaho May 4, 2023) ..................................................................................................................... 8, 15, 19

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) ....................................................... 5

*Vargas ex rel. Gallardo v. Del Puerto Hospital*, 98 F.3d 1202 (9th Cir. 1996) .................... 16, 19

*Virginia Office for Protection & Advocacy v. Stewart*, 563 U.S. 247 (2011) .............................. 15

*Wallingford v. Bonta*, 82 F.4th 797 (9th Cir. 2023) .................................................................... 17

*Weaver's Cove Energy, LLC v. R.I. Coastal Resources Management Council*, 589 F.3d 458 (1st Cir. 2009) .......................................................................................... 3

*West Virginia v. EPA*, 597 U.S. 697 (2022)................................................................26, 27

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001) ........................................9

*Whitman-Walker Clinic, Inc. v. United States Department of Health & Human Services*, 485 F. Supp. 3d 1 (D.D.C. 2020)........................................................28, 29

*Wyeth v. Levine*, 555 U.S. 555 (2009) .............................................................................6

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006) ..................................................................................................................8

*Young Conservatives of Texas Foundation v. Smatresk*, 73 F.4th 304 (5th Cir. 2023) ......................................................................................................................3

*Ex parte Young*, 209 U.S. 123 (1908) ...........................................................................12

**STATUTES**

1 U.S.C. § 8(a) ...............................................................................................................19

10 U.S.C. § 1093 ............................................................................................................22

15 U.S.C. § 1225 ............................................................................................................26

16 U.S.C. § 544*l*(e)(5) ..................................................................................................26

16 U.S.C. § 3507 ............................................................................................................26

20 U.S.C. § 1688 ............................................................................................................22

22 U.S.C. § 5453(b) .......................................................................................................22

22 U.S.C. § 7704(e)(4) ...................................................................................................22

25 U.S.C. § 1676(a) .......................................................................................................22

28 U.S.C. § 1346(b)(1) ..................................................................................................27

42 U.S.C. § 238n ...........................................................................................................22

42 U.S.C. § 280h-5(a)(3)(C) .........................................................................................22

42 U.S.C. § 300a-6 ........................................................................................................22

42 U.S.C. § 300a-7 ........................................................................................................22

42 U.S.C. § 300a-8 ........................................................................................................22

42 U.S.C. § 300z-10(a) ........................................................................................22

42 U.S.C. § 1397ee(c)(7)(A) .................................................................................22

42 U.S.C. § 2996f(b)(8) ........................................................................................22

42 U.S.C. § 12584a(a)(9) ......................................................................................22

42 U.S.C. § 1395dd ...............................................................................................30

42 U.S.C. § 1395dd(a) .....................................................................................19, 23

42 U.S.C. § 1395dd(b)(1) ......................................................................................19

42 U.S.C. § 1395dd(b)(1)(A) .................................................................................27

42 U.S.C. § 1395dd(b)(2) ......................................................................................19

42 U.S.C. § 1395dd(c)(1) .......................................................................................19

42 U.S.C. § 1395dd(c)(1)(A)(ii) ............................................................................20

42 U.S.C. § 1395dd(c)(2) .......................................................................................24

42 U.S.C. § 1395dd(c)(2)(A) ..................................................................................20

42 U.S.C. § 1395dd(d) ...........................................................................................27

42 U.S.C. § 1395dd(d)(2)(A) .......................................................................6, 14, 27

42 U.S.C. § 1395dd(d)(2)(B) .............................................................................14, 27

42 U.S.C. § 1395dd(e)(1)(A)(i) ...................................................................19, 20, 30

42 U.S.C. § 1395dd(e)(1)(A)(ii) ............................................................................30

42 U.S.C. § 1395dd(e)(1)(A)(iii) ...........................................................................30

42 U.S.C. § 1395dd(e)(1)(B)(ii) .............................................................................20

42 U.S.C. § 1395dd(e)(3)(A) .......................................................................20, 23, 27

42 U.S.C. § 1395dd(f) ...............................................................................15, 26, 27

42 U.S.C. § 18023(a) .............................................................................................22

42 U.S.C. § 18023(b) .............................................................................................22

42 U.S.C. § 18023(d) .............................................................................................22

43 U.S.C. § 1600g ................................................................................................... 26

Idaho Code § 18-604(1) ......................................................................................... 30

Idaho Code § 18-622 ........................................................................................ 7-8, 30

LEGISLATIVE MATERIALS

131 Cong. Rec. 28,569 (1985) (statement of Sen. Dole) ........................................ 21

131 Cong. Rec. 28,569 (1985) (statement of Sen. Kennedy) .............................. 21, 25

Consolidated Omnibus Budget Reconciliation Act of 1985, H.R. 3128, 99th Cong.
§ 124 ........................................................................................................ 22

Consolidated Omnibus Budget Reconciliation Act of 1985, H.R. 3128, 99th Cong.
§ 302(b)(2)(B) .......................................................................................... 22

H.R. Rep. No. 99-241, pt. 1 (1985), *as reprinted in* 1986 U.S.C.C.A.N. 579 ........... 26

OTHER AUTHORITIES

42 C.F.R. § 482.55 ................................................................................................... 24

Amicus Brief of St. Luke's, *United States v. Idaho*, No. 23-35440 (9th Cir. Oct. 14,
2024), ECF No. 192 ..................................................................................... 3

Consolidated Brief for the United States, *United States v. Idaho*, No. 23-35440 (9th
Cir. Oct. 15, 2024), ECF No. 194 ............................................................ 26, 28

CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are
Pregnant or Are Experiencing Pregnancy Loss* (July 11, 2022), https://perma.
cc/GT5D-Q9FN .......................................................................................... 28

CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are
Pregnant or Are Experiencing Pregnancy Loss* (Sept. 17, 2021), https://perma.
cc/V4Y9-VDHG .......................................................................................... 28

Declaration of Emily Corrigan, *United States v. Idaho*, No. 22-cv-00329, ECF No.
17-6 ............................................................................................................ 3

Declaration of Stacy T. Seyb, *United States v. Idaho*, No. 22-cv-00320, ECF No.
17-8 ............................................................................................................ 3

Ensuring That Department of Health and Human Services Funds Do Not Support
Coercive or Discriminatory Policies or Practices in Violation of Federal Law,
73 Fed. Reg. 78,072 (Dec. 19, 2008) ......................................................... 28

Joint Stipulation, *Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, Kentucky v. Labrador*, No. 23-cv-00142 (D. Idaho Dec. 18, 2024), ECF No. 182-1 ..........................................................................................................................7

Memorandum Decision and Order on Motion to Dismiss, *Adkins v. Idaho*, No. CV01-23-14744 (Idaho Dist. Ct. Dec. 29, 2023).......................................................7

Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 84 Fed. Reg. 23,170 (May 21, 2019) .........................................................................28

U.S. Const. art I, § 8...........................................................................................................24

## **INTRODUCTION**

In moving to dismiss and opposing St. Luke's Health System's preliminary injunction motion, Attorney General Raúl Labrador has little new to say. Given that this Court has already considered and rejected his arguments on the merits, he resorts to rewording them. But nothing has changed: As ever, Idaho's near-total abortion ban, § 18-622, criminalizes the termination of a pregnancy even when termination is necessary to stabilize serious, debilitating, and painful health emergencies that nonetheless may not threaten to end the patient's life. Meanwhile, the federal Emergency Medical Treatment and Labor Act (EMTALA) *requires* Medicare-participating hospitals that offer emergency services to provide stabilizing care in those situations. Because "it is impossible to comply with both statutes," *United States v. Idaho*, 623 F. Supp. 3d 1096, 1109 (D. Idaho 2022)*,* state law must yield.

