RAÚL R. LABRADOR
ATTORNEY GENERAL

JAMES E. M. CRAIG, ISB #6365
Chief, Civil Litigation and
Constitutional Defense

BRIAN V. CHURCH, ISB #9391
Lead Deputy Attorney General
DAVID J. MYERS, ISB #6528
Deputy Attorney General
Office of the Attorney General
P. O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
james.craig@ag.idaho.gov
brian.church@ag.idaho.gov
david.myers@ag.idaho.gov

*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD.,<br><br>*Plaintiff,*<br><br>v.<br><br>RAÚL LABRADOR, Attorney General of the State of Idaho,<br><br>*Defendant.* | Case No. 1:25-cv-00015-BLW<br><br>**REPLY IN SUPPORT OF MOTION TO MODIFY UNIVERSAL TEMPORARY RESTRAINING ORDER [DKT. 34]** |

**INTRODUCTION**

"A federal court may not issue an equitable remedy more burdensome to the defendant than necessary to redress the plaintiff's injuries." *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, Thomas, and Alito, JJ., concurring) (cleaned up). That is why district courts must "tailor any emergency action to the parties who brought the suit and to the specifics of the challenged law." *Idaho Fed. of Teachers v. Labrador*, No. 1:23-cv-00353-DCN, 2024 WL 3276835, at *14 (D. Idaho July 2, 2024).

The current universal temporary restraining order is tailored neither to the single plaintiff that brought this suit nor to the statutory text of EMTALA. It prevents the Attorney General from enforcing Idaho Code § 18-622, Idaho's Defense of Life Act, against each entity or person that hypothetically could be subject to the alleged conflict between Idaho Code § 18-622 and EMTALA—i.e., any hospital or medical provider. This is a true universal temporary restraining order, the kind that the Supreme Court instructed lower courts not to enter.

If the Court is inclined to maintain its temporary restraining order, then it must be limited—as instructed by the Supreme Court—to protecting St. Luke's from the injury that St. Luke's itself allegedly suffers, i.e., from injuries allegedly caused by the threat that Idaho Code § 18-622 will be enforced against it or its providers. That's all St. Luke's could be entitled to if it ultimately prevails on the merits, and it is entitled to nothing further now.[1]

---

[1] Again, the Attorney General maintains that on the merits St. Luke's should not be entitled to any form of injunctive relief because St. Luke's lacks a viable claim. But the underlying motion is focused solely on the scope of the Court's universal temporary restraining order.

**REPLY**

St. Luke's argues that the Court's universal temporary restraining order is necessary for three reasons. But none of these reasons justifies the Court exceeding the appropriate bounds of its powers and granting additional relief to persons or entities beyond the sole plaintiff here.

**I. St. Luke's unsupported hypothetical concerns about impacts on non-parties are irrelevant; the Court is limited to addressing harms to St. Luke's.**

To obtain a TRO or preliminary injunction, St. Luke's must prove that it, *i.e.,* St. Luke's, would likely suffer irreparable harm to itself. *Winter v Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). St. Luke's first hypothesizes that an injunction only limited to St. Luke's "would result in the diversion of pregnant [women] in critical condition from facilities not covered by the injunction to St. Luke's facilities, straining their resources and ultimately resulting in additional harm to the patients St. Luke's serves." Dkt. 39 at 3.

But St. Luke's offers no evidence to support this. It has not even identified one woman who fell into the alleged conflict between EMTALA and Idaho law—not one woman in its emergency department who had an emergency medical condition as defined by EMTALA, and who needed an abortion was "to assure . . . that no material deterioration of the condition is likely to result from or occur during the transfer of the" pregnant woman, but who did not need an abortion to save her life. 42 U.S.C. § 1395dd(e)(3)(A). St. Luke's also offers no evidence of this situation occurring at any other hospital in the State. As described more fully below, with or without an injunction, the second-biggest medical provider in the State already doesn't perform these abortions, so an injunction isn't likely to increase the number of transfers to St. Luke's.

