UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD.,        Plaintiff,<br><br>v.<br><br>RAÚL LABRADOR, Attorney General of the State of Idaho,<br><br>       Defendant. | Case No. 1:25-cv-00015-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

By design, our national government is a government of limited powers. But when it acts within the realm of those limited power, the Supremacy Clause makes clear that the national government is supreme. The Founders correctly perceived that, for our federal system to work—for fifty states with different cultures and priorities to nonetheless come together as one nation—Congress must at times override the states' dissonant policies. In this, the Supremacy Clause ensures that the tension between national and state government remains productive rather than destructive, that our political differences generate a stronger nation rather than dissolving the country into nothing more than a collection of states. Simply put, when state law and federal conflict, state law must yield. This case provides an

example of these principles at work in our federal system.

One important area that Congress has chosen to regulate is the provision of emergency medical services. In response to "patient dumping"—a practice of transferring or turning away patients deemed undesirable—Congress passed the Emergency Medical Treatment and Labor Act (EMTALA). EMTALA requires that hospitals receiving Medicare funds provide stabilizing treatment to patients who arrive with emergency medical conditions. The law ensures that all Americans in their most vulnerable moments can receive emergency medical care.

EMTALA is decades old and generally uncontroversial. But in one narrow and heartbreaking circumstance, EMTALA conflicts with Idaho law. When a pregnant woman arrives in an emergency room experiencing severe complications, termination of the pregnancy is occasionally the sole treatment that can stabilize her. In the worst cases, an abortion is necessary to prevent the woman's death. In others, the woman's life is not at risk, but termination is the only way to prevent serious harms like kidney failure, stroke, infertility, and a host of other life-altering impairments. Idaho Code § 18-622 allows abortion to save the woman's life, but an abortion to prevent any harm short of death is a felony punishable by two to five years in prison. In these devasting but fortunately rare situations, Idaho law must yield to EMTALA's stabilization mandate.

The Court first ruled on this issue in August 2022, when the United States

sought to enjoin Idaho's abortion ban as it pertained to these emergency abortions. This time, a hospital system subject to EMTALA has invoked the supremacy of federal law. The intervening years have only brought into focus the reality of the conflict. When Idaho's abortion ban went into full effect for six months in 2024, St. Luke's Health System was forced to airlift six pregnant patients with emergency medical conditions to neighboring states where they could receive the appropriate care. In contrast, only a single pregnant patient was airlifted in the entirety of 2023. This sad but illuminating natural experiment shows that Idaho's ban on emergency abortions is not compatible with hospitals' stabilization obligations under EMTALA.

St. Luke's has established that it will likely succeed on the merits and that the Court should preserve the status quo while the parties litigate this matter. For the reasons explained in this decision, the Court will therefore grant St. Luke's motion for a preliminary injunction. During the pendency of this lawsuit, the Attorney General will be enjoined from enforcing Idaho Code § 18-622 to the extent that statute conflicts with EMTALA-mandated care.

## BACKGROUND

### 1.  EMTALA and the Defense of Life Act

This case concerns the conflict between Idaho's Defense of Life Act and the federal Emergency Medical Treatment and Labor Act (EMTALA). Idaho's

Defense of Life Act criminalizes abortion in nearly all circumstances. When a pregnant woman experiences a medical emergency, a health care provider may perform an abortion[1] only when "necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(2)(a)(i). An abortion performed to prevent any harm short of death remains a felony punishable by two to five years in prison and the revocation of the health care provider's professional license. *Id.* § 18-622(1).

This criminalization of emergency abortions creates a problem for hospital systems, which are mandated by EMTALA to provide stabilizing care to any patient with an "emergency medical condition." 42 U.S.C. § 1395dd(b). Specifically, EMTALA requires hospital emergency departments to provide "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e). This applies to any patient experiencing

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-

---

[1] Idaho currently defines abortion as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child," except for ectopic or molar pregnancies or the "removal of a dead unborn child." Idaho Code § 18-604(1).

      (i)    placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

      (ii)   serious impairment to bodily functions, or

      (iii)  serious dysfunction of any bodily organ or part;

*Id.* The hospital may transfer the patient to another facility in lieu of stabilization only when the benefits of the transfer outweigh the risks. *Id.* § 1395dd(c).

EMTALA applies to every hospital that has an emergency department and participates in Medicare. *See id.* § 1395cc(a)(1)(I). For hospitals that fail to comply with the statute, EMTALA imposes civil penalties and creates a private right of action for any individual who suffers harm. *Id.* § 1395dd(d). Individual physicians responsible for the examination, treatment, or transfer of patients also face civil penalties.

## 2. *United States v. Idaho*

This Court addressed many of the issues presented here when it granted a preliminary injunction in *United States v. Idaho*, 623 F. Supp. 3d 1096 (D. Idaho 2022). In that case, the Court recognized that in certain situations a hospital could comply with Idaho Code § 18-622 only by violating EMTALA. The Supremacy Clause of the United States Constitution resolves such conflicts by providing that federal law preempts contradictory state law. Accordingly, the Court enjoined the State of Idaho from enforcing the Defense of Life Act in the very limited

circumstances where it contradicts EMTALA's requirements. The Court later denied the State's motion for reconsideration following an Idaho Supreme Court decision that clarified the scope of the abortion ban.[2] *See United States v. Idaho*, No. 1:22-cv-00329, 2023 WL 3284977 (D. Idaho May 4, 2023).

The State appealed. The Ninth Circuit initially stayed the injunction but vacated the stay after ordering a rehearing en banc. *United States v. Idaho*, 82 F.4th 1296 (9th Cir. 2023) (Mem.). Before the Ninth Circuit could rehear the case, however, the Supreme Court granted a writ of certiorari before judgment and stayed the injunction. *Idaho v. United States*, 144 S. Ct. 541 (2024) (Mem.). Six months later, the Supreme Court decided it had improvidently granted certiorari and vacated the stay. *Moyle v. United States*, 144 S. Ct. 2015, 2015 (2024) (per curiam). The case returned to the Ninth Circuit, where it remained pending until the United States filed a stipulation to dismiss the case on March 5, 2025.

---

[2] In August 2022, when this Court first imposed the injunction, Idaho's abortion criminalization statute was even stricter than it is now. The law did not expressly exclude ectopic pregnancies, and the exception for the life of the mother was an affirmative defense rather than an exception to liability. In *Planned Parenthood of the Great Northwest v. State*, the Idaho Supreme Court determined that the termination of an ectopic pregnancy did not constitute an abortion under the statute and that the affirmative defense imposed a subjective rather than objective standard. 522 P.3d 1132, 1202-04 (Idaho 2023). This Court subsequently held that neither change alleviated the conflict between EMTALA and Idaho Code 18-622. Since then, the Legislature has amended the statute to exclude ectopic pregnancies and treat a threat to the life of the mother as an exception to liability.

### 3. St. Luke's Lawsuit

St. Luke's filed this lawsuit in mid-January 2025, as the transition of presidential administrations loomed. Although the *United States v. Idaho* injunction was in place when it filed, St. Luke's was concerned that the United States would dismiss the suit. Those concerns were borne out a few weeks later: On March 4, 2025, St. Luke's informed the Court that the United States intended to dismiss its complaint in *United States v. Idaho* the next day. St. Luke's moved for an immediate TRO to avoid a gap in protections while the Court considered the merits of a preliminary injunction. After receiving expedited briefing, the Court imposed a TRO with protections identical to the *United States v. Idaho* injunction. The Attorney General then filed a motion to modify the TRO to apply only to St. Luke's—rather than all hospitals and medical providers—and to narrow its substantive scope. As noted above, the Court heard oral argument on March 5, 2025.

### 4. Findings of Fact[3]

St. Luke's operates eight of the 39 hospitals in Idaho that receive Medicare

---

[3] These findings are relevant to the preliminary injunction motion. In considering the Rule 12(b) motions, the Court relied on facts alleged in the complaint. The parties did not request an evidentiary hearing, so the Court did not hear testimony at the hearing—just argument. The Court will therefore make its factual findings based on the evidence in the record here and in *United States v. Idaho,* 22-cv-329, recognizing that such findings are not final. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); 18B Wright, Miller, & Cooper, Federal Practice & Procedure § 4478.1 (3d ed.).

funding and provide emergency services. Idaho has around 22,000 births per year, and in recent years, St. Lukes has delivered around forty percent of those babies. Given that volume, it's not surprising that St. Luke's cares for pregnant patients who arrive at the emergency room with medical conditions that threaten their health, but not their lives. Occasionally—and devastatingly—these patients can be stabilized only through the termination of their pregnancies. *See Seyb Supp. Dec.* ¶¶ 5, 9-14, Dkt. 2-2. Stated more precisely, using EMTALA's defined terms, the record shows that some patients experience serious (but non-life-threatening) pregnancy-related complications that qualify as an "emergency medical condition" where abortion is the only treatment that will "stabilize" them. *See, e.g., Seyb Supp. Dec.* ¶ 5, Dkt. 2-2; *Corrigan Dec.* ¶ 29, *US v. Idaho* Dkt. 17-6. Yet under Idaho law, the woman experiencing these conditions must remain pregnant and endure these harms because her life is not itself at stake.

Examples of these types of conditions include: (1) preterm premature rupture of the membranes (PPROM), which can result in infection, sepsis, or organ failure; (2) preeclampsia, which can result in the onset of seizures and hypoxic brain injury; (3) placental abruption, which can result in uncontrollable bleeding or organ dysfunction; and (4) uterine hemorrhage, which can require a hysterectomy or result in kidney failure, requiring lifelong dialysis. Idaho physicians have submitted declarations describing specific patients who presented with such

conditions.[4] Some of these declarations describe patients who were treated before Idaho's Defense of Life Act took effect.[5] Another describes patients treated during the few months when this Court's injunction was stayed. *See Seyb Supp. Dec.* ¶¶ 9-17, Dkt. 2-2.