Stymied on the merits, the Attorney General turns to justiciability arguments, but finds no support there. The existence of preliminary relief in another case is no answer to the pressing harms that St. Luke's faces if § 18-622 goes into full effect without any injunction. That is evident from the fact that, when this Court's injunction was briefly lifted in that other case, St. Luke's and its patients saw immediate and dire consequences from the conflict between state and federal law. St. Luke's thus has standing. Nor are there any other barriers standing in the way of relief here: St. Luke's has an equitable cause of action, and the Attorney General is subject to suit for prospective relief, which is all St. Luke's seeks. The Court should enter that relief, as it has already done in a materially indistinguishable case.[1]

---

[1] For the background relevant to this consolidated response, St. Luke's refers the Court to its motion for preliminary injunction. *See* Mem. in Supp. of Mot. for Prelim. Inj. at 2-10, ECF No. 2-1.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS & REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - 1

## ARGUMENT

**I.  This Court Should Deny the Attorney General's Motion to Dismiss.**

The Court should deny the Attorney General's motion to dismiss. St. Luke's has Article III standing; this suit is ripe for review; and the Attorney General does not have sovereign immunity. On the merits, St. Luke's plainly states a claim for preemption.

### A.  St. Luke's Has Article III Standing.

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" [2] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). As to enforcement of § 18-622's criminal prohibition, the Attorney General has challenged only the injury-in-fact prong.[3] As to enforcement of § 18-622's licensure consequences, the Attorney General challenges the redressability prong and argues that any such consequence would not be caused by him. On both fronts, the Attorney General's arguments fail.

### i.  St. Luke's Has Adequately Alleged Injury in Fact.

The Attorney General argues that St. Luke's has not adequately alleged injury in fact under case law governing pre-enforcement challenges to government action. Consol. Mem. in Supp. of Mot. to Dismiss Compl. [Dkt. 1] and Opp'n to Mot. for Prelim. Inj. [DKT. 2] at 7-8, ECF No. 25-

---

[2] "When ruling on a facial jurisdictional attack," "the court confines its inquiry to allegations in the complaint," "must accept as true all material allegations of the complaint," and "must construe the complaint in favor of the complaining party." *Poe ex rel. Poe v. Labrador*, 709 F. Supp. 3d 1169, 1182 (D. Idaho 2023) (Winmill, J.).

[3] The Attorney General argues that St. Luke's lacks third-party standing to sue on behalf of its medical providers. St. Luke's does not purport to sue on behalf of its providers. St. Luke's alleges injuries to itself based on potential loss of Medicare funds, private lawsuits, and loss of staff (from criminal conviction and licensure penalties) that would hamper St. Luke's in its ability to care for its patients, among other injuries. Compl. ¶¶ 13, 44, 47, ECF No. 1.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS & REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - 2

1 [hereinafter "Br."]. But as an initial matter, this is not simply a pre-enforcement challenge to a criminal statute. St. Luke's is already "suffer[ing] a concrete injury from [being] subject[] . . . to a preempted state law." *Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 468 (1st Cir. 2009) (finding such injury to supply "standing to make . . . preemption claims"). Among other things, even if § 18-622 were never used to prosecute St. Luke's doctors, the mere existence of a conflict with EMTALA causes a pecuniary injury because it requires St. Luke's to devote considerable resources to advising its physicians about how to proceed in light of the conflict. *See* Decl. of Emily Corrigan ¶ 18, *United States v. Idaho*, No. 22-cv-00329, ECF No. 17-6 (attesting to the "need to consult with a lawyer" before taking medical action if § 18-622 were fully in effect); *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 855-56 (9th Cir.), *amended on denial of reh'g by* 312 F.3d 416 (9th Cir. 2002); *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 310 (5th Cir. 2023). It also deters physicians from accepting jobs at St. Luke's, straining its resources and ability to provide patient care. *See* Decl. of Stacy T. Seyb ¶ 14, *United States v. Idaho*, No. 22-cv-00320, ECF No. 17-8 ("If an Ob-Gyn can practice in a state without these conflicts and risks, it is only natural that they would be deterred from practicing here."); Amicus Br. of St. Luke's at 19-22, *United States v. Idaho*, No. 23-35440 (9th Cir. Oct. 14, 2024), ECF No. 192 (detailing cascading harms from shortages); *see also* Corrigan Decl. ¶ 32 (stating that "at least one of my colleagues has already decided to stop her part-time work at our hospital due to the stress of complying with this law"); *cf. Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 779, 795 (5th Cir. 2024) ("[A]t least one Plaintiff has an ongoing pecuniary injury . . . , as his clients are unwilling to violate [the preempted law].").

Even if the pre-enforcement case law the Attorney General cites applies here, St. Luke's has adequately alleged injury in fact. For pre-enforcement plaintiffs, "the injury [for standing

purposes] is the anticipated enforcement of the challenged statute in the future." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024). "Courts have adopted various metaphors to encapsulate the dilemma facing a pre-enforcement plaintiff—'the rock . . . and the hard place,' the Scylla . . . and the Charybdis,' and the choice to comply or 'bet the farm.'" *Id.* (footnotes omitted). That type of concrete dilemma is exactly what St. Luke's has alleged. *E.g.*, Compl. ¶¶ 44, 46-47, 52. The Attorney General's arguments to the contrary are based on a fundamental misapprehension of the law and of the allegations in the complaint.

First, the Attorney General says that St. Luke's has not alleged an intention to engage in a course of conduct "arguably affected with a constitutional interest" because "the Constitution does not confer a right to abortion." Br. at 8 (quoting *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 292 (2022)). But the Attorney General misunderstands which rights are at stake. Here, the relevant constitutional interest is the interest in being free from preempted state regulation—an interest rooted in the Supremacy Clause of the Constitution.[4] *See Nexus Pharms., Inc. v. Cent. Admixture Pharm. Servs., Inc.*, 48 F.4th 1040, 1045 (9th Cir. 2022) ("The Supremacy Clause is the source of preemption doctrine, which invalidates state laws that are contrary to federal statutes."). St. Luke's has alleged that it is injured when its physicians are subject to conflicting state and federal obligations about whether they may terminate a pregnancy when necessary to prevent damage to the mother's health. *E.g.*, Compl. ¶¶ 11-13, 47-54. St. Luke's cannot fulfil its mission of improving the health of people in the communities it serves when its physicians must

---

[4] The Attorney General appears to acknowledge that the claims advanced by St. Luke's implicate constitutional interests elsewhere in his brief. *See* Br. at 14 (in ripeness context, noting in citation parenthetical that "prudential ripeness considerations 'are amplified *where constitutional issues are concerned*'" (emphasis added)).

delay the provision of stabilizing care to assess the extremely fine line between interventions needed to secure the patient's health and those needed to prevent a patient's death. *Id.* ¶¶ 48-49.

In addition, St. Luke's has alleged it will be injured when its providers are prosecuted, convicted, and subjected to licensing penalties under a preempted state law. *Id.* ¶ 47. St. Luke's medical providers have a constitutional liberty interest in both the continued pursuit of their profession and avoiding prosecution and conviction under an unlawful state statute. *Dittman v. California*, 191 F.3d 1020, 1029 (9th Cir. 1999); *Albright v. Oliver*, 510 U.S. 266, 296 (1994).

In any event, *Driehaus* says the course of conduct proscribed by the challenged law must be "arguably affected with a constitutional interest"—not that the conduct must itself be constitutionally protected. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013) (finding standing satisfied under test later adopted in *Driehaus* without inquiring whether proscribed conduct was itself constitutionally protected); *Arizona v. Yellen*, 34 F.4th 841, 849-50 (9th Cir. 2022) (similar); *Cayuga Nation v. Tanner*, 824 F.3d 321, 331-32 (2d Cir. 2016) (similar). That is why the Ninth Circuit has found the *Driehaus* test satisfied by pre-enforcement plaintiffs in multiple challenges to abortion laws since *Dobbs*. *See Isaacson v. Mayes*, 84 F.4th 1089, 1099 (9th Cir. 2023); *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 837 (9th Cir. 2024). St. Luke's has more than adequately alleged an intent to engage in conduct affected by a constitutional interest.