Pointing to the six airlifted women does not help St. Luke's case either, because (as the Attorney General argued at the March 5 hearing) there is no allegation, much less evidence, that these women required stabilization under EMTALA.

In fact, St. Luke's evidence fails to establish why the women were transferred out of state. Under 42 U.S.C. § 1395dd(c)(1), if the women had an emergency medical condition, St. Luke's had to "stabilize" their condition(s) prior to the transfers unless certain exceptions were met. Under EMTALA, to stabilize means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility. . . ." 42 U.S.C. § 1395dd(e)(3)(A). Additionally, the medical treatment that may be provided is defined by state law. f"A medical provider can nonetheless comply with both EMTALA and state law by offering stabilizing treatment in accordance with state law." *Texas v. Becerra*, 89 F.4th 529, 542 (5th Cir.), cert. denied, 145 S. Ct. 139 (2024) ("EMTALA does not mandate any specific type of medical treatment, let alone abortion.").

By the plain terms of EMTALA, in order to lawfully transfer the women to another facility, St. Luke's must have either: 1) determined that the women were not suffering from an emergency medical condition; 2) appropriately "stabilized" the emergency medical conditions prior to the transfers (with treatment that did not require abortion(s)); or 3) satisfied one of the exceptions to the stabilization requirement. St. Luke's evidence is lacking as to which of these three conditions was met, if any, and therefore the Court cannot use the airlifts as evidence to support St. Luke's request for a TRO or preliminary injunction. Further, even assuming each of these six women presented to the emergency department and was then-presently

experiencing an emergency medical condition, St. Luke's evidence shows about one transfer per month compared to the 8,920 babies it purportedly delivered that year, Dkt. 1 ¶ 11—though St. Luke's refers to this once-a-month transfer as an "alarming frequency." See Dkt. 39 at 4.

St. Luke's offers no evidence that any other hospital has "had" to transfer *any* patients out of state, much less that, without a universal injunction, transfers would be so common as to strain St. Luke's resources. Plus, St. Luke's hypothetical argument ignores obvious realities of the State's vast geography and the limited footprint of St. Luke's emergency medicine departments. Consider that St. Luke's website[2] advertises only providing emergency services in the Magic Valley (Twin Falls and Jerome), the Treasure Valley (Boise, Meridian, Nampa, Fruitland, and Mountain Home), and McCall and Ketchum. To even suggest that hospitals in North Idaho or East Idaho would have to ship their pregnant women to St. Luke's belies credibility. Local community hospitals in the northern and eastern regions of this State, if they need to transfer patients with emergency conditions, would not send them to St. Luke's but to hospitals in larger communities in eastern Washington (e.g., Spokane) or Utah (e.g., Salt Lake) that have the staff and capabilities to treat the patients' conditions.

The pre-*Labrador* cases cited by St. Luke's do not help its position. The *Easyriders* case involved a permanent injunction obtained by motorcyclists challenging California Highway Patrol's enforcement of a state law requiring motorcycle occupants to wear helmets. *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996) The Ninth Circuit affirmed a

---

[2] https://www.stlukesonline.org/communities-and-locations/find-facility?type=Emergency-andUrgentCare. This information is admissible as an admission of a party opponent and subject to judicial notice.

statewide injunction where "it is unlikely that law enforcement officials who were not restricted by an injunction governing their treatment of all motorcyclists would inquire before citation into whether a motorcyclist was among the named plaintiffs or a member of Easyriders[.]" *Id.* at 1502. This reasoning, even if it is still valid after *Labrador*, has no applicability here. It's clear who St. Luke's is—there's no risk of confusion.