The injunction was stayed for approximately two weeks in late 2023 and for approximately six months between January and June 2024. During that brief period—when medical providers faced prosecution for performing emergency abortions—St. Luke's had to airlift six pregnant patients in medical crisis to other states to receive appropriate care. *Id.* ¶¶ 8-15. In 2023, by contrast, only a single patient was airlifted the entire year. *Id.* ¶ 7. Five of the six women airlifted to other facilities presented with PPROM, and a sixth presented with pre-eclampsia. In each

---

[4] Many of the referenced declarations are on file in *United States v. Idaho*, No. 22-cv-329. In lieu of refiling these already-submitted declarations, St. Luke's asked the Court to consider the record in *United States v. Idaho* in resolving this motion. *See Mtn. Mem.*, Dkt. 2-1, at 12 n.3. The Court will grant that request.

[5] *See Corrigan Dec.* ¶¶ 8-30, *US v. Idaho* Dkt. 17-6 (describing three patients who required abortions after experiencing, respectively, (1) severe infection due to premature rupture of the membranes; (2) placental abruption which other medications and blood products failed to mitigate; and (3) preeclampsia with pleural effusions and high blood pressure); *Cooper Dec.* ¶¶ 6-12, *US v. Idaho* Dkt. 17-7 (describing three patients who required abortions after experiencing, respectively, (1) preeclampsia with severe features, (2) HELLP syndrome, and (3) lab abnormalities consistent with a diagnosis of HELLP syndrome); *Seyb Dec.* ¶¶ 7-13, *US v. Idaho* Dkt. 17-8 (describing three patients who required abortions after experiencing, respectively, (1) a septic abortion, (2) preeclampsia with severe features, and (3) heavy vaginal bleeding); *see also Fleisher Dec.* ¶¶ 12-21, *US v. Idaho* Dkt. 17-3; *Seyb Dec.* ¶¶ 4-13, *US v. Idaho* Dkt. 17-8.

case, continuing the pregnancy likely would have resulted in serious and permanent physical harm. *Id.* ¶¶ 8-14. But because physicians could not conclude in good faith that abortion was necessary to prevent the women's death, St. Luke's could not provide stabilizing medical treatment.[6]

Dr. Stacy Seyb succinctly explains the quandary Idaho physicians find themselves in when attempting to simultaneously comply with Idaho law and EMTALA during these situations:

> Fundamentally, each of these conditions [pre-eclampsia, PPROM, placential abruption]—and many more pregnancy complications— poses serious risks to pregnant patients, and termination is very often the only treatment available to address these risks and stabilize the patient. In some cases, these conditions can and do cause death. But sometimes, a physician may conclude that although there is *not* a high probability of the pregnant patient's death, the patient may experience impairment or severe dysfunction of bodily organs, including losing her reproductive capacity, absent termination of her pregnancy. And often, it will simply not be possible for a physician to determine whether termination is necessary to prevent her death as opposed to some severe harm to the patient short of death.

*Seyb Supp. Dec.* ¶ 5, Dkt. 2-2.

## ANALYSIS

### 1.  Motion to Dismiss

Before considering the merits of St. Luke's Motion for Preliminary

---

[6] Indeed, one of the airlifted patients, diagnosed with PPROM while twenty-two weeks pregnant, eventually delivered twins. *Suppl. Dec. of Stacy Seyb* ¶ 14, Dkt. 2-2. That patient's case—and her happy outcome—underscores the essential incompatibility between the absolutes of Idaho's abortion ban and the ambiguities that define emergency medical treatment decisions.

Injunction, the Court must make a threshold determination of justiciability. The Attorney General raises three issues here: (1) lack of Article III standing, (2) prudential unripeness, and (3) sovereign immunity. The Attorney General also argues that St. Luke's lacks an equitable cause of action under EMTALA. The Court concludes that each of these challenges fails.

**A. Standing**

The doctrine of standing stems from the principle that the federal judiciary has authority to decide only "actual cases or controversies." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976). The party invoking federal jurisdiction has the burden of establishing the three elements of standing: "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)). The present dispute centers on the injury-in-fact requirement for a pre-enforcement plaintiff. The Attorney General also contends that he is an improper defendant for the injunction as it pertains to professional licensure penalties and that St. Luke's lacks third-party standing to sue on behalf of its providers.

**i. Injury in Fact**

St. Luke's brings a pre-enforcement challenge to Idaho's prohibition of

emergency abortions. A pre-enforcement plaintiff has, by definition, not yet experienced direct harm from the enforcement of the challenged statute. *Peace Ranch LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024). Nonetheless, the injury-in-fact requirement does not mean that a plaintiff must suffer "an actual arrest, prosecution, or other enforcement action." *Driehaus*, 573 U.S. at 158. The possibility of enforcement can in itself constitute an injury, creating a dilemma for plaintiffs described variously as being forced to choose between "the rock and the hard place, the Scylla and the Charybdis, and the choice to comply or bet the farm." *Peace Ranch*, 93 F.4th at 487 (quotations and alterations omitted). Thus, a plaintiff can allege an injury in fact when the circumstances "render the threatened enforcement sufficiently imminent." *Driehaus*, 573 U.S. at 159.

The Ninth Circuit utilizes a three-part test, adopted from *Susan B. Anthony List v. Driehaus*, for pre-enforcement standing. First, the plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Peace Ranch*, 93 F.4th at 487 (quoting *Driehaus*, 573 U.S. at 161). Second, "[t]he intended future conduct must be 'arguably proscribed by the challenged statute.'" *Id.* (quoting *Driehaus*, 573 U.S. at 162) (alterations omitted). Third, "the threat of future enforcement must be 'substantial.'" *Id.* (quoting *Driehaus*, 573 U.S. at 164). St. Luke's challenge to Idaho's ban of emergency abortion meets each of these requirements.

First, the conduct at issue is "arguably affected with a constitutional interest" by the Supremacy Clause. St. Luke's alleges that Attorney General intends to prosecute emergency-room physicians for complying with their obligations under EMTALA to provide stabilizing treatment to pregnant patients. To the extent that Section 18-622 conflicts with EMTALA—an issue taken up below on the merits— the state law is preempted due to the Supremacy Clause. And because St. Luke's compliance with EMTALA in these circumstances implicates the Supremacy Clause, that conduct carries a constitutional interest.

The role of the Supremacy Clause here warrants some further explanation. It is true that "the Supremacy Clause is not the 'source of any federal rights,' and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015) (quoting *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 107 (1989)). But the present issue is whether the Supremacy Clause renders St. Luke's conduct "affected with a constitutional interest"—which is a different matter entirely. This Court rejects the recent suggestion by a district court in North Dakota that the statute at issue in a pre-enforcement challenge "must ostensibly prohibit the exercise of a specific constitutional right." *See Splonskowski v. White*, 714 F. Supp. 3d 1099, 1104 (D.N.D. 2024). Not only is such a requirement far narrower than the test articulated in *Driehaus*, but it runs contrary to Ninth Circuit caselaw recognizing pre-

enforcement standing in preemption cases even when a plaintiff's intended conduct is not directly constitutionally protected. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013) (preemption challenge to immigration law); *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 652-53 (9th Cir. 2021) (preemption challenge to employee classification law); *see also Consumer Data Industry Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012) (plaintiffs met injury-in-fact requirement for preemption challenge to state credit reporting law).

In short, the Supremacy Clause does not create a constitutional right, but it does "affect[] with a constitutional interest" St. Luke's efforts to comply with EMTALA. This is because the Supremacy Clause resolves a constitutional tension between the medical treatment which St. Luke's must provide its pregnant patients under federal law and that which it can legally provide under state law.  For purposes of standing, this is enough.

 Second, St. Luke's intended conduct—the termination of pregnancies as stabilizing treatment during medical emergencies—is "arguably proscribed by" Section 18-622. The Court will take up this statutory conflict further when discussing the merits of the preliminary injunction, but the Attorney General does not dispute that St. Luke's meets this requirement.

Third, there is a substantial threat of enforcement. The United States' dismissal of *United States v. Idaho* has dissolved that injunction, meaning that St.

Luke's will be immediately subject to the full penalties of Section 18-622 in the absence of action here. And, contrary to the Attorney General's arguments, the United States' decision to dismiss its complaint did not end the threat of injury to St. Luke's. Although the United States may, like any party, change its interpretation of the relevant law, it cannot unilaterally alter the meaning of a statute enacted by Congress. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009) ("The purpose of Congress is the ultimate touchstone in every pre-emption case."). St. Luke's would still face the possibility of lawsuits by private litigants harmed by violations of EMTALA—a risk highlighted by the airlifts of six pregnant patients during the six-month stay. And of course, the United States could easily change its position on EMTALA again. The discretion inherent in the executive's law enforcement authority underscores St. Luke's vulnerability in the absence of an injunction.

Even if the United States had not dismissed the case, a preliminary injunction in a third party's lawsuit does not end the threat to others who intend to engage in the proscribed conduct. A preliminary injunction is a form of provisional relief designed only "to balance the equities as the litigation moves forward." *Trump* v. *Int'l Refugee Assistance Project*, 582 U. S. 571, 580 (2017) (per curiam). Due to the temporary nature of the remedy, the Supreme Court has held that a preliminary injunction does not alleviate the threat of injury and therefore does not

deprive a plaintiff of standing. *Nielsen v. Preap*, 586 U.S. 392, 403 (2019)

("Unless that preliminary injunction was made permanent and was not disturbed on

appeal, these individuals faced the threat of [injury]."); *see O.A. v. Trump*, 404 F.