The Attorney General next charges that St. Luke's cannot establish a substantial threat of enforcement because "§ 18-622 is enjoined relevant to this lawsuit." Br. at 9. Other courts have flatly rejected identical arguments, for good reason. "[P]reliminary injunctive relief does not defeat Article III standing," as "the relief is by definition temporary, leaving the threat of future injury in place." *O.A. v. Trump*, 404 F. Supp. 3d 109, 145-46 (D.D.C. 2019); *see Nielsen v. Preap*, 586 U.S.

392, 403 (2019) (dismissing argument that preliminary injunction mooted case because "[u]nless th[e] preliminary injunction was made permanent and not disturbed on appeal, these individuals faced the threat of re-arrest and mandatory detention"). As another district court put it, the Attorney General's "argument is circular": He "contend[s] that Plaintiff[] lack[s] standing because [it is] no longer being injured due to the [c]ourt's preliminary injunction. Accordingly, the preliminary injunction should be lifted. At which point, Plaintiff[] will again face a cognizable injury, have standing, and be entitled to a preliminary injunction." *Doe 2 v. Mattis*, 344 F. Supp. 3d 16, 27 (D.D.C. 2018). This Court should analyze standing here the same way: by "consider[ing] whether Plaintiff[] would be harmed if the preliminary injunction were lifted and [the statute] allowed to go into effect." *Id.* St. Luke's has alleged such harm. *E.g.*, Compl. ¶¶ 44, 52.

The Attorney General's theory for why such harm will not come to pass even if the *United States* injunction is lifted misses the mark. *See* Br. at 9. If the preliminary injunction in the *United States* litigation is dissolved because the United States changes its position as to EMTALA and dismisses its complaint, St. Luke's will still face harm. Private litigants may still sue St. Luke's for violating EMTALA, 42 U.S.C. § 1395dd(d)(2)(A), and the meaning of the statute passed by Congress would not change. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 398-400 (2024) (explaining that courts must "exercise[] . . . independent judgment" to "reach[]" the "best reading" of a statute without deferring to administrative interpretations); *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case."). That St. Luke's will face immediate harm if the injunction is lifted is obvious from looking at the harms St. Luke's actually experienced during the time when the *United States* injunction was briefly lifted and St. Luke's had to airlift six patients out of state. *Moyle v. United States*, 603 U.S. 324, 327 (2024) (Kagan, J., concurring) ("The on-the-ground impact was immediate.").

ii. **The Attorney General is a Proper Defendant for the Requested Relief.**

The Attorney General also makes a more limited objection to Plaintiff's standing: He contends that he is not the correct defendant against whom to enjoin the law's licensure penalties because "the Attorney General does not enforce the relevant boards' laws and rules." Br. at 10. St. Luke's does not contend otherwise—rather, it contends that the link between conviction (which the Attorney General has authority to pursue) and licensure penalties (which the Board can pursue *only upon conviction*) serves as an additional and independent injury supporting standing. *See* Mem. in Supp. of Mot. for Prelim. Inj. at 18-19 & n.5, ECF No. 2-1 [hereinafter "PI Mem."].

On that point, the Attorney General has no answer. Under current law, § 18-622 does not allow a licensure board to take disciplinary action absent a conviction. Mem. Dec. and Order on Mot. to Dismiss, *Adkins v. Idaho*, No. CV01-23-14744 at 11 n.1 (Idaho Dist. Ct. Dec. 29, 2023) ("If [§ 18-622] is the authority for the suspension, however, a conviction must be awaited. That's the upshot of statutory language creating a criminal offense and then penalizing the offender with a license suspension 'upon [an] offense.'"). As St. Luke's set forth in its opening brief, the licensing boards agree. Joint Stip., *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, No. 23-cv-00142, ECF No. 182-1 (D. Idaho Dec. 18, 2024). This causal relationship between one state official's action and another's supports standing. *See California v. Trump*, 963 F.3d 926, 940 (9th Cir. 2020) (plaintiffs had standing to challenge diversion of funds, without which "there would be no basis to invoke" the statutory waiver that was "most directly responsible for the[ir] injuries"); *Matsumoto v. Labrador*, 122 F.4th 787, 800 (9th Cir. 2024) (finding standing where "the legislature wrote this precise causation chain into" the statute); *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997) (standing does not require showing of proximate cause).

Conviction is not only a condition precedent to disciplinary action by a licensure board; it also appears to be a mandatory trigger. Under § 18-622, "upon" a provider's conviction, his or her

license "*shall* be suspended," or "*shall* be permanently revoked," depending on whether it is a first

or second conviction. § 18-622(1) (emphases added). Thus, St. Luke's has standing to sue the

Attorney General to enjoin the effect his enforcement actions would have on licensure—an effect

that does not depend on any independent third-party action or discretion. *See Matsumoto*, 122 F.4th

at 799-800 ("Typically, when a court undertakes a 'chain of causation' traceability analysis, it does

so because the case involves unregulated plaintiffs and the actions of private third parties.").

### B.  This Suit is Ripe for Adjudication by This Court.

The Attorney General further argues that the claims presented by St. Luke's are

"prudentially unripe." Br. at 12. "The two guiding considerations for prudential ripeness are 'the

fitness of the issues for judicial decision and the hardship to the parties of withholding court

consideration.'" *Tingley v. Ferguson*, 47 F.4th 1055, 1070 (9th Cir. 2022) (quoting *Thomas v.

Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (en banc)). This suit satisfies

both prongs.

To start, these issues are clearly fit for judicial decision, because this Court has already

rendered multiple decisions on them. *See Idaho*, 623 F. Supp. 3d at 1109-15; *United States v.

Idaho*, No. 22-cv-00329, 2023 WL 3284977, at *3-5 (D. Idaho May 4, 2023). The "precise legal

question to be answered" is whether EMTALA preempts § 18-622 insofar as it criminalizes

pregnancy termination necessary to provide stabilizing care. *Yahoo! Inc. v. La Ligue Contre Le

Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1212 (9th Cir. 2006); *see* Compl. ¶¶ 6, 64-68. That

question involves statutory interpretation (of EMTALA, the Affordable Care Act, and § 18-622)

and application of preemption doctrines. "The question of preemption is predominately legal" and

thus fit for judicial resolution. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev.

Comm'n*, 461 U.S. 190, 201 (1983). And courts similarly generally view statutory-interpretation

questions as fit for judicial review without further factual development. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001).

The Attorney General argues that "further factual development is required" based on the declaration St. Luke's attached to its preliminary injunction motion describing six instances in which pregnant patients had to be airlifted out of state to have access to the full range of stabilizing care. *See* Br. at 13-14 (citing Suppl. Seyb Decl., ECF No. 2-2). According to the Attorney General, this declaration prompts factual questions as to whether "St. Luke's [has] brought a case within the bounds of [the] . . . narrow conflict" between EMTALA and § 18-622. Br. at 14. This puts the cart before the horse. Again, the legal question here is whether there is a conflict between EMTALA and § 18-622, and what that conflict is—not, for instance, whether each out-of-state transfer was in fact the medically appropriate option at the time based on the facts of each case. *See Idaho*, 623 F. Supp. 3d at 1109 (applying "the plain language of the statutes" to answer the preemption question).

To the extent factual questions bear on the answer to this legal question, they are the types of factual questions courts routinely allow to be answered in later phases of litigation. They are not factual questions arising from a record "devoid of *any* specific factual context" to sketch the "contours of the case or controversy." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1141-42 & n.8 (9th Cir. 2000) (emphasis added). That is, the "challenged circumstances" here "are not hypothetical." *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1139 (9th Cir. 2024). Absent an injunction, St. Luke's medical providers faced with a pregnant patient whose pregnancy must be terminated to stabilize her health condition must choose between "withhold[ing] critical stabilizing treatment required under EMTALA" and "risk[ing] criminal prosecution," potential loss of their professional licenses, and potential civil liability and loss of

Medicare funds for St. Luke's. Compl. ¶¶ 46-47; *see, e.g.*, *Educ. Credit Mgmt. Corp. v. Coleman* (*In re Coleman*), 560 F.3d 1000, 1009 (9th Cir. 2009) (need for factual development does not necessarily defeat prudential standing); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009) (claims fit for judicial resolution even where record was "admittedly sparse" but "the circumstances presented by [the plaintiffs were] not hypothetical").