The other case cited by St. Luke's has no applicability either. The *Cachil Dehe Band* case concerned a challenge to a pool of gaming machine licenses the State of California issued as a result of compacts with various Indian tribes—to put it differently, California and approximately 60 tribes entered into compacts to distribute tens of thousands of licenses to operate gaming machines. *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 618 F.3d 1066 (9th Cir. 2010). When two tribes challenged and succeeded on summary judgment in proving that California had placed too few licenses into the pool, the district ordered a draw of the remaining (or additional) licenses by the tribes with compacts. The Ninth Circuit affirmed this approach, remarking that "the district court appropriately ordered a license draw according to the process the parties agreed to in the Compacts"—had it authorized a license draw only for the two tribes that sued, it could have given them more licenses than they were entitled to. *Id.* at 1084. But in this case there is no contract between the State and St. Luke's at issue and no contractual process the Court can order the State to follow that might incidentally benefit third parties.

St. Luke's further argues the Court should sustain the universal temporary restraining order because St. Luke's "has an organizational mission to improve the health of the people in the communities it serves, *making the harm to patients a harm to St. Luke's itself*." Dkt. 39 at 5

(emphasis added). But this argument, if accepted, would eliminate all limits on universal injunctions—the ACLU could argue, "we need a nationwide injunction because we have an organizational mission to protect the civil liberties of all Americans," libertarian activists could argue, "we need a universal injunction because we have an organizational mission to protect the economic freedoms of all Americans," and so on. St. Luke's concern for community health may be admirable, but it does not expand the Court's equitable powers.

**II. St. Luke's has disclaimed third-party standing, and so its unfounded worries about its providers being able to operate within multiple hospitals has no impact.**

St. Luke's next argument for preserving the Court's universal temporary restraining order relates to "administrability issues." Dkt. 39 at 6. St. Luke's first contends that its providers who have privileges at other hospitals would have a difficult time adjusting from one hospital system to another. But this argument is meritless: providers are smart people and operate in a world full of complex hospital policies that vary from hospital to hospital and department to department. Consider, for example, the fact that St. Alphonsus, the largest competitor of St. Luke's in the Treasure Valley, does not perform abortions by its hospital policy. U.S. Conf. of Catholic Bishops, Ethical and Religious Directives for Catholic Health Care Services (6th ed. 2018) ("Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted.")[3]—even with a universal injunction, abortions would still not occur at St. Alphonsus. Providers who have privileges both at St. Luke's and at St. Alphonsus operate within the realm of varying hospital

---

[3] U.S. Conf. of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services*, (6th ed. 2018) at ¶ 45, https://www.usccb.org/resources/ethical-religious-directives-catholic-health-service-sixth-edition-2016-06_3.pdf.

policies day-in-and-day-out. St. Luke's lack of respect for its providers' ability to be able to move from one hospital system to another and operate within the respective policies of each other is disappointing.

The other side of St. Luke's argument relates to ambulance drivers. St. Luke's worries they "will need to decide where to take pregnant [women] in critical condition." Dkt. 39 at 6. But St. Luke's argument is problematic because it would extend the reach of EMTALA beyond the emergency department of the hospital itself. *See* 42 U.S.C. § 1395dd(a), (b). It also fails to address how that would be different than the situation as it currently exists, where St. Alphonsus does not perform abortions, and St. Luke's does, or at least wants to.

From a technical standpoint, both sides of St. Luke's administrability argument are also misfocused. The question for temporary injunctive relief is what relief is needed to address the *party*'s alleged injury, not the party's patients' alleged injuries, or the party's providers' other patients' alleged injuries, or the party's physicians' alleged injuries in other hospitals, or the ambulance-drivers-who-would-transport-patients-to-the-party's alleged injuries. What's more, St. Luke's also disclaimed bringing any form of claim on behalf of third parties. *E.g.*, Tr. 20:09–20:10 (3/5/2025 hr'g). It said it wanted to bring a claim directly on its own behalf. If St. Luke's providers or if ambulance drivers wanted to sue they could. But they haven't. It is sufficient for today's purposes to conclude that the Court must appropriately limit its temporary restraining order to St. Luke's.