Supp. 3d 109, 145-46 (D.D.C. 2019) ("Preliminary injunctive relief does not defeat

Article III standing."). Indeed, the periodic stays of the injunction in *United States

v. Idaho* illustrate the precariousness of a third party's reliance on another's

lawsuit.

Accordingly, St. Luke's has established pre-enforcement standing to

challenge Idaho Code § 18-622 to the extent that the law conflicts with EMTALA.

### ii. Licensure Penalties

The Court now turns to a more limited question of standing: whether the

Attorney General is the correct defendant for an injunction against Section 18-

622's licensure penalties. The Attorney General argues that this aspect of the

injunction cannot run against him because he does not enforce the professional

boards' rules and laws. This objection overlooks the fact that licensing penalties

for violating the abortion ban are available only after a criminal conviction—

indeed, such a conviction appears to be a mandatory trigger. *See* § 18-622(1)

(stating that a health care professional's license "shall" be suspended or revoked).

To satisfy standing requirements, an alleged injury must be "fairly traceable"

to the challenged criminal statute and "likely to be redressed by a favorable

decision." *Matsumoto v. Labrador*, 122 F.4th 787, 799 (9th Cir. 2024) (citing

*Lujan*, 504 U.S. at 560). "An injury is fairly traceable to a challenged action as

long as the links in the proffered chain of causation are not hypothetical or tenuous

and remain plausible." *Id.* (quoting *Ass'n of Irritated Residents v. EPA*, 10 F.4th

937, 943 (9th Cir. 2021)). The Attorney General's direct causal role in effecting

the licensure penalties easily meets this requirement. As a result, he is an

appropriate defendant for this aspect of the injunction.

### iii. Third-Party Standing

The final question of standing concerns St. Luke's ability to assert claims for

its providers. The Attorney General reads the Complaint as bringing claims on

behalf of individual medical providers, and he accordingly argues that St. Luke's

must meet the elements of third-party standing. The Court disagrees. St. Luke's has

clearly brought this claim on behalf of itself. The Complaint includes factual

allegations about the medical providers because St. Luke's is a hospital system,

and the injury it faces from the enforcement of Section 18-622 derives naturally

from the conduct of the professionals who work there. St. Luke's own financial

and ethical interests are clearly impacted if its medical providers face

imprisonment and loss of licensure for complying with federal law.  But this does

not mean that St. Luke's seeks to assert the rights of its providers, and nothing in

the Complaint suggests that this is the case. Because St. Luke's seeks to vindicate

its own rights, third-party standing is a non-issue.

**B. Prudential Ripeness**

The Attorney General next challenges justiciability by arguing that the matter is not ripe.

After a plaintiff establishes Article III standing, a court may nonetheless decline to exercise jurisdiction because the matter is prudentially unripe. Two considerations guide this analysis: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Tingley v. Ferguson*, 47 F.4th 1055, 1070 (9th Cir. 2022) (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (en banc)). As the Ninth Circuit recently explained, "[t]he fitness prong is met when "the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Id.* (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009)). The hardship prong considers "whether the challenged law 'requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance.'" *Id.* at 1070-71 (quoting *Stormans*, 586 F.3d at 1126).

Regarding the fitness prong, this case is about preemption, which is a "predominantly legal" question. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983). The existence of a

statutory conflict between Section 18-622 and EMTALA does not, in itself, require meaningful factual development. The factual questions pertain primarily to the degree and immediacy of the injury to St. Luke's, and at this stage the record is sufficiently developed for the Court to proceed. By detailing the impact of Section 18-622's full enforcement for six months in 2023, St. Luke's has provided "a specific factual context for the legal issues," such that the claims "do not leave incomplete hypotheticals or open factual questions." *Tingley*, 47 F.4th at 1070 (quoting *Stormans*, 586 F.3d at 1126).

The Attorney General suggests that more factual development is needed because the State now claims that emergency conditions like PPROM can be treated through an abortion "even if the threat to the woman's life is not imminent." *Moyle*, 603 U.S. at 336 (Barrett, J., concurring). Although this statement might slightly broaden the life-of-the-mother exception, it does nothing to address a pregnant woman's need for stabilizing treatment to stop an injury short of death.

In each of the cases described in the Seyb Declaration, an abortion did not appear necessary to prevent the woman's death, imminent or otherwise, and there is a callous irony in the Attorney General's questioning of St. Luke's decision to airlift these women out of state. The memorandum asks "why St. Luke's providers did not provide an abortion in Idaho if they determined if [sic] was necessary to

save the life of the mother." *Def.'s Consolidated Mem.* at 13, Dkt. 25-1. The answer, of course, is obvious—the providers were unsure. While confident that their patient's health would be seriously compromised, the providers were not as certain that death would occur if no abortion was performed. And their freedom and licensure would hang in the balance as they navigated that uncertain terrain. Indeed, the entire point of the Declaration—and of this lawsuit—is that an abortion is occasionally the only possible treatment to prevent serious but non-fatal harm, such as kidney failure, stroke, infertility, and a host of other life-altering impairments. As Idaho recently acknowledged before the Ninth Circuit, Section 18-622 would criminalize an abortion necessary to prevent the amputation of a pregnant woman's leg.[7]

The issue is thus fit for a judicial decision. As far as hardship, St. Luke's would suffer from a delay for the reasons explained in the Court's above analysis of the injury-in-fact requirement. This question of harm will be taken up further below when the Court considers the merits of the injunction.

### C. Sovereign Immunity

Finally, the Attorney General contends that he is immune from this lawsuit. "[A] federal court generally may not hear a suit brought by any person against a

---

[7] Oral Argument at 4:30, *United States v. Idaho*, No. 23-35440 (9th Cir. 2024), https://www.ca9.uscourts.gov/media/video/?20241210/23-35440/.

nonconsenting State." *Allen v. Cooper*, 589 U.S. 248, 254 (2020). This principle of immunity does not appear in the text of the Constitution—except for the Eleventh Amendment, which refers only to suits by out-of-state plaintiffs—but derives inherently from the sovereignty vested in each state. *Id.* State officials, including the Attorney General, enjoy the same protection. *Id.*

Nonetheless, state officials, including the Attorney General, are successfully sued all the time. *See, e.g.*, *Planned Parenthood Great Nw.*, 122 F.4th 825, 841-43 (9th Cir. 2024). This is because sovereign immunity does not apply when a "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). As the Supreme Court concluded when setting out this doctrine in *Ex parte Young*, "the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity." 209 U.S. 123, 159 (1908). Accordingly, the Ninth Circuit more recently explained, "suits seeking prospective relief under federal law may ordinarily proceed against state officials sued in their official capacities." *Planned Parenthood Great Nw.*, 122 F.4th at 842.

Here, St. Luke's seeks injunctive relief for a threatened violation of federal law. This is enough to render sovereign immunity inapplicable. *See Vickery v.*

*Jones*, 100 F.3d 1334, 1346 (7th Cir. 1996) ("[T]he Young exception permits relief against state officials only when there is an ongoing *or threatened* violation of federal law." (emphasis added)). The Attorney General opines that there is no "ongoing violation" because the *United States v. Idaho* injunction enjoins him from the relevant enforcement of Section 18-622. This argument is, of course, no longer applicable due to the dismissal of *United States v. Idaho*. But even if the United States had not dismissed the case, the Attorney General reads the ongoing violation requirement far too narrowly. Pre-enforcement challenges, by definition, are brought prior to the violation, in the most literal sense. In these situations, an official's plan to violate federal law suffices to defeat sovereign immunity. *See Armstrong*, 575 U.S. at 326.

In sum, for the reasons explained above, St. Luke's has brought a justiciable claim against the Attorney General.

### D. Equitable Claim

The final issue raised in the Attorney General's motion to dismiss is whether St. Luke's has a valid equitable cause of action. Equitable relief is the rule rather than the exception, and such a claim is available to St. Luke's here.

Although the Supreme Court in *Armstrong v. Exceptional Child Center* held that Congress can expressly or implicitly limit the equitable powers of federal courts, equitable relief remains "traditionally available to enforce federal law." 575

U.S. 320, 329 (2015). The Attorney General says that *Armstrong* forecloses this lawsuit, but *Armstrong*'s foundational holding supports the viability of St. Luke's equitable claim.

The *Armstrong* Court considered whether private parties could bring an equitable action to enforce § 30(A) of the Medicaid Act. 575 U.S. at 322. The plaintiffs provided "habilitation services" to persons covered by Idaho's Medicaid plan. They claimed that Idaho was violating § 30(A) of the Medicaid Act by reimbursing them at rates lower than those allowed by § 30(A), which required Idaho's Medicaid plan to

> provide such methods and procedures relating to the utilization of,
> and the payment for, care and services available under the plan ...
> as may be necessary to safeguard against unnecessary utilization of
> such care and services and to assure that payments are consistent
> with efficiency, economy, and quality of care and are sufficient to
> enlist enough providers so that care and services are available
> under the plan at least to the extent that such care and services are
> available to the general population in the geographic area....

42 U.S.C. § 1396a(a)(30)(A).

The Court held that the habilitation providers could not proceed in equity because Congress had implicitly foreclosed such a claim. Before reaching that holding, however, the Court observed that it had "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate federal law." *Armstrong*, 575 U.S. at 326. Indeed, these types of suits aren't particularly novel or unusual. *Id.* at 336-37 (Sotomayor,

J., dissenting). Still, though, "Congress may displace the equitable relief traditionally available to enforce federal law," *id.* at 329, and it may do so explicitly or implicitly. *Id.* at 327 ("The power of federal courts of equity to enjoin executive action is subject to express and implied statutory limitations.").