The Attorney General's argument is also perplexing considering the timeline of this litigation. He argues that it is not clear "how St. Luke's would respond to a pregnant woman suffering PPROM or from preeclampsia . . . *after* the Supreme Court ruling" in *Moyle*, Br. at 14, but St. Luke's filed its complaint, preliminary injunction motion, and supplementary declaration after both the United States Supreme Court and the Idaho Supreme Court weighed in on § 18-622—indeed, the complaint and motion cite both developments. *See, e.g.*, Compl. ¶¶ 31, 36; PI Mem. at 7, 14-16. And Dr. Seyb described in the present tense his view that "Idaho Code § 18-622 still prohibits necessary emergency care," specifically stating that "[n]o changes to Idaho or federal law since 2022 have changed the fact that it is impossible to discern the point at which Idaho law allows the provision of stabilizing pregnancy terminations." Suppl. Seyb Decl. ¶¶ 18-24; *see also Moyle*, 603 U.S. at 343 (Jackson, J., concurring in part) ("[T]he representations Idaho's counsel made during oral argument and in the State's brief filed in this Court are not a definitive interpretation of Idaho law."). It is thus far from mysterious how St. Luke's continues to experience the conflict between EMTALA and § 18-622 in light of the United States and Idaho Supreme Courts' treatments of § 18-622.

This suit also satisfies the second prong of prudential ripeness: Withholding a decision would pose hardship to St. Luke's. The Attorney General argues St. Luke's would face no hardship because of the preliminary injunction in the *United States* litigation. Again, "the relief is by

definition temporary, leaving the threat of future injury in place." *O.A.*, 404 F. Supp. 3d at 145-46; *Nielsen*, 586 U.S. at 403. If this Court were to require St. Luke's to wait until the *United States* injunction has lifted to file suit, it would be immediately exposed to grievous injury. *See supra* at 3-6. The same logic that compels the Court to find an injury in fact counsels in favor of concluding that St. Luke's satisfies the hardship prong of the prudential-ripeness analysis.[5]

### C.  The Attorney General Is Not Immune from Suit.

Relying on the principle that *Ex parte Young*'s exception to sovereign immunity applies only to suits challenging "an ongoing violation of federal law," the Attorney General again cites the extant preliminary injunction to contend there is no ongoing violation. Br. at 15-16 (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). But the ongoing-violation principle merely limits *Ex parte Young*'s reach to suits seeking prospective relief. *See Planned Parenthood Great Nw.*, 122 F.4th at 842 ("[S]uits seeking prospective relief under federal law may ordinarily proceed against state officials sued in their official capacities."); *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1219 (11th Cir. 2000) ("*Ex parte Young* has been applied in cases where a violation of federal law by a state official is *ongoing as opposed to cases in which federal law has been violated* at one time or over a period of time *in the past*." (emphases added)). The existence of a previously entered preliminary injunction does not bar St. Luke's from suing a state official because it still requests prospective relief against that official. *Cf. Nielsen*, 586 U.S. 392; *Doe 2*, 344 F. Supp. 3d at 27.

Reading the "ongoing violation" requirement literally, as the Attorney General suggests, would mean *no* pre-enforcement challenge could ever be brought against state officials, a

---

[5] The Attorney General gestures vaguely toward the fact that "[h]ardship to the government from allowing a case to move forward" also matters in the prudential-ripeness analysis, *see* Br. at 13, but offers no argument that it would actually experience such hardship.

preposterous idea given the consistent practice allowing such suits, not to mention the fact that *Ex parte Young* itself involved a pre-enforcement challenge. *Ex parte Young*, 209 U.S. 123, 129 (1908); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) ("[F]ederal courts may in some circumstances grant injunctive relief against state officers who are violating, *or planning to violate*, federal law." (emphasis added)); *Cotto v. Campbell*, 126 F.4th 761, 767 & n.3 (1st Cir. 2025) (explaining *Ex parte Young* "can also apply when plaintiffs . . . alleg[e] an anticipated (as opposed to an ongoing) violation of federal law"); *Planned Parenthood Great Nw.*, 122 F.4th at 842 (allowing such a suit under *Ex parte Young*). Because this suit looks forward rather than backward, sovereign immunity does not stand in its way.

The Attorney General makes the further claim that because "EMTALA does not apply to the Attorney General, . . . the Supremacy Clause does not command him to do anything." Br. at 16. As addressed in more detail *infra*, the fact that Congress legislates under the Spending Clause and imposes restrictions directly on funding recipients does not give state officials license to veto the federal prerogatives set out in that legislation. The Supremacy Clause—when properly enforced through an equitable cause of action—demands that the Attorney General refrain from enforcing a state criminal law preempted by federal law, and he has no immunity from suits seeking to enjoin him from doing so. *See Silva v. Farrish*, 47 F.4th 78, 84-85 (2d Cir. 2022) (*Ex parte Young* abrogates state official's immunity from suit for preemption claims); *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("*Ex parte Young* gives life to the Supremacy Clause" and "vindicate[s] the federal interest in assuring the supremacy of that law.").

### D.  St. Luke's Has a Cause of Action for Equitable Relief.[6]

As St. Luke's explained in its complaint, it brings this suit pursuant to a long-recognized equitable cause of action. Compl. ¶ 64. The Attorney General argues that *Armstrong v. Exceptional Child Center, Inc.*, forecloses the claim St. Luke's asserts. Not so.

In *Armstrong*, the Supreme Court held that the Supremacy Clause "does not confer a right of action." 575 U.S. at 326. It recognized, however, an equitable cause of action allowing suit "to enjoin unconstitutional actions by state and federal officers"—including "state regulatory action[] preempted" by federal law. *Id.* at 326-27 (citing *Ex parte Young*, 209 U.S. at 155-56). That remedy is a "creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.* at 327. The core rule articulated by *Armstrong* is that "equitable relief . . . is traditionally available to enforce federal law" unless Congress has "displace[d]" it by demonstrating an "'intent to foreclose' equitable relief." *Id.* at 328-29 (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 647 (2002)). The Attorney General seeks to flip this background principle on its head.

In *Armstrong*, the Supreme Court determined that Congress intended to foreclose equitable relief under the challenged law (§ 30(A) of the Medicaid Act) based on two aspects of the statute, neither of which is present here. "First, [in § 30(A),] the sole remedy Congress provided for a State's failure to comply with Medicaid's requirements" was "the withholding of Medicaid funds by the Secretary of Health and Human Services." 575 U.S. at 328. By providing *only* an agency remedy, Congress had evidently traded "the comparative risk of inconsistent interpretations and

---

[6] In deciding whether to dismiss for failure to state a claim, "the court must accept as true all well-pleaded factual allegations," and the "complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Poe ex rel. Poe*, 709 F. Supp. 3d at 1183 (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

misincentives that can arise out of an occasional inappropriate application of the statute in a private action" for "the expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decisionmaking." *Id.* at 328-29. EMTALA is distinct: It contains a similar fund-withholding enforcement mechanism, but it also creates a private right of action for individual patients and medical facilities to obtain damages and equitable relief. 42 U.S.C. § 1395dd(d)(2)(A), (B). It is the exposure to that private litigation that in part creates the injury to St. Luke's in this case. *See supra* at 3-6. Unlike with § 30(A) of the Medicaid Act, in EMTALA, Congress thus plainly did *not* "confer[] enforcement . . . upon the Secretary alone" and did *not* "want[] to make the agency remedy that it provided exclusive." *Armstrong*, 575 U.S. at 328-29 (internal quotation marks omitted).