### III. St. Luke's misunderstands the Attorney General's argument about the absence of conflict between the standard of practice established in Idaho Code § 18-622 and EMTALA, which does not establish a standard of care.

St. Luke's says that the universal temporary restraining order "does not impose a serious burden" on the Attorney General based on his "stance that no conflict exists[.]" Dkt. 39 at 3. It argues that the Attorney General "cannot maintain both that there is no conflict between state and federal law and that a statewide injunction that is specifically directed at that conflict needlessly burdens him." *Id.* at 6. It thus contends that the Attorney General "cannot make out the requisite showing of harm at the existence of an injunction at all, much less its scope." *Id.* at 7.

But St. Luke's argument turns the burden of proof on its head. As the party seeking equitable relief, *St. Luke's* bears the burden of proving that it is entitled to a TRO and that it would likely suffer irreparable harm. The Attorney General does not have the burden of proving that he would be harmed by the issuance of a TRO or preliminary injunction. *E.g., Idaho Fed. of Teachers*, 2024 WL 3276835, at *3. St. Luke's argument also ignores the fact that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

St. Luke's misunderstands the Attorney General's argument. The Attorney General's argument in this case, on the merits, has proceeded as follows. The Attorney General argues that St. Luke's lacks a viable claim because there is no conflict between a state statute, like the Defense of Life Act, regulating the practice of medicine through the State's police powers,

and EMTALA, which explicitly does not establish a national standard of care. *See* Dkt. 25-1 at 22–23; *see also* 42 U.S.C. § 1395. EMTALA requires a Medicare-participating hospital with an emergency department to screen a person who presents to the department and requests examination or treatment of a medical condition. 42 U.S.C. § 1395dd(a). That screening determines "whether or not an emergency medical condition [as statutorily defined] exists." If the hospital determines the person has an emergency medical condition, it has two choices: (1) it "must provide . . . within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition" *or* (2) it "must provide . . . for transfer of the individual to another medical facility in accordance with [42 U.S.C. § 1395dd(c)]." 42 U.S.C. § 13495dd(b)(1). Importantly, a hospital may not "transfer" a patient until the patient is "stabilized" unless certain exceptions are met. 42 U.S.C. § 1395dd(c)(1).

EMTALA does not preempt Idaho Code § 18-622 because EMTALA specifically provides that it does not establish a medical standard of care and categorically leaves that to the State. The State of Idaho has determined that the life of an unborn child should be preserved in every situation except, as relevant here, where the abortion is necessary to preserve the life of the mother. Therefore, the standard of care in Idaho is set forth clearly, as interpreted by the Idaho Supreme Court. EMTALA cannot and does not preempt under the Supremacy Clause because it accepts Idaho's standard of care. *See Becerra*, 89 F.4th at 543-44.

The statutory text of EMTALA precludes reading it as a preempting abortion mandate. Dkt. 25-1 at 23–25. The Attorney General's position also finds support in the purpose and context behind EMTALA. *Id.* at 25–28. Likewise, the fact that EMTALA imposes a duty to

protect the health of the unborn child further cements the Attorney General's position. *Id.* at 23–25; *see also* 42 U.S.C. § 1395dd(e)(1). And the courts of appeal are unanimous in holding that EMTALA does not establish a national standard of care. *Id.* at 22–23. The Fifth Circuit recently rejected the federal government's attempt to construe EMTALA as an abortion mandate, concluding that "EMTALA does not impose a national standard of care." *Texas v. Becerra*, 89 F.4th 529, 543 (5th Cir. 2024), *cert denied*, 145 S.Ct. 139, 2024 WL 4426546, at *1 (U.S. Oct. 7, 2024) (Mem.); *id.* at 545 ("EMTALA leaves the balancing of stabilization to doctors, who must comply with state law.").