The *Armstrong* Court concluded that two aspects of the Medicaid Act, combined, established that Congress intended to foreclose private enforcement of § 30(A) of that Act. First, the Court observed that the sole remedy Congress provided for a state's failure to comply with Medicaid's requirement was the withholding of Medicaid funds by the Secretary of Health and Human Services. By providing only an agency remedy, Congress had evidently traded "the comparative risk of inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action" for "the expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decisionmaking." *Id.* at 328-329.

This "sole-remedy" concern is not present here. Although EMTALA does contain a similar, fund-withholding mechanism, that is not the only remedy it provides. EMTALA also creates a private right of action for individual patients and medical facilities to obtain damages or equitable relief. *See* 42 U.S.C. § 1395dd(d)(2)(A), (B). Moreover, the fact that the statute expressly permits equitable relief by certain parties is evidence that Congress did not intend to bar

the broader availability of equitable claims.

The second aspect of the Medicaid Act that convinced the *Armstrong* Court that Congress intended to foreclose an equitable claim was the nature of the statute itself. The Court described the statute there as "judicially unadministrable." *Id.* at 328. Justice Breyer put a finer point on it. He said that "[t]he history of ratemaking"—and that's what was at the heart of the dispute between the *Armstrong* parties—"demonstrates that administrative agencies are far better suited to this task than judges." *Id.* at 333 (Breyer, J., concurring). In his estimation, the verbiage of the statute "underscore[d] the complexity and nonjudicial nature of the rate-setting task." *Id.* at 334 (Breyer, J., concurring).

The EMTALA provisions at issue here do not suffer from this problem. The Court is not faced with a rate-setting statute that is "judicially unadministrable." Rather, it is called upon to perform a very familiar task—statutory interpretation, or, more specifically, deciding whether a state statute conflicts with a federal one. *Cf. Moyle v. United States*, 603 U.S. 324, 347 (2024) (Alito, J., dissenting) (describing the underlying issue in *United States v. Idaho* as "a straightforward question of statutory interpretation"). Under these circumstances, the Court concludes that *Armstrong* does not foreclose St. Luke's equitable claim.

## 2. Preliminary Injunction

Having decided that St. Luke's may proceed with its claims, the Court will

turn to the injunction motion. "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Fraihat v. United States Immigration & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021) (citation omitted). To obtain relief, St. Luke's must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## A. Likelihood of Success on the Merits

To determine whether St. Luke's is likely to succeed on the merits of its claims, the Court must once again consider whether EMTALA preempts Idaho's Defense of Life Act in the narrow range of circumstances at issue here. The Court will first explain the general nature of the statutory conflict and EMTALA's preemptive power. The analysis will then turn to several specific constitutional and statutory concerns: (1) restrictions on Spending Clause legislation; (2) EMTALA's reference to the "unborn child," as well as the statute's broader context and purpose; and (3) the absence of a national standard of care under EMTALA.[8] *See*

---

[8] The Attorney General raises several additional arguments "in a summary manner," either because this Court already ruled on the arguments in *United States v. Idaho* or because the Ninth Circuit was about to do so. *Opp.*, Dkt. 25-1, at 29. The Court will not address these undeveloped arguments other than to say none persuade it that St. Luke's is unlikely to succeed on the merits.

*infra* §§ 2.B.ii to iv.

**i.    Conflict and Preemption: Idaho's Defense of Life Act is Preempted In the Narrow Circumstance Where It Prohibits Stabilizing Treatment Required Under EMTLA**

To decide whether Idaho's Defense of Life Act directly conflicts with EMTALA and is therefore preempted in the context of EMTALA-mandated care, the Court is guided by the Supremacy Clause and basic preemption principles. The Supremacy Clause provides that federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "Congress may consequently pre-empt, *i.e.*, invalidate, a state law through federal legislation." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015).

In EMTALA, Congress indicated its intent to displace state law through an express preemption provision, which says EMTALA preempts state law only "to the extent that the [state law] requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). The Ninth Circuit has construed EMTALA's "directly conflicts" language as referring to two types of preemption— impossibility preemption and obstacle preemption. *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993). Impossibility preemption occurs, straightforwardly, "where it is impossible for a private party to comply with both state and federal law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). And obstacle preemption exists where state law "stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 373. Both standards are satisfied here.

Beginning with impossibility preemption, Section 18-622 directly conflicts with EMTALA because in a narrow range of circumstances it is impossible for physicians to comply with both laws. When a pregnant woman suffering from an emergency medical condition that, absent an abortion, will threaten serious harm to her health but not cause her death, Idaho law prevents the physician from performing the very treatment EMTALA requires. This is clear from a comparison of the two laws: Idaho's Defense of Life Act allows abortion only when "necessary to prevent the death of the pregnant woman," Idaho Code § 18–622(2)(a)(i), while EMTALA requires stabilizing care to prevent "serious jeopardy" to the woman's health, 42 U.S.C. § 1395dd(e)(1)(A)(i).

And this isn't simply an academic issue. Taking just one example, if a woman comes to an emergency room with PPROM, she may not be facing death, but she does face serious risks to her health, including damage to her uterus, which may prevent her from having children in the future. Six members of the Supreme Court appear to have acknowledged that a conflict exists in this precise situation. Justice Kagan, joined by Justice Sotomayor, observed that "when a woman comes to an emergency room with PPROM, the serious risk she faces may not be of death but of damage to her uterus, preventing her from having children in the future,"

and that "Idaho has never suggested that its law would allow an abortion in those circumstances." *Moyle*, 603 U.S. at 328 (Kagan, J., concurring). Justice Jackson stated that "Idaho cannot credibly maintain that its law *always* permits abortions in cases of PPROM or pre-eclampsia such that its mandate *never* conflicts with federal law." *Id.* at 342 (Jackson, J., concurring in part and dissenting in part). Even Justice Alito's dissent, joined by Justice Thomas and Justice Gorsuch, acknowledged that "in PPROM cases, there may be an important conflict between what Idaho law permits and what EMTALA, as interpreted by the Government, demands"—though the dissent disputed that EMTALA can ever require hospitals to perform emergency abortions. *Id.* at 365 (Alito, J., dissenting).

PPROM is not the only situation where it is impossible to comply with both laws. As the Court has found, patients may present in emergency rooms with several medical conditions that place their health in serious jeopardy, or threaten their bodily functions or organs, but do not necessarily threaten their lives. To highlight a few examples, doctors have described specific patients who presented with conditions including preeclampsia with severe features, HELLP Syndrome, hypovolemic shock due to blood loss, and septic abortion. *See Cooper Dec.* ¶¶ 6, 8, 10, *US v. Idaho* Dkt. 17-7; *Seyb Dec.* ¶¶ 7-12, *US v. Idaho* Dkt. 17-8. In each case, the patient's health was in serious jeopardy. In each case, a fetal heartbeat was present. And in each case, the physicians determined that an abortion was

"necessary to assure, within reasonable medical probability, that no material deterioration of the condition [was] likely to result." 42 U.S.C. § 1395dd(e)(3)(A). But despite these conditions' serious risks, it may not be possible for the physician to know whether abortion is "necessary to prevent the death" of the pregnant patient. *Fleisher Dec.* ¶¶ 22-23, *US v. Idaho* Dkt. 17-3.

The Attorney General nevertheless insists there is no conflict between the two laws. *See, e.g., Mar. 5. Tr.*, Dkt. 40 at 33 ("Your Honor, there is no conflict between EMTALA and the Idaho Defense of Life Act."). During oral argument, he contended that the six airlifts described above demonstrate that EMTALA does not require abortion as a stabilizing treatment. Essentially, he argues that an emergency termination is never necessary in these situations because a woman suffering from conditions such as PPROM, preeclampsia, or placental abruption, but who is not facing death, can always be stabilized for transfer. He says the fact that the six airlifts occurred necessarily "prove[s] that abortion was not necessary to provide the stabilizing care." *Id.* at 34.

The first problem with this argument is that the declarations on file clearly set out situations where abortion is the necessary stabilizing treatment—direct

evidence of a nonspeculative conflict.[9] *See, e.g., Corrigan Dec.* ¶ 29, *US v. Idaho* Dkt. 17-6 (describing a patient with preeclampsia with severe features, where "[t]he only medically accepted standard of care" in her case "was to terminate the pregnancy through evacuation of the uterus"). To highlight one example, Dr. Seyb describes a patient, ultimately airlifted to a neighboring state, who came to the emergency room experiencing PPROM while 20 weeks pregnant. Her pregnancy was pre-viability, and the infection threatened to damage her kidneys and render her infertile. *See Seyb Supp. Dec.* ¶ 9. This easily meets EMTALA's definition of an emergency medical condition. The treating physician determined "that, without termination, the patient's kidneys could stop functioning," meaning that an abortion was the appropriate stabilizing care within the meaning of EMTALA. But the physician could not "say that termination was necessary to prevent death"— imminent or otherwise. *Id.* ¶ 9. The Court therefore rejects the Attorney General's

---

[9]  The Attorney General suggests St. Luke's can't sue unless it can point to a specific St. Luke's patient who—at the moment the complaint is filed—is "in present need of an abortion that EMTALA authorizes or requires," but that § 18-622 forbids. *Opp.*, Dkt. 25-1, at 30. But St. Luke's obviously cannot be expected to wait until a patient is in the midst of a medical emergency before suing. There would hardly be enough time to pull the papers together—much less for the Court to enter relief. Moreover, although the conflict alleged in a preemption case "must be an actual conflict, not merely a hypothetical or potential conflict," this "does not foreclose challenges based on future or anticipated conflicts." *Montana Med. Ass'n v. Knudsen,* 119 F.4th 618, 623 (9th Cir. 2024). In short, the Court is not persuaded by the Attorney General's argument that St. Luke's claim is based on speculation and must be treated as a facial challenge. *See United States v. Idaho,* 623 F. Supp. 3d 1096, 1107-08 (D. Idaho 2022) (rejecting Idaho's argument that the United States had launched a facial challenge).

assertion that "there is no medical situation in which it's necessary to do an abortion as the stabilizing care." *Mar. 5, 2025 Tr.,* Dkt. 40, at 34.