For that same reason, the second salient aspect of § 30(A) upon which the *Armstrong* Court relied is absent here. In *Armstrong,* the Court specifically noted that "[t]he provision for the Secretary's enforcement by withholding funds might not, *by itself*, preclude the availability of equitable relief," but "it does so when combined with the judicially unadministrable nature of § 30(A)'s text." *Id.* at 328. EMTALA's text, by contrast, is not "judicially unadministrable"; instead, it is *designed* to be administered by courts, including those deciding private claims under the statute's express private rights of action. *See Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 147 (2d Cir. 2016) ("A federal court can evaluate the [defendant]'s compliance with these obligations without engaging in the sort of 'judgment-laden' review that the Supreme Court in *Armstrong* concluded evinced Congress's intent not to permit private enforcement of § 30A of the Medicaid Act.").

The Attorney General also argues that Congress, by creating private rights of action against hospitals and certain physicians, intended to allow judicial relief against *only* those defendants

(and not the state or its officials). Br. at 21. But Congress expressly preempted state laws that directly conflict with EMTALA. *See* 42 U.S.C. § 1395dd(f). "It is difficult to imagine," *Armstrong*, 575 U.S. at 328, that Congress intended for EMTALA to preempt state laws but foreclosed any mechanism for regulated parties to enforce the law's preemption provision in light of the statute's other avenues for relief. State regulation prohibiting compliance with EMTALA is, after all, *at least* as disruptive to Congress's objectives in enacting EMTALA as individual providers' violations of the law. It is implausible that, by authorizing remedies against hospitals and physicians, Congress intended to displace traditional remedies against states and state officials. *Cf. Va. Off. for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 256 n.3 (2011) ("The fact that the Federal Government can exercise oversight of a federal spending program and even withhold or withdraw funds . . . does not demonstrate that Congress has displayed an intent not to provide the more complete and more immediate relief that would otherwise be available under *Ex parte Young*." (internal quotation marks omitted)).

In sum, "the federal statutory scheme does not contain, expressly or implicitly, any intent by Congress to limit the traditional equity powers of the federal courts to enjoin state interference with the operation of federal law." *Restoration Risk Retention Grp., Inc. v. Gutierrez*, 880 F.3d 339, 346 (7th Cir. 2018). The "equitable relief . . . traditionally available to enforce federal law" is thus firmly in place and available for this challenge by St. Luke's. *Armstrong*, 575 U.S. at 329.

### E.  St. Luke's Has Stated a Claim of Preemption.

Today, as when this Court first entered its injunction, EMTALA preempts § 18-622 to the extent it prohibits terminating a pregnancy to safeguard a patient's health (but where the patient's life is not in danger). It remains "impossible to comply with both statutes." *Idaho*, 623 F. Supp. 3d at 1109; *see also Idaho*, 2023 WL 3284977, at *3-5; *see also Moyle*, 603 U.S. at 327 (Kagan, J.,

concurring) (noting that "when a woman comes to an emergency room with PPROM, the serious risk she faces may not be of death but of damage to her uterus, preventing her from having children in the future," and "Idaho has never suggested that its law would allow an abortion in those circumstances"); 603 U.S. at 365 (Alito, J., dissenting) (acknowledging that "in PPROM cases, there may be an important conflict between what Idaho law permits and what EMTALA, as interpreted by the Government, demands").

Second, "even if it were theoretically possible to simultaneously comply with both laws, Idaho law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Idaho*, 623 F. Supp. 3d at 1111 (citation omitted). Section 18-622 is preempted because its severe penalties create an insuperable obstacle to the fulfillment of ETMALA's purpose of "ensuring that patients[] . . . receive adequate emergency medical care." *Vargas ex rel. Gallardo v. Del Puerto Hosp.*, 98 F.3d 1202, 1205 (9th Cir. 1996). None of the Attorney General's attacks on the instant preemption claim warrants departing from this Court's rulings in the *United States* litigation.

### i. St. Luke's Adequately Alleges the Existence of a Non-Speculative Conflict.

The Attorney General asserts that "St. Luke's has pled that there 'can' be situations in which the two laws conflict" but has not "identified any actual situation in which the conflict exists." Br. at 30. In his view, St. Luke's must point to "a specific patient . . . in present need of an abortion that EMTALA authorizes or requires," but § 18-622 forbids. Br. at 30. This Court's grant of preliminary injunctive relief in *United States v. Idaho* shows that not to be the case. *See Idaho*, 623 F. Supp. 3d at 1107-11. The rule in preemption cases that "the conflict must be an actual conflict, not merely a hypothetical or potential conflict, . . . does not foreclose challenges based on future or anticipated conflicts." *Montana Med. Ass'n v. Knudsen*, 119 F.4th 618, 623 (9th Cir.

2024) (internal quotation marks omitted). Indeed, the Attorney General's proposed rule would be unworkable in this context because it would force St. Luke's to run to the courthouse in the midst of a patient's medical emergency, leaving the court essentially no time to even issue preliminary relief, let alone reach a final ruling. *Cf. Wallingford v. Bonta*, 82 F.4th 797, 801 (9th Cir. 2023) (courts applying "capable of repetition, yet evading review" exception generally conclude that "actions lasting more than two years are frequently considered long enough to be fully litigated prior to cessation, while actions lasting less than two years are considered too short").

Ignoring the practical application of his proposed rule, the Attorney General complains that without an actual patient in the midst of an emergency, the Court will be forced to answer an "abstract question" about whether a conflict exists. Br. at 31. This, he contends, sets the Court up for failure because it will not be able to determine whether "(a) the proposed abortion is outside the scope of Idaho Code § 18-622 and therefore permissible (such as a molar or ectopic pregnancy), or (b) the abortion can fairly be described under the statutory standard as being necessary to prevent the death of the woman." Br. at 31. That is incorrect. Even without a here-and-now patient emergency implicating the conflict, the complaint decisively alleges that such emergencies would arise absent an injunction. Again, this Court has already decided this issue. In doing so, it identified several pregnancy-related conditions with presentations that, at times, fall within the zone of conflict, including PPROM, preeclampsia, placental abruption, and uterine hemorrhage. *Idaho*, 623 F. Supp. 3d at 1101, 1104.

In addition, St. Luke's alleged that six such situations *did* arise during the mere months-long stay of this Court's injunction. Compl. ¶ 51. During that time, St. Luke's providers made the difficult decision to recommend that six patients presenting with preeclampsia or PPROM—not molar or ectopic pregnancies—be transferred out of state to facilitate the availability of EMTALA-

mandated care. *Id.* Preeclampsia is characterized by "high blood pressure and protein in the urine or other problems such as impaired liver function or low platelet count," and can result in "severe liver failure, renal dysfunction, [and] cerebral hemorrhage." *Id.* PPROM carries a "high risk of infection, sepsis, and bleeding from placental abruption." *Id.* Transfer in these cases, St. Luke's alleged, is the "medically appropriate course of action to avoid a conflict between the stabilizing treatment required by federal law and Idaho's law," which is no surprise because "neither of these conditions—preeclampsia or PPROM—*always* requires termination of pregnancy to prevent the death of the mother," the only scenario in which Idaho law allows termination. *Id.* ¶¶ 51, 54. These six examples clearly show the existence of a non-speculative, non-hypothetical conflict and refute the Attorney General's claim that the complaint includes "no facts regarding actual patients whose actual doctors believe" a conflict existed. Br. at 31.