But even if the Court were to reject the Attorney General's position and conclude that EMTALA does establish a national standard of care,[4] the Attorney General argues in the alternative that St. Luke's proffered interpretation of EMTALA violates the Spending Clause. Dkt. 25-1 at 16–20. Alternative arguments are authorized, *cf.* Fed. R. Civ. P. 8(d)(2), and the Attorney General's contention that there is no conflict between the Defense of Life Act and EMTALA does not preclude him from arguing that even if there is a conflict, St. Luke's still cannot satisfy the requirements for injunctive relief.

## IV. The fact that the universal temporary restraining order copied erroneous language also appearing in the *United States* injunction is no reason to support its inclusion again.

In response to the point that the Court's universal temporary restraining order does not track with the text of EMTALA, St. Luke's first points to the fact that it "is identical to

---

[4] St. Luke's position in this case has to be that EMTALA establishes a national standard of care, which requires abortion, and which supersedes Idaho's regulation of the practice of abortion through the Defense of Life Act. If that is not St. Luke's position, then St. Luke's has no entitlement to an injunction because it is not harmed by two non-conflicting statutes.

the one that was . . . in place in the *United States* litigation. . . ." Dkt. 39 at 7. But just because the erroneous language was copied over from the Court's prior injunction does not make it any less erroneous. And indeed, this language was challenged by the State of Idaho throughout the Course of the *United States* litigation. *E.g., United States v. Idaho*, No. 1:22-cv-00329-BLW (D. Idaho), Dkt. 101-1 at 2–3 (seeking reconsideration on this point); *Idaho v. United States*, No. 23-727, 2024 WL 752335, Pet'r's Br at *41 (U.S. Feb. 20, 2024). (noting that the Court's prior injunction "does not align with EMTALA's definition of stabilizing treatment.").

St. Luke's next says it does not oppose modifying the universal temporary restraining order's wording to "confirm . . . the injunction's effect." Dkt. 39 at 7. Its proposed language suggests barring the Attorney General from enforcing Idaho Code § 18-622 as to an abortion that was "necessary to 'stabilize' a patient presenting with an 'emergency medical condition' as required by EMTALA pursuant to 42 U.S.C. § 1395dd(e)(1)(A), (3)(A)." *Id.* Although the Attorney General still disputes that a temporary restraining order is needed or that it should be universal, he does not contest for purposes of this motion the proposed phrasing changing the "necessary to avoid . . ." framework to a "necessary to 'stabilize'" framework.

However, St. Luke's still fails to address the Attorney General's other point regarding the scope of the universal temporary restraining order: the order "does not account for St. Luke's concessions, which were in line with the concessions of the Untied States' Solicitor General." Dkt. 34 at 5 (citing Dkt. 2-1 at 17–18). The order should account for those.

## CONCLUSION

The Court should correct its clear errors and modify its previously issued universal temporary restraining order to limit it to St. Luke's and to limit the relief to accord with the statutory definition of "to stabilize" and the concessions by St. Luke's.

DATED: March 11, 2025.

                                        STATE OF IDAHO
                                      OFFICE OF THE ATTORNEY GENERAL

                            By: /s/ *Brian V. Church*
                                      BRIAN V. CHURCH
                                      Lead Deputy Attorney General

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 11, 2025, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Wendy J. Olson
wendy.olson@stoel.com

Alaina Harrington
alaina.harrington@stoel.com

Lindsay C. Harrison
lharrison@jenner.com

Jessica Ring Amunson
jamunson@jenner.com

Sophia W. Montgomery
smontgomery@jenner.com

Ruby C. Giaquinto
rgiaquinto@jenner.com

*Attorneys for Plaintiff St. Luke's Health System*

Stephen L. Adams
sadams@gfidaholaw.com

Chad Golder
cgolder@aha.org

*Attorneys for Proposed Amici American Hospital Association, America's Essential Hospitals, and the American Association of Medical Colleges*

          /s/ *Brian V. Church*      
          Brian V. Church