The second problem with the Attorney General's argument is that the mere fact that this patient was airlifted out of state does not, standing alone, demonstrate she was stabilized pre-transfer. To be sure, EMTALA defines stabilization with reference to a potential transfer. The relevant section provides:

> The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition *is likely to result from or occur during the transfer* of an individual from a facility . . . .

42 U.S.C. § 1395dd(e)(3)(A) (emphasis added); *see also* § 1395dd(e)(3)(B) (defining "stabilized"). But the fact of a transfer does not necessarily mean the underlying emergency medical condition was stabilized because EMTALA allows a transfer when an individual has not been stabilized if a physician certifies that the medical benefits from a transfer to another medical facility will outweigh the increased risks. 42 U.S.C. § 1395dd(c)(1)(A)(ii). Paragraph 53 of the complaint speaks to this cost-benefit analysis:

> Of course, airlifting patients also puts patients at risk due to significant delays in care while arranging medical transport out of state. And those delays could create a situation *where the patient is no longer stable enough that the benefits of transfer outweigh the risks*, again leaving St. Luke's medical providers to wait until termination is necessary to prevent the patient's death—even while knowing that the wait could have severe health consequences, including damage to the

patient's future reproductive health. As a result, St. Luke's physicians
described a constant fear that patients would present in an emergency
room who were not stable enough to transfer, yet the medically
indicated stabilizing care—termination—could not be provided
because it was not yet needed to prevent the patient's death.

*Compl.* ¶ 53, Dkt. 1 (emphasis added).

Consistent with this allegation, Dr. Seyb's declaration discusses the risk-

benefit analysis that attended the airlifts. *See Supp. Seyb Dec.* ¶ 17, Dkt. 2-2. In

other words, it appears that each of those six patients was experiencing an

emergency medical condition, but the benefits of transfer outweighed the risks. *See*

*id.* ¶ 8 (indicating that the six patients had to be airlifted because St. Luke's was

"unable to provide the full range of stabilizing care necessary to preserve the

patient's health"). This tracks with Dr. Seyb's description of the six airlifted

patients, where he states that each patient was experiencing an emergency medical

condition: "In these instances, *each patient was experiencing an emergency*

*medical condition that placed her health in serious jeopardy, risked serious*

*impairment to her bodily functions, or risked serious dysfunction to bodily organs*

*or parts.* The treating physicians—either one of my colleagues or I—would have

offered and/or recommended termination as a treatment option, consistent with the

standard of care, but believed we could not do so consistent with § 18-622." *Seyb*

*Supp. Dec.* ¶ 15, Dkt. 2-2 (emphasis added). The Attorney General's argument that

an abortion is never the necessary stabilizing care under EMTALA is thus

contradicted by the record.

Another problem with the Attorney General's argument that there is no practical conflict between EMTALA and the Defense of Life Act is that he is attempting to impose the rigidities of criminal law onto the fluid nature of delivering emergency medical care. Although the Idaho Supreme Court has said that a pregnant woman's death need not be "imminent" to qualify under the life-saving exception, the Defense of Life Act plainly requires that an abortion is "necessary to prevent the death." If "imminent" is not the standard, how close must the woman be to death for the abortion to be "necessary"? There is no way for physicians to know this, and the price of falling on the wrong side of the line is a felony conviction. EMTALA, in contrast, uses much less categorical language: "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is *likely* to result . . . ." 42 U.S.C. § 1395dd(e)(3)(A).

The Attorney General's suggestion that St. Luke's should simply transfer pregnant emergency-room patients also stands antithetical to EMTALA's key purpose. The Attorney General—along with several Supreme Court justices—have emphasized the fact that Congress enacted EMTALA in response to "patient dumping." *D.'s Resp. to Pl.'s Suppl. Brief* at 5, Dkt. 47; *D.'s Consol. Mem.* at 28, Dkt. 25-1; *Moyle*, 603 U.S. at 352 (Alito, J., dissenting). Before EMTALA,

hospitals would often turn away or transfer patients "deemed troublesome or undesirable." Makenzie Doubek & Scott J. Schweikart, *Why Should Physicians Care About What Law Says About Turfing and Dumping Patients?,* 25 AMA Journal of Ethics 892 (2023). When EMTALA passed, these "undesirable" patients were the indigent. Today, they are pregnant women. Although Congress could not have foreseen this dimension of patient dumping—women transferred to other facilities not because they are poor but because the emergency service they need has been criminalized—EMTALA's requirements are deliberately broad. Patients cannot be transferred to another facility until they have received stabilizing treatment, regardless of whether they can pay and regardless of what form that care must take.

In sum, the Court reaches the same conclusion it reached before, in *United States v. Idaho*. That is, in a narrow range of cases, it is impossible to simultaneously comply with EMTALA and Idaho Code §18-622. Moreover, "even if it were theoretically possible to simultaneously comply with both laws, Idaho law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Idaho*, 623 F. Supp. 3d at 1111 (citation omitted); *see also Seyb Supp. Dec.* ¶ 6, Dkt. 2-2. The severe penalties that attach to violating § 18-622 pose an obstacle to the fulfillment of EMTALA's purpose of "ensuring that patients[] . . . receive adequate emergency medical care." *Vargas ex*

*rel. Gallardo v. Del Puerto Hosp.*, 98 F.3d 1202, 1205 (9th Cir. 1996).

Neither the Idaho legislature's amendment to § 18-622 nor the Idaho Supreme Court's decision *Planned Parenthood of the Great Nw. v. State,* 522 P.3d 1132, 1202-04 (Idaho 2023), changes this conclusion. The 2023 amendments to Idaho Code § 18-622 codified an exception for ectopic pregnancies and converted what was previously an affirmative defense into an exception for liability in situations where an abortion is necessary to prevent the pregnant woman's death. Those revisions do nothing to bring the two laws closer together in terms of what they require and what they prohibit. Likewise, the Idaho Supreme Court's *Planned Parenthood* decision does not eliminate the conflict. That court acknowledged the conflict between the two laws when it explained that § 18-622 "does *not* include the broader 'medical emergency' exception for abortions" contained in other statutes, and that EMTALA's broader definition of medical emergency "explains to medical providers" when "the Total Abortion Ban cannot be enforced." *Planned Parenthood Nw.*, 522 P.3d at 1196, 1207.

Finally, the fact that the Idaho Supreme Court adopted a subjective, good-faith medical judgment standard for the life-of-the-mother exception does not cure the uncertainty regarding what Idaho's Defense of Life Act allows medical professionals to do. *See Seyb Supp. Dec.* ¶ 19, Dkt. 2-2. Even in that situation, the state's prosecutors may call "other medical experts" to opine on "whether the

abortion was, in their expert opinion, medically necessary" as a way of calling into question the doctor's good faith. This aspect of Idaho's law was explored during the following exchange between Justice Barrett and counsel for Idaho:

| Justice Barrett: | What if the prosecutor thought differently? What if the prosecutor thought, well, I don't think any good-faith doctor could draw that conclusion, I'm going to put on my expert? |
| Idaho's Counsel: | …that, Your Honor, is the nature of prosecutorial discretion, and *it may result in … a case* . . . . |

*Transcript*, at 29:3-11 (emphasis added). Thus, notwithstanding the Idaho Supreme Court's adoption of a subjective, good-faith standard, Idaho Code § 18-622 will still deter the provision of EMTALA-mandated stabilizing care. The law is therefore preempted.

### ii. The Spending Clause

That Congress enacted EMTALA pursuant to its spending power does not change the above analysis. The Attorney General raises the novel constitutional argument—also asserted on appeal in *United States v. Idaho*—that the Supremacy Clause does not always apply to Spending Clause legislation. The Court rejects this inversion of the principles of federalism.

The Spending Clause empowers Congress to "lay and collect Taxes, . . . to pay the Debts and provide for the general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. "Put simply, Congress can tax and spend." *NFIB v.*

*Sebelius,* 567 U.S. 519, 537 (2012). When exercising its spending power, "Congress may attach conditions on the receipt of federal funds, and [it] has repeatedly employed the power to further broad policy objectives by conditioning receipt of the federal moneys upon compliance by the recipient with federal, statutory, and administrative directives." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (internal quotation marks and citations omitted). There are, however, restrictions to Congress' power to attach these conditions: (1) Congress must provide clear notice of any condition; (2) the condition must relate to the program or funding stream; (3) the condition may not be unduly coercive, and (4) the condition may not induce a recipient to violate another constitutional provision. *Id.* at 207-08.

Here, Idaho has not accepted the federal funds at issue; those funds are paid to the participating hospitals, including St. Luke's. Since Spending Clause legislation is viewed as being "much in the nature of a contract," this raises the problem that Idaho has not accepted the terms of this particular contract. *See generally NFIB v. Sebelius,* 567 U.S. 519, 576-77 (2012) (observing that the Supreme Court has "repeatedly characterized . . . Spending Clause legislation as 'much in the nature of a *contract*'") (emphasis in original; citation omitted). As the Attorney General puts it, "[t]he United States' contract with a private hospital cannot bind a nonconsenting state, any more than any contract can bind a

nonparty." *Response,* Dkt. 25-1, at 18.