It is simply not appropriate on a motion to dismiss to second-guess the complaint's allegations on the basis that "[i]t may turn out, based on the evidence before the Court," that these examples did not constitute a genuine conflict. *Id.* In any event, the very suggestion that the alleged decisions to airlift these six patients are not enough to demonstrate a conflict runs directly counter to the Attorney General's claim that § 18-622 abides no questioning of a provider's medical judgment regarding when death is imminent. *Contra id.* at 25 n.15; *but see Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1204 (Idaho 2023) (state's prosecutors may challenge "good faith" by calling "other medical experts" to opine on "whether the abortion was, in their expert opinion, medically necessary"). St. Luke's alleges that its medical providers made the call that these patients were not yet in need of pregnancy termination to prevent their deaths but faced substantial risks to their health requiring transfer out of state. Compl. ¶¶ 51, 54. Under the Attorney General's own rubric, this medical judgment should carry the day. By insisting that these decisions

must be subject to further scrutiny (and at the motion to dismiss stage, no less), the Attorney General proves the untenable bind in which providers find themselves.

Finally, the Attorney General's argument does not contend with the obstacle-preemption theory put forth by St. Luke's, and ruled on favorably by this Court in *United States v. Idaho*, 623 F. Supp. 3d at 1111-15, under which the reasonable perception of a conflict renders state law invalid. As St. Luke's has argued, § 18-622 presents an impermissible obstacle to EMTALA's "overarching purpose of ensuring that patients[] . . . receive adequate emergency medical care," *Vargas ex rel. Gallardo*, 98 F.3d at 1205, because exposure to criminal prosecution renders medical providers less inclined or entirely unwilling to risk providing treatment. *See* PI Mem. at 13-14 (collecting cases); *Idaho*, 623 F. Supp. 3d at 1111. That is enough for obstacle preemption.

### ii. EMTALA's Text, Context, and Purpose Show that EMTALA Requires Stabilizing Care that Sometimes Includes Pregnancy Termination.

This Court previously—and correctly—held that the United States was likely to succeed in arguing that EMTALA obliges participating hospitals to provide stabilizing care that sometimes encompasses termination of pregnancies. *Idaho*, 623 F. Supp. 3d at 1109-11; *Idaho*, 2023 WL 3284977, at *3-5. The Attorney General nonetheless argues that EMTALA's text, context, and purpose "preclude" reading the statute to impose precisely that requirement. Specifically, the Attorney General first argues that "EMTALA's text imposes a duty to 'the unborn child'" that "forecloses the argument that EMTALA mandates abortions." Br. at 23 (formatting omitted). But EMTALA's references to the "unborn child" do not cabin EMTALA's stabilization requirement. *See Moyle*, 603 U.S. at 330 (Kagan, J., concurring). All EMTALA's duties run to the "individual" seeking care. *See* 42 U.S.C. § 1395dd(a), (b)(1), (b)(2), (c)(1). And the provision of EMTALA addressing pregnant patients distinguishes between "the individual" (denoting the "pregnant woman") and "her unborn child." 42 U.S.C. § 1395dd(e)(1)(A)(i); *see* 1 U.S.C. § 8(a) (defining

"individual" to "include every infant member of the species homo sapiens who is born alive at any stage of development," but not a fetus). Accordingly, when the treatment required to stabilize a pregnant woman's emergency medical condition is terminating the pregnancy, EMTALA requires the hospital to offer that treatment and allow her—the "individual"—to make an informed decision about whether to proceed.

None of EMTALA's four references to an "unborn child" alters this core obligation. *See Moyle*, 603 U.S. at 330-31 (Kagan, J., concurring). Three of these references simply direct hospitals to also consider risks to an "unborn child" in determining whether a woman in labor may be permissibly transferred before delivery. 42 U.S.C. § 1395dd(c)(1)(A)(ii), (2)(A), (e)(1)(B)(ii). The fourth specifies that a hospital must treat a condition that "plac[es] the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy." § 1395dd(e)(1)(A)(i). As Justice Kagan explained in *Moyle*, "[t]he parenthetical there, added in an amendment to EMTALA, ensures that a woman with no health risks of her own can demand emergency-room treatment if her fetus is in peril." 603 U.S. at 331 (Kagan, J., concurring). That expansion of EMTALA did not alter the statute's existing requirements to stabilize pregnant women with emergency health conditions. In any event, as a practical matter, in many of the tragic emergencies where the stabilizing treatment is pregnancy termination, the pregnancy complication itself means the fetus would not have survived even absent immediate pregnancy termination. EMTALA cannot possibly require stabilization of both the pregnant woman and the fetus when there is no treatment that could "assure, within reasonable medical probability, that no material deterioration" of the fetus's condition is likely to occur. 42 U.S.C. § 1395dd(e)(3)(A).

The Attorney General next argues EMTALA's purpose and context are inconsistent "with a preempting abortion mandate." Br. at 25 (formatting omitted). The Attorney General, citing the

vacated Ninth Circuit panel decision staying the injunction in *United States v. Idaho*, argues that EMTALA's purpose was limited to keeping hospitals from turning away indigent patients. *Id.* at 26-27. The statute's text and legislative history show that to be too narrow a view. Congress's specific concern about "patient dumping" reflected its commitment to a broader principle that "every patient who has a bonafide emergency" should receive stabilizing care. 131 Cong. Rec. 28,569 (1985) (statement of Sen. Kennedy); *see, e.g.*, *id.* (statement of Sen. Dole). Numerous courts have rejected similar attempts to narrow EMTALA's scope as inconsistent with the statutory text. *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1040 (D.C. Cir. 1991) (although EMTALA's "legislative history reflects an unmistakable concern with the treatment of uninsured patients, the Act itself draws no distinction between persons with and without insurance"); *Hardy v. N.Y. City Health & Hosps. Corp.*, 164 F.3d 789, 792-93 (2d Cir. 1999); *Correa v. Hosp. S.F.*, 69 F.3d 1184, 1193-94 (1st Cir. 1995); *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1259 & n.3 (9th Cir. 1995). In any event, this case, and the experience of St. Luke's while the *United States* injunction was lifted, illustrate how enforcing EMTALA's guarantees for all patients addresses patient-dumping by ensuring that women will not need to be airlifted across state lines to access required stabilizing treatment.

It is irrelevant that the Hyde Amendment was in effect when EMTALA was enacted. The Hyde Amendment does not purport to limit EMTALA's stabilization obligation. To the extent federal funds cannot be used to pay for certain care required under EMTALA, that is no reason to except that care from EMTALA's stabilization mandate. Much of the care EMTALA requires is not subsidized by federal funds because the statute mandates that care be provided universally, including to patients who are not covered by Medicare or any other federally funded healthcare. For the same reason, the fact that President Reagan, who signed EMTALA into effect, opposed

financing abortions is immaterial. The Attorney General can point to no special rule carving out abortion care from EMTALA's otherwise-applicable rules, because there is none. *See*, *e.g.*, 10 U.S.C. § 1093 (special rule excluding certain abortion care from generally applicable rules in different statute); 20 U.S.C. § 1688 (similar); 22 U.S.C. §§ 5453(b), 7704(e)(4) (similar); 25 U.S.C. § 1676(a) (similar); 42 U.S.C. §§ 238n, 280h-5(a)(3)(C), 300a-6, 300a-7, 300a-8, 300z-10(a), 1397ee(c)(7)(A), 2996f(b)(8), 12584a(a)(9) (similar). Indeed, the same legislation that led to EMTALA's enactment initially included a separate program that, unlike EMTALA, expressly prohibited abortion. *Compare* Consolidated Omnibus Budget Reconciliation Act of 1985, H.R. 3128, 99th Cong. § 124 (language that became EMTALA), *with id.* § 302(b)(2)(B) (excluding abortion from a different program's authorized activities). Finally, in the Affordable Care Act's carefully negotiated section on abortion, although Congress provided that the Act would not require insurance plans to cover abortion and indeed prohibited the use of federal subsidies for certain abortions, Congress also specifically provided that "[n]othing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, *including section 1395dd of this title (popularly known as 'EMTALA')*." 42 U.S.C. § 18023(a), (b), (d); *see* Brief of Amicus American Hospital Association, et al., ECF No. 19.