But the point of requiring states to knowingly and voluntarily assent to conditions stated in Spending Clause legislation is that Congress would otherwise be unable to impose those conditions on the states. Those concerns are not present here. As the Supreme Court recognized in *Gonzales v. Oregon*, "[e]ven though regulation of health and safety is 'primarily, and historically, a matter of local concern,' *there is no question that the Federal Government can set uniform national standards in these areas.*" 546 U.S. 243, 271 (2006) (internal citations omitted; emphasis added). Thus, Congress may regulate the provision of emergency medical services under the Commerce Clause. *Cf. Gonzales v. Raich,* 545 U.S. 1, 9 (2005) (holding that the Commerce Clause empowers Congress to prohibit state-law-permitted individual marijuana cultivation for personal medical purposes); *see also Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 337 (2022) (Kavanaugh, J.) (recognizing that when it comes to abortion, "[t]he Constitution is neutral and leaves the issue for the people and their elected representatives to resolve through the democratic process in the States *or Congress* . . . .") (emphasis added).

The Court is not persuaded by the Attorney General's various arguments to the contrary. Among other things, the Attorney General says that although the Commerce Clause "authorizes Congress to *regulate* interstate commerce" it does

not allow Congress "to order individuals to engage in it." *NFIB*, 567 U.S. at 588.

He likens the situation here to the individual mandate at issue in *NFIB v. Sebelius*,

567 U.S. 519 (2012). But that analogy doesn't hold because the relevant parties are

already engaged in commerce: hospitals are already providing emergency

healthcare services and pregnant patients are already arriving at those hospitals

seeking emergency services.

Returning to the broader principle, then, Congress doesn't need Idaho's

consent here, because it could adopt the regulation directly. That the structure of

EMTALA suggests it was enacted under the Spending Clause instead of the

Commerce Clause doesn't change that conclusion. As the Supreme Court has

explained, "[t]he 'question of the constitutionality of action taken by Congress

does not depend on recitals of the power which it undertakes to exercise.'" *NFIB*,

567 U.S. at 570 (citing *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948)).

The Ninth Circuit confirmed this principle in *Nevada v. Skinner*, 884 F.2d

445 (9th Cir. 1989). There, Nevada argued that Congress had imposed coercive

conditions attendant to an exercise of its spending power by conditioning receipt of

highway funds on states' adoption of a 55-mph speed limit. *Id.* at 446-47. The

court held that the "anti-coercion principle" was "simply inapplicable" because

Congress could have imposed the 55-mph speed limit though an exercise of its

power to regulate commerce. *Id.* at 450. As the court explained, "if Congress has

the authority under the Commerce Clause to order a state directly to comply with a

particular standard such as a 55-mile-per-hour speed law, we see no reason why

Congress should be prohibited from reaching that same result *indirectly* by

withholding funds if the state fails to comply with that standard." *Id.* at 449. The

same is true here.

     This interpretation further reflects the Supreme Court's long-held

understanding that ordinary preemption principles apply to Spending Clause

legislation—even if private parties happen to be the recipients of the federal funds.

*See, e.g. Coventry Health Care of Mo., Inc. v. Nevils,* 581 U.S. 87, 95-99 (2017);

*Bennett v. Arkansas,* 485 U.S. 395, 396 (1988) (per curiam); *Lawrence County v.*

*Lead-Deadwood Sch. Dist. No. 40-1,* 469 U.S. 256, 269-70 (1985); *Philpott v.*

*Essex County Welfare Bd.,* 409 U.S. 413, 417 (1973); *United States v. Butler*, 297

U.S. 1 (1936). The Attorney General says these sorts of cases aren't relevant or

helpful. Among other things, he says some of the cases just cited—*Coventry*

*Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95-99 (2017) and *Bennett v.*

*Arkansas*, 485 U.S. 395, 396 (1988) (per curiam), for example—aren't even

Spending Clause cases. *Reply,* Dkt. 29, at 11. Granted, those two cases don't

explicitly discuss the Spending Clause. But the point is that the legislation at issue

was passed under Congress's spending power. So the foundational teaching is that

Spending Clause legislation traditionally has been subject to basic preemption

principles—even where a private party receives the federal funds. The Court sees no reason to depart from that basic principle.

### iii. The Text, Context, and Purpose of EMTALA

The Attorney General next contends that the text, context, and purpose of EMTALA "preclude reading it as a preempting abortion mandate." *Response,* Dkt. 25-1, at 23. This argument is primarily rooted in EMTALA's various references to protecting an "unborn child." *See* 42 U.S.C. § 1395dd(c)(1)(A)(ii), (2)(A), (e)(1)(A)(i), (e)(1)(B)(ii). The phrase "unborn child" appears four times in the text. Three of those references relate to transferring women who are in labor. *See* § 1395dd(c)(1)(A)(ii), (2)(A), (e)(1)(B)(ii). The fourth is contained in EMTALA's definition of an "emergency medical condition," which obligates a participating hospital to treat a condition that "[p]laces the health of the individual (or, with respect to a pregnant woman, the health of the woman and her unborn child) in serious jeopardy." § 1395dd(e)(1)(A)(i).

These references to the unborn child do not alter a hospital's core obligation to offer an abortion if that is the stabilizing treatment EMTALA guarantees. Having considered the parties' various arguments on this point (including arguments based on the concurring and dissenting opinions in *Moyle v. United States*, 603 U.S. 324 (2024)), the Court is persuaded by the reasoning set forth in Justice Kagan's concurring opinion. *See Moyle,* 603 U.S. at 330-31 (Kagan, J.,

concurring). As Justice Kagan explains, the parenthetical reference to an "unborn child" in EMTALA's definition of an emergency medical condition, which "was added in an amendment to EMTALA,[10] ensures that a woman with no health risks of her own can demand emergency-room treatment if her fetus is in peril. *It does not displace the hospital's duty to a woman whose life or health is in jeopardy, and who needs an abortion to stabilize her condition.* Then, the statute requires offering that treatment to the woman." *Moyle*, 603 U.S. at 331 (Kagan, J., concurring) (emphasis added).

In the Court's view, this is the correct reading of the statutory language. It's also worth noting that where an abortion is the necessary stabilizing treatment, the pregnancy complication means that the fetus will almost surely not survive, even absent an immediate termination. *See, e.g., Seyb Supp. Dec.* ¶¶ 10, 12 Dkt. 2-2 (describing two patients who presented at 18 and 23 weeks, with serious complications, where the fetuses would "almost certainly" not be viable). In those circumstances, there would be no treatment that could "assure, within reasonable medical probability, that no material deterioration" of the fetus's condition would be likely to occur.

---

[10] EMTALA was originally enacted in 1986 and amended in 1989. *Compare* 42 U.S.C. § 1395dd(c), (e), Pub. L. 99-272, 100 Stat. 164, 165-67 (1986), *with* 42 U.S.C. § 1395dd(c), (e), Pub. L. 101-239, 103 Stat. 2245, 2246-49 (1989).

The Court is likewise unpersuaded by the Attorney General's argument that EMTALA's purpose and context are inconsistent with what he calls "a preempting abortion mandate." The Attorney General correctly observes that a key purpose of EMTALA was to prevent "patient-dumping" by discharging or transferring critically ill patients who lacked insurance rather than providing them "the care they need." 131 Cong. Rec. 28, 569 (1985) (Sen. Kennedy). But the statute's text and legislative history show that patient-dumping was not the only concern. Rather, Congress's concern about "'patient dumping' reflected its commitment to a broader principle that 'every patient who has a bonafide emergency' should receive stabilizing care." *Id.* The statute Congress enacted plainly mandates that care.

The larger context in which EMTALA was enacted—particularly, the Hyde Amendment's restrictions on abortion funding—does not alter this conclusion. Congress enacted the first version of the Hyde Amendment in 1976 as a rider to an appropriations bill. The amendment restricted the use of federal funds to pay for abortion services. The language and scope of the Hyde Amendment changed over the years, but the version in effect when EMTALA was enacted and amended prohibited using federal funds to pay for abortions except when the life of the mother would be endangered if the fetus was carried to term. Given that context, the Attorney General say it is not plausible to conclude that EMTALA permits emergency abortions.

But the Hyde Amendment does not limit EMTALA's underlying

stabilization obligation. And just because an abortion—or any other stabilizing

treatment, for that matter—will not be subsidized with federal funds doesn't

excuse participating hospitals from EMTALA's stabilization mandate. Indeed,

much of the care EMTALA requires will not be subsidized by federal funds. The

United States made this point before the Supreme Court, offering this hypothetical:

> I'll give you an example of a Medicare patient who goes in and his
> emergency medical condition means he needs a particular drug that's
> not covered by his Medicare benefits. Still, the hospital has to provide
> him with stabilizing treatment and give him the medication, even
> though federal funding isn't going to pay for it.
>
> And that also applies to people who are uninsured, who aren't covered
> by Medicare in the first instance. The … whole point of EMTALA
> was it doesn't matter your circumstances, it doesn't matter whether
> you can pay or not, it doesn't matter the particulars of your situation,
> this is a guarantee. You can get the stabilizing treatment.

*Apr. 24, 2024 Tr.*, at 94:21 to 95:11.[11] Put another way, EMTALA and the Hyde

Amendment operate in separate spheres: the Hyde Amendment restricts using

federal funding to subsidize abortions while EMTALA deals with emergency

medical treatment, which may at times include abortions. The Attorney General's

arguments based on the Hyde Amendment are thus unpersuasive.

The Court believes the more relevant legislative context is found in

---

[11] The transcript is available here:
https://www.supremecourt.gov/oral_arguments/argument_transcript/2023.