EMTALA's context, like its purpose, is thus at odds with the Attorney General's reading of the law. It is therefore unsurprising that this reading could not garner a majority of votes when these issues were presented to the Supreme Court. *Moyle*, 603 U.S. at 352-53 (Alito, J., dissenting) (joined only by Justices Thomas and Gorsuch).

### iii.   The Conflict Is Apparent from EMTALA's Text and Does Not Depend on a Freestanding National Standard of Care.

St. Luke's does not ask the Court to hold that EMTALA creates some overarching, atextual national standard of care; recognizing the conflict between EMTALA and § 18-622 requires no

more and no less than interpreting the plain text of the statute's stabilization requirement. As this Court has already held, that statutory text "calls for stabilizing treatment, which *of course may include abortion care*—when harm is probable, when the patient could 'reasonably be expected' to suffer injury." *Idaho*, 623 F. Supp. 3d at 1109 (emphasis added). Disregarding this ruling, the Attorney General contends that because EMTALA does not create a national standard of care, "it does not require any specific medical procedure," including termination of pregnancy. Br. at 23. That is wrong on multiple levels.

*First*, the Attorney General cites two Ninth Circuit cases for the proposition that EMTALA does not create a national standard of care, but neither takes him far. Both deal with the statute's screening provision, rather than its stabilization requirement. The screening provision instructs only that hospitals "must provide for an appropriate medical screening examination." 42 U.S.C. § 1395dd(a). The Ninth Circuit has reasonably found that this language is not clear enough to supplant state law with regard to what constitutes appropriate medical action. *See Bryant v. Adventist Health System/West*, 289 F.3d 1162, 1166 (9th Cir. 2002); *Eberhardt*, 62 F.3d at 1258. The stabilization requirement is an entirely different matter: When it comes to selecting a stabilizing treatment, EMTALA requires the provision of care that is "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely." 42 U.S.C. § 1395dd(e)(3)(A). All this Court must do—indeed, all it has *already done*—is determine whether conditions like PPROM and preeclampsia could necessitate termination of a pregnancy to ensure "no material deterioration." *Id.* As this Court has already found, the answer is yes.

*Second*, the fact that EMTALA requires stabilization as defined above rather than listing out the procedures that hospitals must provide is no reason to interpret it as the Attorney General urges. It would be impossible (and unnecessary) for the statute to list every conceivable emergency

medical condition and its corresponding stabilizing treatment; rather than attempt to catalog these infinite possibilities, EMTALA's statutory and regulatory regime relies heavily on the medical expertise of participating hospitals' qualified medical providers. *See* 42 U.S.C. § 1395dd(c)(2); 42 C.F.R. § 482.55. For that reason, Congress did not identify the particular treatments necessary to achieve stabilization for the wide range of emergency medical conditions that EMTALA covers.

> ### iv. The Spending Clause Does Not Give States Veto Power Over Federal Policy Objectives.

Not only does EMTALA clearly conflict with, and thereby preempt, § 18-622 in the situations at issue here, but it does so pursuant to valid congressional authority under the Spending Clause. U.S. Const. art I, § 8. That authority runs broad and deep. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022) ("Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds."). Laws enacted under Congress's "substantive" and "distinct" Spending Clause authority carry just as much weight under the Supremacy Clause as those enacted under other congressional powers. *See United States v. Butler*, 297 U.S. 1, 65-66, 74 (1936).

In resisting these principles, the Attorney General advances two arguments that converge into a single contention: that Spending Clause legislation directing funds to private parties—rather than states—cannot preempt state law. Br. at 16–20. He asserts that such preemption would amount to an involuntary and unknowing agreement to funding conditions by the state in question. *Id.* This novel carveout from the Supremacy Clause has no basis in precedent or logic.

The Spending Clause does not require Congress to obtain the informed consent of third-party states to further its spending-related policy aims. If it did, a potent tool in Congress's box of regulatory powers would be hamstrung. Unsurprisingly, then, courts have never endorsed the Attorney General's theory. That is clearest from the Supreme Court's decision in *Butler*, which

involved a federal program granting money to private farmers on certain conditions. The Court explained that where "[t]he United States can make the contract" with a state's citizens because "the federal power to tax and to appropriate reaches the subject-matter of the contract," "its exertion cannot be displaced by state action." *Butler*, 297 U.S. at 74. "To say otherwise is to deny the supremacy of the laws of the United States; to make them subordinate to those of a state." *Id.* In keeping with *Butler*, the Supreme Court has repeatedly applied ordinary preemption principles to spending legislation that directs federal funding to entities other than states. *See, e.g.*, *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95-99 (2017); *Bennett v. Arkansas*, 485 U.S. 395, 396-98 (1988) (per curiam); *Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 269-70 (1985).

Moreover, there is no reason to think these cases and principles do not extend to the context of spending related to medical practice. The Attorney General suggests that "health and safety" regulations are primarily in the states' bailiwick. Br. at 17-18 (quotation marks omitted). But there is an undeniable federal interest in furthering the provision of safe and effective healthcare for all Americans, regardless of where they live. Indeed, "there is no question that the Federal Government can set uniform national standards" on matters of "health and safety," including "medical practice." *Gonzales v. Oregon*, 546 U.S. 243, 271 (2006). Relatedly, only the federal government can step in to prevent interstate patient-dumping, an aim that animated EMTALA's passage. 131 Cong. Rec. 28,569 (1985) (statement of Sen. Kennedy). In short, there is no exception to the Supremacy Clause for spending legislation, nor for spending legislation directing funds to private parties, nor for spending legislation dealing with matters of health and safety. Federal law is federal law, and states must not interfere with Congress's legitimate policy prerogatives.

## II. This Court Should Grant the Preliminary Injunction.

As St. Luke's has demonstrated, preliminary injunctive relief is warranted here, and nothing the Attorney General has said undercuts the showing St. Luke's has made on each prong of the preliminary injunction analysis.

### A. St. Luke's Is Likely to Succeed on the Merits.

For all of the above reasons, and taking into account both the supplementary declaration from Dr. Seyb and the declarations already in the record in the *United States* litigation, St. Luke's has demonstrated a likelihood of success on the merits. None of the Attorney General's assortment of other likelihood-of-success arguments has merit.[7] *See* Br. at 29.

*First,* there is no cause to apply a "presumption against preemption," *id.*, because Congress explicitly stated it intended EMTALA to preempt directly conflicting state laws.[8] 42 U.S.C. § 1395dd(f); *R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th 542, 553 n.6 (9th Cir. 2022). EMTALA's preemption language is a common construction that reflects the ordinary rule that federal law preempts "direct[ly]" conflicting state law. *See, e.g.*, 15 U.S.C. § 1225; 16 U.S.C. §§ 3507, 544*l*(e)(5); 43 U.S.C. § 1600g; *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984).

*Second,* the major-questions doctrine does not apply here. It applies when an "agency" asserts an "[e]xtraordinary grant[] of regulatory authority." *West Virginia v. EPA*, 597 U.S. 697, 722-23 (2022). But this is not an agency-delegation case. *See Mayes v. Biden*, 67 F.4th 921, 933 (9th Cir.) (rejecting application of major-questions doctrine where "no relevant agency action"

---

[7] The Attorney General "raises [these] issues in a summary manner" and incorporates Idaho's arguments from the *United States* litigation. St. Luke's responds briefly to these arguments but also incorporates the United States' arguments from its opposition brief in *United States v. Idaho*, No. 23-35440 (9th Cir. Oct. 15, 2024), ECF No. 194.

[8] EMTALA does "not preempt stricter" (i.e., more protective) "state laws." H.R. Rep. No. 99-241, pt. 1, at 4 (1985), *as reprinted in* 1986 U.S.C.C.A.N. 579, 582; *see, e.g.*, *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001) (Section 1395dd(f) preserves additional "state remedies").

was challenged), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023). Instead, at issue here are "policy decisions" made by "Congress . . . itself." *West Virginia*, 597 U.S. at 723 (citation omitted).