Congress's passage of the Affordable Care Act. In a section of that Act dealing

entirely with abortion, Congress provided that the Affordable Care Act would not

require insurance plans to cover abortion and prohibited the use of federal

subsidies for abortions. 42 U.S.C. § 18023 (a), (b). But Congress also provided that

"[n]othing in this Act shall be construed to relieve any health care provider from

providing emergency services as required by State or Federal law, including

section 13955dd of this title (popularly known as 'EMTALA')." § 18023(d). With

this provision, the Affordable Care Act eliminated any doubt that Congress

considered abortion to be an "emergency service" under EMTALA. More to the

point here, if the Affordable Care Act contemplates an "abortion" as an EMTALA-

mandated emergency service, which it surely does, then EMTALA cannot require

hospitals to "protect an 'unborn child' in the way the Attorney General insists. *See*

*Br. of Amicus Am. Hosp. Ass'n*, Dkt. 19.

The Attorney General says this view of the Affordable Care Act is flawed

because another provision says state abortion laws are not preempted. But that

provision is limited to state laws regarding coverage, funding, and procedural

requirements. It provides:

> Nothing in this Act shall be construed to preempt or otherwise have
> any effect on State laws regarding the prohibition of (or requirement
> of) *coverage, funding, or procedural requirements on abortions*,
> including parental notification or consent for the performance of an
> abortion on a minor.

§ 18023(c)(1) (emphasis added). Idaho's Defense of Life Act is not the kind of procedural requirement covered by this provision. To the contrary, § 18-622 is a ban on the *performance* of an abortion—not a "procedural requirement[] on abortion." Accordingly, this preemption provision does not undermine the Court's conclusion that Affordable Care Act requires hospitals to provide emergency abortions if that is the necessary stabilizing treatment under EMTALA.

### iv. National Standard of Care

The Attorney General's next argument arises from cases holding that EMTALA does not establish a national standard of care. The logic is that because EMTALA does not establish a national standard of care, it cannot require hospitals to perform any specific medical procedure: "if state law prohibits a particular treatment, then the treatment is not available, and EMTALA does not require it." *Reply,* Dkt. 29, at 9; *see also Opp.,* Dkt. 25-1, at 23. Thus, the Attorney General says that even if terminating a pregnancy is the only treatment that will "stabilize" a patient with an "emergency medical condition" (as those terms are defined in EMTALA), and even if physicians at the hospital are capable of providing that treatment, EMTALA cannot require it. This interpretation distorts EMTALA's core mandate.

EMTALA does not create a private federal right of action for "medical malpractice" under "a national standard of care." *Bryant v. Adventist Health*

*System/West*, 289 F.3d 1162, 1166 (9th Cir. 2002); *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995). But that doesn't mean EMTALA has nothing to say about the type of screening examination or stabilizing treatment that must be performed. Rather, the larger point from these cases is that liability under EMTALA "is determined independently of whether any deficiencies in the screening or treatment provided by the hospital may be actionable as negligence or malpractice." *Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 173-174 (3d Cir.), *amended*, 586 F.3d 1011 (2009). A state-law malpractice action asks whether any aspect of the provider's treatment breached a duty of care as defined by state law. EMTALA asks a more focused question: Whether a provider satisfied a specific statutory obligation to provide an "appropriate medical screening examination" and to provide such treatment as necessary to "stabilize" an "emergency medical condition." 42 U.S.C. 1395dd(b)(1)(A).

The Ninth Circuit's decision in *Eberhardt v. City of Los Angeles*, 62 F.3d 1253 (9th Cir. 1995), illustrates how federal and state laws operate in these situations. There, the plaintiff sued a hospital and physician for discharging his son in an unstable mental condition, alleging that they had violated EMTALA's requirement to properly screen and stabilize him. Regarding the screening requirement, the court explained that "[t]he hospital's failure to detect the decedent's alleged suicidal tendency may be actionable under state medical

malpractice law, but not under EMTALA." *Id.* at 1258. But the court also explained that "Congress's refusal to impose a national standard of care does not mean that a hospital can discharge its duty under EMTALA by not providing *any* screening, or by providing screening at such a minimal level that it properly cannot be said that the screening is 'appropriate.'" *Id.* (citing *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 879 n.7 (4th Cir. 1992)). And to determine what "appropriate" meant, the court looked to the standard articulated in EMTALA: "The touchstone is whether, as § 1395dd(a) dictates, the procedure is designed to identify an 'emergency medical condition,' that is manifested by 'acute' and 'severe' symptoms." *Id.*

The *Eberhardt* court also had to decide if the hospital had violated EMTALA's stabilization requirement. That was an easier issue; the court decided there was no violation because the hospital hadn't detected an emergency medical condition in the first place. But the court nevertheless clarified that the hospital was independently obligated to satisfy EMTALA's stabilization requirement. And, once again, the Court noted that EMTALA's text would guide the inquiry:

> [W]e do note that the stabilization requirement is not met by simply dispensing uniform stabilizing treatment, but rather, by providing the treatment necessary "to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result...." 42 U.S.C. § 1395dd(e)(3)(A).

*Id.* at 1259 n.3 (citing *In the Matter of Baby K*, 16 F.3d 590, 596 (4th Cir. 1994)

(holding that "the Hospital must provide that treatment necessary to prevent the material deterioration of each patient's emergency medical condition")).

Under *Eberhardt*'s logic, although EMTALA does not supplant state medical malpractice law, states cannot enact legislation denying patients the right to an "appropriate" screening examination. Nor can states enact legislation denying the stabilizing care EMTALA guarantees. If they do, it is state law that must give way—not federal law.

## B. Likelihood of Irreparable Harm

Turning to likelihood of irreparable harm in the absence of an injunction, the Court easily finds St. Luke's has made this showing. Given the unique posture of this case, we've had a preview of what will happen in the absence of an injunction. When the Supreme Court stayed the injunction issued in *United State v. Idaho*, Justice Jackson rightly noted that a "months-long catastrophe" quickly ensued. *Moyle,* 603 U.S. at 338 (Jackson, J., dissenting). As described above, within a few months' time, St. Luke's had to airlift six pregnant women experiencing medical emergencies to neighboring states where they could receive the full range of stabilizing care warranted by their conditions. And given that Idaho has approximately 22,000 births per year, and a large number of high-risk pregnancies due to surrogacy, these emergency medical conditions likely will continue to occur for a sizeable number of pregnant patients within Idaho. *See Corrigan Dec.* ¶¶ 8,

19, *US v. Idaho* Dkt. 17-6; *Fleisher Dec.* ¶¶ 36-38, *US v. Idaho* Dkt. 17-3.

Allowing the law to go back into full effect would prevent St. Luke's medical providers from providing necessary care in emergency circumstances, resulting in significant and irreparable harm. And if St. Luke's is unable to provide this care, St. Luke's likely will be directly harmed, including a potential loss of Medicare funds, the possibility of private lawsuits by patients denied the stabilizing care mandated by EMTALA, and the potential loss of staff.

## C. The Balance of the Equities and the Public Interest

The next question is whether the balance of equities tips in the St. Luke's favor and whether an injunction is in the public interest. When the government is a party, these factors merge. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2020).

Looking first to the public at large, in the most general sense, "preventing a violation of the Supremacy Clause serves the public interest." *United States v. California*, 921 F.3d 865, 893-94 (9th Cir. 2019). But the equities also favor St. Luke's and the public in a more direct, tangible way. In the absence of an injunction, St. Luke's patients will be unable to access EMTALA-mandated stabilizing care, which, in turn, would likely lead to the patient-dumping EMTALA was designed to stop and which occurred when this Court's previous injunction was stayed.

The Attorney General says the equities and public interest favor him because Idaho should be able to exercise its powers without "unnecessary interference from federal overreach." *Opp.*, Dkt. 25-1, at 35. He argues the State has an interest in protecting unborn children and that "[e]ach day that the Act is enjoined undermines the public interest." *Id.* He also claims that Idaho's Defense of Life Act is saving lives: "[i]n 2023, the first full year in which Idaho's [abortion] laws were in effect, pregnancy-related deaths dropped by 44.4 % compared to 2021." *Id.* at 1. The Court has reservations about that reported statistic.[12] But assuming its accuracy, the argument ignores the fact that there was a limiting injunction in place during the vast majority of 2023.

It's also worth repeating that the injunction St. Luke's requests is a modest one. Even when the injunction is in place, the Attorney General will be free to

---

[12] The Attorney General cites an Idaho MMRC Annual Report to support this statistic. *See Opp.*, Dkt. 25-1, at 1 n.1. Even assuming, arguendo, that the data presented there is methodologically sound, there are other possible causes for a decrease in maternal deaths as reported by Idaho's Maternal Mortality Review Committee between 2021 and 2023. As one example, COVID-19 was responsible for four out of sixteen maternal deaths in 2021, but did not contribute to any of the eleven maternal deaths in 2023. *Compare* IDAHO DEP'T OF HEALTH AND WELFARE, MATERNAL MORTALITY REVIEW COMMITTEE ANNUAL REPORT (2021) *with* IDAHO DIV. OF OCCUP. & PRO. LICENSES, MATERNAL MORTALITY REVIEW COMMITTEE ANNUAL REPORT (2023). As another example, it is possible that patients chose to seek pregnancy care outside the state once Idaho's Defense of Life Act went into effect. Further, maternal death statistics do not capture non-fatal harm experienced by patients, which can be significantly increased by laws like Idaho's Defense of Life Act, as studies in other states with comparable laws have shown. *See* Lizzie Presser et al., *Texas Banned Abortion. Then Sepsis Rates Soared.*, PROPUBLICA (Feb. 20, 2025), https://www.propublica.org/article/texas-abortion-ban-sepsis-maternal-mortality-analysis (finding significant increase in sepsis after enactment of Texas's abortion ban).

enforce § 18-622 in almost all its applications. The injunction the Court intends to

enter will apply to the thinnest sliver of pregnant women—those who present to St.