*Third*, state law does not constrain EMTALA's stabilization requirement. *Contra* Br. at 29. As already discussed, *see supra* 22-24, EMTALA requires treatment that is "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely," 42 U.S.C. § 1395dd(e)(3)(A); the ordinary meaning of these words requires hospitals to provide necessary stabilizing treatment, as determined by evidence-based clinical standards. *Cf. Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 969 (9th Cir. 2013). It would be inconsistent with that standard to import state legal restrictions on medically necessary care. *See In re Baby K*, 16 F.3d 590, 597 (4th Cir. 1994) (preempting state-law limit on necessary care).

There simply is no basis for any state-law limitation on necessary care in the statute's text. *Cf. Betlach*, 727 F.3d at 964, 968-75. Certainly, EMTALA's requirement of treatment "within the staff and facilities available at the hospital," 42 U.S.C. § 1395dd(b)(1)(A), does not furnish such a limitation; that phrase refers to physical and personnel constraints, not legal constraints. *Cf. id.*; *see Ross v. Blake*, 578 U.S. 632, 642 (2016) (defining "available" as "capable of use for the accomplishment of a purpose" and "that which is accessible or may be obtained"). Nor do the law's references to "negligen[ce]," 42 U.S.C. § 1395dd(d), which do not come with the statutory language one would expect if Congress intended to incorporate state negligence standards. *See, e.g.*, 28 U.S.C. § 1346(b)(1) (applying the "law of the place" under the Federal Tort Claims Act). Where Congress intended to incorporate state law in EMTALA, it did so expressly. *See* 42 U.S.C. § 1395dd(d)(2)(A), (B). And, of course, there is the preemption provision, which further indicates that state law cannot constrain the care that EMTALA requires. 42 U.S.C. § 1395dd(f).

*Finally*, while administrative interpretations of statutes are not dispositive, HHS has consistently understood (and enforced) EMTALA to require pregnancy termination in appropriate emergency circumstances. *See* Consol. Br. for the United States, *United States v. Idaho*, No. 23-35440 (9th Cir. Oct. 15, 2024), ECF No. 194 (citing examples of such enforcement decisions from CMS database). For example, in 2008, HHS issued a final rule expressing its understanding that hospitals must offer "abortions that are necessary to stabilize the mother, as that term has been interpreted in the context of EMTALA."[9] Unsurprisingly, then, every court to consider the issue before *Dobbs* recognized that EMTALA can require that pregnancy termination be offered. *See, e.g.*, *Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 709-18 (E.D. Mich. 2009); *New York v. HHS*, 414 F. Supp. 3d 475, 537-39 (S.D.N.Y. 2019); *California v. United States*, No. 05-328, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008).

## B. St. Luke's Satisfies the Other Preliminary Injunction Factors.

The Attorney General says little to rebut the showing St. Luke's has made on the remaining preliminary injunction factors. On irreparable harm, the Attorney General argues that "St. Luke's must establish that it is *likely* to suffer irreparable harm in the absence of *its* requested injunction." Br. at 32. Pointed italics do not, however, overcome logic and case law. "[C]ourts routinely grant follow-on injunctions against the [g]overnment." *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 59-60 (D.D.C. 2020); *see also supra* at 3-6. When a preliminary injunction entered in

---

[9] Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law, 73 Fed. Reg. 78,072, 78,087 (Dec. 19, 2008); *see also* Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 84 Fed. Reg. 23,170, 23,183 (May 21, 2019) (similar); CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss* 4 (Sept. 17, 2021), https://perma.cc/V4Y9-VDHG (similar); CMS, *Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss* 2 (July 11, 2022), https://perma.cc/GT5D-Q9FN.

a separate case "raises potential questions as to whether Plaintiffs can still demonstrate irreparable harm . . . in the absence of a similar order," it is dispositive that "circumstances may well be different tomorrow." *Id.* It is precisely because of the involvement of a third party—the United States—that the existing preliminary injunction does not bar entry of a preliminary injunction here: That relief could end at any time, and harm would immediately befall St. Luke's. *See id.* And as experience has taught, "even a temporary lag between the lifting of [the existing] injunction . . . and entry of an injunction by this Court would likely entail some irreparable harm to [St. Luke's]." *Id.* (internal quotation marks omitted); Suppl. Seyb. Decl. ¶¶ 6-17.

The last two preliminary injunction factors likewise support entry of relief. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (noting that the balance-of-equities and public-interest factors merge when a government actor is a party). The Attorney General says that "Idaho enacted the Defense of Life Act to implement the State's strong interest in protecting unborn children," Br. at 35, and that this interest is undermined when § 18-622 is enjoined in the situations at issue. But there is reason for the Court to doubt—to put it mildly—that § 18-622 serves the public interest: The Attorney General touts that during "the first full year in which Idaho's [abortion] laws were in effect, pregnancy-related deaths dropped by 44.5%"—but § 18-622 was *enjoined* for most of that time. And "given that the preliminary injunction" in the *United States* case "has been in place" for the better part of two-and-a-half years, "the lack of support" for any assertion of harm to the Attorney General and the public is "especially concerning." *Doe 2*, 344 F. Supp. 3d at 28. "If the preliminary injunction were causing the [Attorney General] irreparable harm, . . . Defendant[] would have presented the Court with evidence of such harm by now." *Id.* On the other hand, as described at length in the motion for preliminary injunction and

accompanying declaration, St. Luke's—and the Idaho communities it serves—face significant, tangible harm absent a preliminary injunction that outweighs any harm to the Attorney General.

## <u>CONCLUSION</u>

The Court should deny the Attorney General's motion to dismiss the complaint and grant the motion for a preliminary injunction St. Luke's has filed. St. Luke's seeks here the identical injunction entered in the *United States* litigation, except that it shall run against the Attorney General and his officers, employees, and agents. Specifically, the Court should order: (1) That Attorney General Raúl Labrador—and his officers, employees, and agents—are preliminarily enjoined from enforcing Idaho Code § 18-622 as applied to medical care required by the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd; and (2) that Attorney General Labrador and his officers, employees, and agents are specifically prohibited from, either directly or indirectly, initiating any criminal prosecution against, attempting to suspend or revoke the professional license of, or seeking to impose any other form of liability on any medical provider or hospital based on their performance of conduct that is defined as an "abortion" under Idaho Code § 18-604(1), but that is necessary to avoid: (i) "placing the health of" a pregnant patient "in serious jeopardy"; (ii) a "serious impairment to bodily functions" of the pregnant patient; or (iii) a "serious dysfunction of any bodily organ or part" of the pregnant patient, pursuant to 42 U.S.C. § 1395dd(e)(1)(A)(i)-(iii).

Dated: February 20, 2025                    Respectfully submitted,

                                            WENDY J. OLSON

                                            /s/ Wendy J. Olson
                                            Wendy J. Olson, Bar No. 7634
                                            Alaina Harrington, Bar No. 11879
                                            Stoel Rives LLP
                                            101 S. Capitol Blvd.
                                            Suite 1900
                                            Boise, ID 83702
                                            (208) 387-4291
                                            wendy.olson@stoel.com

                                            Lindsay C. Harrison*
                                            Jessica Ring Amunson*
                                            Sophia W. Montgomery*
                                            Ruby C. Giaquinto*
                                            Jenner & Block LLP
                                            1099 New York Ave NW, Suite 900
                                            Washington, D.C. 20001
                                            (202) 639-6000
                                            lharrison@jenner.com
                                            *admitted pro hac vice

                                            *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 20, 2025, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which sent a notice of electronic filing to the following persons:

Brian V. Church
brian.church@ag.idaho.gov

David J. Meyers
david.myers@ag.idaho.gov

*Attorneys for Attorney General Labrador*

Chad Golder
cgolder@aha.org

Stephen Lee Adams
sadams@gfidaholaw.com

*Attorneys for Amici American Hospital Association, America's Essential Hospitals, and the American Association of Medical Colleges*


/s/ Wendy J. Olson_____