Luke's with an "emergency medical condition," where abortion is the necessary

stabilizing care under EMTALA but not "necessary to prevent death." It is only in

that narrow circumstance that the Attorney General will be prevented from enforcing

Idaho law. Moreover, the Attorney General has asserted that Idaho law would allow

an abortion in these types of situations anyway. The Court does not agree with him

on that point, for reasons detailed above. But if he is correct, the preliminary

injunction would have no practical effect because it would never prevent

enforcement of Idaho's Defense of Life Act.

### D. The Scope of the Injunction

The final task is to determine the appropriate scope of the injunction. The

TRO currently in effect states:

> Specifically, the Attorney General, including his officers, employees,
> and agents, are prohibited from initiating any criminal prosecution
> against, attempting to suspend or revoke the professional license of, or
> seeking to impose any other form of liability on, any medical provider
> or hospital based on their performance of conduct that is defined as an
> "abortion" under Idaho Code § 18-604(1), but that is necessary to
> avoid: (i) "placing the health of" a pregnant patient "in serious
> jeopardy"; (ii) a "serious impairment to bodily functions" of the
> pregnant patient; or (iii) a "serious dysfunction of any bodily organ or
> part" of the pregnant patient, pursuant to 42 U.S.C. §
> 1395dd(e)(1)(A)(i)-(iii)

Dkt. 33, at 4. The TRO is only in effect until the Court issues this decision, so the

Court is free to change its mind about the scope of the TRO. And, in any event, the Ninth Circuit has "long recognized 'the well-established rule that a district judge always has power to modify or to overturn an interlocutory order or decision while it remains interlocutory.'" *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 809 (9th Cir. 1963)).

The Attorney General says the TRO should be narrowed in two respects. First, he says it shouldn't apply to anyone other than St. Luke's. Second, he says the Court restrained conduct that falls outside EMTALA's stabilization mandate. Put differently, the Attorney General says the TRO applies to too many people and restrains too much conduct.

### i.  The Scope of Conduct

The Court will begin with the scope of the conduct restrained. The Attorney General says the restraining order sweeps too broadly because it allows healthcare providers to ignore Idaho's Defense of Life Act when "necessary to avoid" an emergency medical condition, as opposed to when a patient is experiencing an emergency medical condition, as defined in EMTALA. According to this logic, the TRO prevents enforcement of Idaho Code § 18-622 before an "emergency medical condition" exists. St. Luke's says it does not interpret the existing language as doing anything more than enjoining § 18-622 to the extent it conflicts with

EMTALA. Still, though, it is amenable to revising the order to address the

Attorney General's concerns. St. Luke's suggests the revision shown here:

> Specifically, the Attorney General, including his officers, employees, and agents, are prohibited from initiating any criminal prosecution against, attempting to suspend or revoke the professional license of, or seeking to impose any other form of liability on, any medical provider or hospital based on their performance of conduct that is defined as an "abortion" under Idaho Code § 18-604(1), but that is ~~necessary to avoid: (i) "placing the health of" a pregnant patient "in serious jeopardy"; (ii) a "serious impairment to bodily functions" of the pregnant patient; or (iii) a "serious dysfunction of any bodily organ or part" of the pregnant patient, pursuant to 42 U.S.C. § 1395dd(e)(1)(A)(i)-(iii)~~ necessary to "stabilize" a patient presenting with an "emergency medical condition" as required by EMTALA pursuant to 42 U.S.C. § 1395dd(e)(1)(A), (3)(A).

This revised language continues to capture the intended effect of the injunction,

and the Attorney General has indicated that this revision addresses his concern

regarding the "necessary to avoid" framework. *See Reply*, Dkt. 43, at 11.

Accordingly, the Court will modify the injunction to incorporate this revision.

### ii. The Universal Injunction

The next issue is whether the injunction should apply to parties not before

the Court. The TRO the Court entered applied to "any medical provider or

hospital," yet St. Luke's is the only plaintiff before the Court. The Attorney

General says such an injunction is erroneous, particularly given the Supreme

Court's order in *Labrador v. Poe ex rel. Poe,* 144 S. Ct. 921 (2024), where several

members of the Supreme Court questioned the value of universal injunctions. *Id.* at

921–28 (Gorsuch, J., concurring, joined by Thomas, J. and Alito, J.); *id.* at 928-34 (Kavanaugh, J., concurring, joined by Barrett, J.).

"The general rule regarding the scope of preliminary injunctive relief is that it 'should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court.'" *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018), *rev'd in part, vacated in part*, 591 U.S. 1 (9th Cir. 2020) (citation omitted). And "where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (*quoting Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987)). Nonetheless, "broad injunctions are appropriate when necessary to remedy a plaintiff's harm." *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 986 (9th Cir. 2020). Similarly, "an injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Bresgal*, 843 F.2d at 1171-72 (emphasis in original).

Under this standard, the Court must be mindful that St. Luke's is the only plaintiff in this case; no other hospital system or provider has sued. And the primary harms St. Luke's alleges to itself include the potential loss of Medicare

funds, the possibility of private lawsuits by patients denied the stabilizing care

mandated by EMTALA, and the potential loss of staff (from criminal convictions

and licensure penalties) that would hamper St. Luke's ability to care for its

patients. *See St. Luke's Consolidated Opp. & Reply,* Dkt. 27, at 2 n.3; *Compl.,* Dkt.

1, ¶ 13, 44, 47. The Court finds that an injunction limited to St. Luke's and its

medical providers will suffice to address these alleged harms.

Granted, St. Luke's does not exist in vacuum, and it suggests it would not

have the capacity to accept transfers from other Idaho hospital systems, which, in

turn, would impact its ability to appropriately care for its patients. *See Response,*

Dkt. 39, at 3; *Seyb Supp. Dec.* ¶ 24, Dkt. 2-2. In other words, St. Luke's says this is

a systemic problem that justifies statewide relief. St. Luke's also says that if the

injunction is narrowed to cover only St. Luke's, this would create "difficult

administrability issues" because providers would be subject to different rules at

different hospitals. *Response,* Dkt. 39, at 6. The problem, however, is that the

Court must focus on the harm St. Luke's alleges to itself, and what sort of

injunction would remedy that harm. And the potential additional strain on St.

Luke's resources, as well as the stated "administrability issues," are—relatively

speaking—small and indirect harms. Thus, in keeping with the requirement that an

injunction be narrowly tailored to remedy the specific harm shown, the Court will

modify the restraining order. That said, the Court will not limit the injunction only

to St. Luke's; it will include St. Luke's medical providers as well. Although these

medical providers are not before the Court, a broader injunction is nonetheless

necessary. To redress the harms St. Luke's alleges to itself, St. Luke's medical

providers must have the ability to provide EMTALA-mandated stabilizing care.

### iii. St. Luke's "Concessions"

Finally, the Attorney General says the restraining order must be modified

such that it explicitly accounts for "St. Luke's concessions, which were in line with

the concessions of the United States Solicitor General." *Motion,* Dkt. 34, at 5

(citing Dkt. 2-1 at 17–18). This issue received very little attention in the briefing.

The Attorney General included a single sentence in his motion, which just directed

the Court to St. Luke's brief. The cited portion of the brief, in turn, discussed

statements the Solicitor General made during oral argument in *United States v.*

*Idaho.* These statements relate to mental health emergencies, post-viability

abortions, conscience protections, and the fact that EMTALA requires treatment

only when a medical situation is acute. The cited portion of St. Luke's brief states:

> The United States did not make any representations before the
> Supreme Court that were not already true about EMTALA's scope. It
> explained that: (1) EMTALA does not require pregnancy termination
> as stabilizing care to treat mental health conditions, (2) EMTALA
> does not require abortion after viability since post-viability, the
> pregnancy can terminate through delivery; (3) EMTALA requires
> treatment only when a medical situation is acute; and (4) EMTALA
> does not override conscience protections. But these points were
> always true about EMTALA; the EMTALA this Court confronts
> today is unchanged and its injunction's scope remains correct.

Dkt. 2-1, at 17 (internal citations omitted).

The Court does not find it necessary to modify the injunction to specifically address these four issues because nothing in the language of the existing TRO conflicts with any of the above statements. Nor does the Court find it necessary to add clarifying language. The Court notes that the Supreme Court was content to vacate its stay of a substantially identical injunction in *United States v. Idaho* without modification. That said, if the parties stipulate to additional language addressing these issues, the Court will consider it. But absent such a stipulation, the Court will deny the request related to these four issues.

### E. Bond Requirement

The Court will waive the bond requirement, finding that a bond under Rule 65 is unnecessary.

## ORDER

**1.** Defendant's Motion to Dismiss (Dkt. 25) is **DENIED.**

**2.** Plaintiff's Motion for a Preliminary Injunction (Dkt. 2) and Defendant's Motion to Modify the Universal TRO (Dkt. 34) are **GRANTED IN PART and DENIED in part**, in that the Court will enter the following preliminary injunction:

**3**. The Court orders that Attorney General Raúl Labrador—and his officers, employees, and agents—are preliminarily enjoined from enforcing Idaho Code § 18-622 against St. Luke's or any of its medical providers as applied to medical care

required by the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd. Specifically, the Attorney General, including his officers, employees, and agents, are prohibited from initiating any criminal prosecution against, attempting to suspend or revoke the professional license of, or seeking to impose any other form of liability on, St. Luke's or any of its medical providers based on their performance of conduct that is defined as an "abortion" under Idaho Code § 18-604(1), but that is necessary to "stabilize" a patient presenting with an "emergency medical condition" as required by EMTALA pursuant to 42 U.S.C. § 1395dd(e)(1)(A), (3)(A).

**4.** This preliminary injunction is effective immediately and shall remain in full force and effect through the date on which judgment is entered in this case.

DATED: March 20, 2025

B. Lynn Winmill
U.S. District Court Judge